UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ISAAC RICHEY,

                                  Plaintiff,            1:23-cv-00344-AMN-DJS

        -against-


ANN MARIE T. SULLIVAN, MD, in her Individual
and Official Capacity, NEW YORK STATE OFFICE
OF MENTAL HEALTH, NEW YORK STATE OFFICE
OF NICS APPEALS AND SAFE ACT, LI-WEN GRACE
LEE, M.D., Individually, CARMEN BARBER, Individually,
TONY TRAHAN, Individually, and DOES 1-5 in
their individual capacities,

                                Defendants.
-----------------------------------------------------------------x



# MEMORANDUM OF LAW

# IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


**Amy L. Bellantoni, Bar No. 701018**
***Attorney for Plaintiff***
**THE BELLANTONI LAW FIRM, PLLC**
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**abell@bellantoni-law.com**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES..................................................................................................... i

PRELIMINARY STATEMENT............................................................................................... 1

I. OFFICIAL CAPACITY CLAIMS AGAINST THE COMMISSIONER ARE PROPER .......... 6

    A. Second Amendment Claims ........................................................................................ 6

    B. Fourteenth Amendment Due Process ......................................................................... 7

    C. Commissioner Sullivan is Enforcing an Unconstitutional State Statute that Conflicts With Federal Law – MHL 7.09(j) ....................................................................................... 7

II. STATE CONFLATES 'INVOLUNTARY' WITH A FINDING OF 'DANGEROUSNESS' ........................................................................................................... 9

III. THE STATE'S INTERPRETATION OF MHL 9.39 ADMISSIONS IS INCONSISTENT WITH 18 U.S.C. 922(g)(4), 27 C.F.R. 478.11 AND THE SECOND AMENDMENT ............... 10

    A. No New York Case Cited Involves a Second Amendment Challenge ...................... 11

    B. *Phelps v. Bosco* Did Not Involve Second Amendment or Due Process Claims......... 12

    C. *Escamilla* is Flawed – and Not Controlling ............................................................. 13

IV. PLAINTIFF'S FOURTH AMENDMENT CLAIMS ARE PROPER................................... 14

V. PLAINTIFF WAS NOT REQUIRED TO SEEK STATE COURT REMEDIES ................... 15

    A. Exhaustion Not Required .......................................................................................... 15

    B. Plaintiff's Due Process Claims Have No Statutory Remedy in New York ................ 15

VI. PLAINTIFF'S DUE PROCESS CLAMS ARE TIMELY ...................................................... 17

VII. INDIVIDUAL CAPACITY CLAIMS SHOULD NOT BE DISMISSED ............................ 18

    A. The State is Far Afield of the Four Corners of the Complaint ................................... 18

    B. Defendants are Not Entitled to Judicial Immunity.................................................... 19

VIII. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ........................... 22

CONCLUSION..................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buckley v. Fitzsimmons*,
    509 U.S. 259 (1993) ............................................................................. 21

*Burns v. Reed*,
    500 U.S. 478 (1991) ............................................................................. 21

*Butcher v. City of McAlester*,
    956 F.2d 973 (10th Cir.1992) ............................................................... 15

*Clark v. Yosemite Community College Dist.*,
    785 F.2d 781 (9th Cir.1986) ................................................................. 15

*Colihan v. State*,
    211 A.D.3d 1432 (3d Dept. 2022) ........................................................ 12

*Eagleston v. Guido*,
    41 F.3d 865 (2d Cir.1994) .................................................................... 17

*Escamilla v. United States*,
    62 F.4th 367 (7th Cir. 2023) ................................................................. 13

*Galvin v. N.Y. Racing Ass'n*,
    70 F.Supp.2d 163 (E.D.N.Y.1998) ....................................................... 17

*Heck v. Humphrey*,
    512 U.S. 477 (1994) ............................................................................. 15

*Imbler v. Pachtman*,
    424 U.S. 409 (1976) ............................................................................. 21

*In re Gault*,
    387 U.S. 1 (1967) ................................................................................. 17

*Kantarakias v. Kim*,
    226 A.D.3d 1020 (2d Dept. 2024) ........................................................ 12

*Katz v. United States*,
    389 U.S. 347 (1967) ............................................................................. 14

*Malley v. Briggs*,
    475 U.S. 335 (1986) ............................................................................. 21

*Matter of George L.*,
   85 N.Y.2d 295 (1995) ........................................................................ 11

*Mione v. McGrath*,
   435 F. Supp. 2d 266 (S.D.N.Y. 2006) .............................................. 17

*Monroe v. Pape*,
   365 U.S. 167 (1961) ........................................................................ 15

*Montero v. Travis*,
   171 F.3d 757 (2d Cir. 1999) ............................................................ 20

*NYSRPA v. Bruen*,
   597 U.S. 1 (2022) ................................................................... 13, 22

*Olivier v. Robert L. Yeager Mental Health Ctr.*,
   398 F.3d 183 (2d Cir. 2005) ............................................................ 11

*Patsy v. Board of Regents of the State of Fla.*,
   457 U.S. 496 (1982) ........................................................................ 15

*People v. Leon*,
   63 F.4th 132 (2d Cir. 2023) ............................................................ 20

*Phelps v. Bosco*,
   711 F. App'x 63 (2d Cir. 2018) ................................................ 12, 13

*Pierson v. Ray*,
   386 U.S. 547 (1967) ........................................................................ 21

*Rehberg v. Paulk*,
   566 U.S. 356 (2012) ........................................................................ 21

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007) ............................................................ 18

*Soldal v. Cook Cnty., Ill.*,
   506 U.S. 56 (1992) .......................................................................... 14

*Spinelli v. City of New York*,
   579 F.3d 160 (2d Cir. 2009) ............................................................ 17

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
   837 F.3d 678 (6th Cir. 2016) .......................................................... 11

*United States v. Jacobsen*,
  466 U.S. 109 (1984) ............................................................................... 14

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) ................................................................... 5, 9, 22

*United States v. Rehlander*,
  666 F.3d 45 (1st Cir. 2012) ............................................................. 10, 12

*Wetzel v. Town of Orangetown*,
  2010 WL 743039 (S.D.N.Y. Mar. 2, 2010) ......................................... 19

*Wilbur v. Harris*,
  53 F.3d 542 (2d Cir. 1995) .................................................................. 15

*Zinermon v. Burch*,
  494 U.S. 113 (1990) ............................................................................ 16

## Statutes

18 U.S.C. 921(a)(3) .................................................................................. 8
18 U.S.C. 922(g)(4) ......................................................................... Passim
18 U.S.C. section 922 (d)(4) and (g)(4) ................................................... 8
N.Y. Mental Hygiene Law § 7.09 ............................................................. 8
Federal NICS Improvement Amendments Act of 2007, Public Law 110-180, section 105 ................ 7
N.Y. Criminal Procedure Law § 402 ......................................................... 2
N.Y. Criminal Procedure Law § 508 ......................................................... 2

## Rules

N.Y. CPLR 7803 ..................................................................................... 20
Fed.R.Civ.P. 12(b)(6) ............................................................................. 18
Fed.R.App.P. 32.1 .................................................................................. 12
Fed.R.Civ.P. 12 ........................................................................................ 1

## Regulations

14 N.Y.C.R.R. § 543.4(b) .................................................................. 1, 2, 4
14 NYCRR 543.1(b) ............................................................................. 7, 8
27 C.F.R. § 478.11 ......................................................................... Passim

## PRELIMINARY STATEMENT

Isaac Richey ("Plaintiff") submits the within memorandum of law in opposition to Defendants' motion to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12((b)(1) and (6).

Plaintiff has never been found to be a "dangerous" individual or adjudicated as mentally defective, nor has he experienced any hospitalization or event for which the termination of his right to possess firearms can be justified by the State under America's national historical traditions of firearm regulation.[1]

To adopt the State's position would mean that anyone who was admitted to a hospital for a period of observation and evaluation is automatically deemed "involuntarily committed." The State, and to be sure, the case law as well, also intermingles and conflates the terms "admitted" and "committed," but the federal statute specifically bars those "committed to a mental institution" from possessing firearms. 27 C.F.R. § 478.11; 18 U.S.C. 922(g)(4); 14 N.Y.C.R.R. § 543.4(b).

New York's 14 N.Y.C.R.R. § 543.4(b) mirrors the federal statute,[2] including language that acknowledging that "such term does not include a person in a mental institution for observation or a voluntary admission to a mental institution."

---

[1] The State's claim that reporting of Plaintiff to NICS is "not necessarily a permanent bar from possessing or purchasing firearms" is disingenuous [State Br. at 6]. Plaintiff's firearm rights have been terminated by Defendants' reporting to NICS of his hospital admission under MHL 9.39. There is no 'automatic' reinstatement of rights under New York law. And, as applied to Plaintiff, Defendants denied his request to have his rights reinstated.

[2] "Committed to a mental institution means, as such term is defined in Federal regulations at 27 C.F.R. 478.11, a formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. Such term includes a commitment to a mental institution involuntarily; commitment for mental defectiveness or mental illness; and commitments for other reasons, such as for drug use, provided, however, that such term does not include a person in a mental institution for observation or a voluntary admission to a mental institution…"

However, 14 N.Y.C.R.R. § 543.4(b) goes on to declare that, "For purposes of this Part, committed to a mental institution shall include persons who have been involuntarily committed or confined pursuant to article 9 or 10 of the Mental Hygiene Law, article 730 or section 330.20 of the Criminal Procedure Law, section 402 or 508 of the Correction Law, or section 322.2 or 353.4 of the Family Court Act."

The inclusion of Article 9 is overly broad and unconstitutional, facially and as applied to Plaintiff because Article 9 includes § 9.39 entitled, "Emergency   admissions   for   immediate observation, care, and treatment."

According to the plain language of the statute, individuals admitted to a hospital under § 9.39 are only "*alleged* to be mentally ill." No formal adjudication has been done prior to such admission. Yet, such individuals are reported to the OMH Office of NICS Appeals and included in the NICS reporting database *upon admission.* Many of such people, like Plaintiff, are observed, evaluated, and discharged without ever being "involuntarily committed" under MHL § 9.27 or 9.37.

Indeed, even if a court holds a hearing under MHL § 9.39 by which it "shall hear testimony and examine the person alleged to be mentally ill" and determines that "there is reasonable cause to believe that the patient has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others," that post-hearing order "shall not be deemed to be an adjudication that the patient is mentally ill, but only a determination that there is reasonable cause to retain the patient" for evaluation and observation.

***No Legislative Intent That MHL § 9.39 is an Adjudication or Formal Determination***

The plain language of MHL § 9.39 bears out the legislative intent to categorize MHL § 9.39 as a period of evaluation that shall not have the effect of an "adjudication" or any formal finding or determination that the individual, in fact, is mentally defective.

Individuals who are admitted pursuant to MHL § 9.39 and discharged without being converted to an involuntary commitment fall within the federal exception to NICS reporting requirements for individuals who were only admitted for observation [and then discharged after being evaluated].

This interpretation is buttressed by a review of the other New York State NICS reporting statutes under Article 10  of the Mental Hygiene Law, article 730 and section 330.20 of the Criminal Procedure Law, section 402 and 508 of the Correction Law, and sections 322.2 and 353.4 of the Family Court Act.

MHL Article 10, entitled "Sex Offenders Requiring Civil Commitment or Supervision," pertains to sexual predators who, by definition, are individuals who are an adjudicated to be a danger to the public.

Under Article 730 and section 330.20 of the Criminal Procedure Law, which concern a mental disease or defect excluding an individuals' fitness to proceed in a criminal action, also involve adjudications where the court "must adjudicate him or her an incapacitated person, and must issue a final order of observation or an order of commitment." CPL § 730.50.

 Family Court Act § 322.2 involves incapacitated juveniles lacking the mental capacity to aid in their own defense and 353.4 authorizes the court-ordered transfer of juvenile delinquent if adjudicated to have a "mental illness, or intellectual or developmental disability…likely to result

in serious harm to himself or herself or others" to "the office of children and family services or…local commissioner of social services". See also, Correction Law § 402.

### Finding of 'Dangerousness' vs. Mere Allegations

The issue in this Second Amendment challenge is the *finding* of dangerousness. Not all provisions of Article 9 involve a *finding* of dangerousness. And there is no historical analogue for terminating one's Second Amendment rights based on a mere allegation.

As with the adjudications discussed above, MHL 9.37 requires a psychiatric finding of dangerousness. Under MHL 9.37, a hospital may involuntarily admit a patient who "*has* a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others," (emphasis added).

MHL § 9.45 also requires a psychiatric finding of dangerousness. Under MHL 9.45, a hospital is authorized to involuntarily confine an individual upon a report that the person "*has* a mental illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others."

In stark contrast, 9.39 and 9.41 are only allegations that a person might have a mental illness. Section 9.39 authorizes the involuntary admission of "any person *alleged* to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others."

### Federal Statute Exempts Involuntary Admissions for 'Observation'

Federal rule 27 C.F.R. § 478.11 and New York State rule 14 N.Y.C.R.R. § 543.4(b) acknowledge that "a person in a mental institution for observation **or** a voluntary admission to a mental institution" do not constitute prohibited persons.

4

The regulations distinguish between a "voluntary" admission and an admission for "observation." Meaning that an involuntary "observation" is not a disqualifying event. The State's focus on the word "involuntary" is a red herring argument that must be rejected for the regulatory distinction to hold any meaning.

### An Admission for Observation and Evaluation is Not a Rights-Terminating Event

Similar to MHL 9.41, which authorizes the police to seize [by definition, involuntarily] of an individual who "appears to be mentally ill" and "acting in a manner likely to result in serious harm to himself or others," a hospital admission for a period of evaluation and observation under MHL 9.39 just an allegation of mental illness.[3] Neither are the equivalent of a formal adjudication of dangerousness, as with the statutes concerning the criminally insane, deviant sexual predators, and those who are mentally defective and unable to assist in their own defense.[4]

Adopting the State's view, no provision of New York State's mental hygiene law exists where an individual can be admitted to a hospital, evaluated, observed, declared by a psychiatrist *not* to be a danger to himself or others and discharged and maintain their Second Amendment rights. It is not the involuntariness of the admission, but the adjudication – the finding – of dangerousness that affects the constitutional right. Anyone can be involuntarily held in a hospital until observed and 'cleared,' but without a finding after a psychiatric evaluation that a person is

---

[3] While MHL §§ 9.13 and 9.15 allow persons to voluntarily admit themselves to a hospital for mental health treatment, without having to show that they pose a threat to themselves or to others, individuals like Plaintiff who voluntarily seek admission at a hospital are not admitted under MHL §§ 9.13 and 9.15 – they are admitted under MHL 9.39 and improperly reported to the state NICS reporting database. See also, Giannavola v. Lee, M.D. et al, 6:24-cv-06096-FPG [ECF 1 (plaintiff voluntarily drove himself to the hospital talk to someone about having recently lost his job, was admitted under MHL 9.39, and reported to NICS)]; D.B. v. Sullivan, MD et al., 1:22-cv-00282-MAD-CFH [ECF at 15 (plaintiff voluntarily drove himself to the hospital admitted himself for evaluation, was discharged without conversion to involuntary commitment; yet, hospital records classified him under MHL 9.39 admission and reported him to the state NICS reporting database)].

[4] Notably, MHL Article 81 – Proceedings for Appointment of a Guardian- is not included within this reporting requirement – again, bearing out the fact that a *formal adjudication* of *dangerousness* underlies the interference with Second Amendment rights. See e.g., *United States v. Rahimi*, 144 S. Ct. 1889 (2024).

mentally ill and a danger to others, there has been no forfeiture of the individual's Second Amendment rights. The State's interpretation of the federal statute [27 C.F.R. § 478.11] is plainly erroneous and must be rejected.

In addition to Plaintiff's facial challenge, the complaint also sufficiently pleads as-applied constitutional violations.

For the reasons stated herein, the State's motion should be denied, except where expressly consented to.[5]

## I. OFFICIAL CAPACITY CLAIMS AGAINST THE COMMISSIONER ARE PROPER

The State's defenses to Plaintiff's official capacity claims are rooted in two theories: (i) the idea that the OMH reporting of MHL 9.39 admissions is properly conducted pursuant to federal law; and (ii) the idea that Sullivan is entitled to quasi-judicial immunity in her capacity as the determiner of applications for certificates of relief related to firearm possession.

Plaintiff's official capacity claims against Sullivan are properly before this Court because she has the authority to enforce the relief sought from this Court.

### A. Second Amendment Claims

If the Court determines that the State has failed to identify a national America tradition of terminating an individual's right to possess firearms because they were alleged to be dangerous, or admitted to a hospital for an evaluation and observation and discharged, then as the Commissioner of OMH – the NICS reporting agency – Sullivan may properly be enjoined from reporting such individuals to NICS.

---

[5] Plaintiff does not oppose that part of the motion seeking dismissal of the claims against the named state agencies, to wit, the New York State Office of Mental Health and New York State Office of NICS Appeals and SAFE Act.

**B. Fourteenth Amendment Due Process**

If the Court determines that Sullivan, as the Commissioner of OMH, has no process in place to notify individuals that they have been reported to the OMH state reporting database, and/or that by being in the OMH NICS reporting database their right to possess and purchase firearms has been terminated – consistent with the **notice** required by the Fourteenth Amendment – then Sullivan is the proper party to be named to require that OMH put such notifications in place.

**C.    Commissioner Sullivan is Enforcing an Unconstitutional State Statute that Conflicts With Federal Law – MHL 7.09(j)**

Commissioner Sullivan is not entitled to quasi-judicial immunity, as she is not enforcing federal law (nor does she have any authority to enforce federal law). Sullivan is enforcing an overly broad and unconstitutional state law that conflicts with 18 U.S.C. 922(g)(4), 27 C.F.R. 478.11, and the NARIP.

Under NARIP[6], the Brady Act was amended to establish the National Instant Criminal Background Check System (NICS). 14 NYCRR 543.1(b) [Complaint at ¶ 27]. The NARIP was developed to improve the completeness, automation, and transmission of records to state and federal systems used by the NICS. These include records of criminal history, felony convictions, warrants, protective orders, convictions for misdemeanors involving domestic violence and stalking, drug arrests and convictions, mental health adjudications, and other information that may disqualify an individual from possessing or receiving a firearm under federal law [*Id.* at ¶28]. The NICS Index contains records provided by local, state, and federal agencies about persons prohibited from receiving firearms under federal law [*Id.* at ¶29].[7]

---

[6] Federal NICS Improvement Amendments Act of 2007, Public Law 110-180, section 105.
[7] https://bjs.ojp.gov/programs/nics-improvement-amendments-act#7k6m7f

NICS contains records concerning certain events, such as criminal convictions and mental health adjudications that may disqualify a person from purchasing a firearm. All records in the NICS Index are considered "federally disqualifying records" and will prohibit the transfer of a firearm. 14 NYCRR 543.1(b). [Complaint at ¶¶ 30-31].

NARIP also requires participating states, in exchange for receiving federal funds for such reporting, to establish a "certificate of relief from disabilities" process to permit a person who has been or may be disqualified from possessing a firearm pursuant to 18 U.S.C. section 922 (d)(4) and (g)(4) to petition for relief from that disability. 14 NYCRR 543.1(b) [*Id.* at ¶ 32].

By enforcing the state law challenged herein, Sullivan is violating NARIP by reporting individuals to NICS who are explicitly exempt from reporting requirements under 27 C.F.R. 478.11.

An injunction against Commissioner Sullivan will provide Plaintiff with the relief that he seeks because it will prevent Sullivan from reporting to NICS that he is a prohibited person within the meaning of 18 U.S.C. 922(g)(4) and 27 C.F.R. 478.11.

Sullivan has the authority to effect Plaintiff's relief because, as the Commissioner of Mental Health, she is the executive tasked with enforcing MHL 7.09(j)(1).

New York Mental Hygiene Law § 7.09  authorizes OMH (Sullivan) to collect, retain, modify, or transmit data or records for inclusion in the NICS system for the purpose of responding to NICS queries regarding attempts to purchase or otherwise take possession of firearms, as defined in 18 U.S.C. 921(a)(3).

By holding that, *inter alia,* MHL 9.39 is not a reportable event and/or does rise to the level of affecting one's Second Amendment rights, by declaring that MHL 7.09(j)(1) is

unconstitutionally overbroad, Plaintiff's information will no longer be reported to NICS and the barrier to his right to possess and purchase firearms will be lifted.

## II.  STATE CONFLATES 'INVOLUNTARY' WITH A FINDING OF 'DANGEROUSNESS'

The premise behind NICS reporting is to prevent dangerous people from possessing firearms. The mere fact that an individual is 'involuntarily' held does not equate to a psychiatric, judicial, or statutory finding of dangerousness or an adjudication that a person is mentally defective.

And there is no American tradition of imposing upon an individual's Second Amendment rights based on a non-adjudicated allegation. It is inconsistent with the principles that "underpin our regulatory traditions" to terminate an individual's Second Amendment rights because they were held to be evaluated, found not to be dangerous, and then discharged. *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).

The State's theory is akin to an individual jailed at the police station for a felony offense, who is cleared by a detectives' evaluation of the case and released, but having their Second Amendment rights terminated as if they had been convicted.

No finding of 'dangerousness' has taken place at the moment of a MHL 9.39 admission. If, during the evaluation period a psychiatric evaluation is conducted and the individual is determined to be a danger to himself or others, s/he is committed under MHL § 9.37.

MHL 9.37 admissions involve a psychiatric finding of dangerousness; *at admission* under 9.37 a psychiatric finding has *already occurred* finding that the individual "*has* a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others," (emphasis added).

In marked contrast, a MHL 9.39 all that is concluded is that there is an allegation that the individual may have a mental illness rendering them a danger to themselves or others.

If an individual being observed under MHL 9.39 is evaluated by a staff psychiatrist and found not to be a danger to self or others, there is no substantive basis to "commit" the individual – and, therefore, no basis to report them to NICS.[8] Plaintiff's discharge without a conversion to a MHL 9.37 admission means that, at admission he was alleged to have a mental illness and at discharge he psychiatrically cleared from being a danger to himself or others; therefore, there is no point in time in which Plaintiff was found, adjudicated, or deemed to be 'dangerous' as a result of a mental illness.

## III. THE STATE'S INTERPRETATION OF MHL 9.39 ADMISSIONS IS INCONSISTENT WITH 18 U.S.C. 922(g)(4), 27 C.F.R. 478.11 AND THE SECOND AMENDMENT

The federal and state cases cited by the State are either not controlling, did not involve Second Amendment challenges, or both.

Other courts that have addressed the issue of mental health confinements support Plaintiff's Second Amendment claims.

In *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012) the First Circuit held that 18 U.S.C. 922(g)(4) "could not be read to encompass temporary involuntary emergency hospitalization" based on due process grounds because the state statute "permits three-day involuntary hospitalizations (earlier it was five days) without any adversary proceeding and with no finding by an independent judicial or even administrative officer that the subject is either mentally disturbed or dangerous." *Rehlander*, 666 F.3d at 48.

---

[8] One might say that, at the point that a person is discharged from a MHL 9.39 they, more than anyone else in society, is the safest person to possess firearms because of the existence and immediate recency of the psychiatric evaluation deeming them non-dangerous.

Similarly, MHL 9.39 offers no pre-admission due process and under 9.39(a)(2) the patient may be held for up to five (5) days without any judicial oversight.

In *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016), a challenge to 18 U.S.C. 922(g)(4) decided under the pre-*Bruen* intermediate scrutiny standard, the Sixth Circuit held that the plaintiff stated a Second Amendment violation as there is no indication of the continued risk presented by people who were involuntarily committed many years ago and who have no history of intervening mental illness, criminal activity, or substance abuse."

*Tyler* supports Plaintiff's Second Amendment as-applied challenge to Defendants' denial of his application for a Certificate of Relief, as Plaintiff has no prior arrests, charges, or convictions and no disqualifiers to firearm possession, as reflected by the fingerprint-based criminal history report from the FBI and New York State Division of Criminal Justice Services provided in his certificate of relief application packet [Complaint ¶ 107]. Plaintiff has also never been hospitalized for any mental health purposes in any other hospital before or since the admission at issue [Complaint at ¶¶ 89-91].

And while the plaintiff in *Tyler* had been committed for approximately one month and "adjudicated as a mental defective" [*id.* at 699], the court's observation that, "Congress' evidence seems to focus solely on the risk posed by those presently mentally ill and who have been recently committed" underscores the conclusion that Congress did not intend that 18 U.S.C. 922(g)(4) would encompass a fleeting period of evaluation and observation that resulted in a psychiatric finding that the individual is not a danger to himself or others, as in Plaintiff's case.

### A. No New York Case Cited Involves a Second Amendment Challenge

*Phelps* discussed below, did not involve any constitutional challenges. *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183 (2d Cir. 2005) involved a lawsuit against a hospital for

due process violations related to the plaintiff's confinement. *Matter of George L.*, 85 N.Y.2d 295, 648 N.E.2d 475 (1995) involved "an acute paranoid schizophrenic who had been found not responsible, by reason of mental disease or defect, of attempting to murder his father with a hunting knife, constituted a physical danger to himself or others." As an insanity acquittee, *George* is decidedly not comparable to a MHL 9.39 observatory admission.

In *Colihan v. State*, 211 A.D.3d 1432, 1437 (3d Dept. 2022) was brought pursuant to CPLR Article 78. Constitutional challenges may not be raised in an Article 78 proceeding. See, *Kantarakias v. Kim*, 226 A.D.3d 1020, 1021–22 (2d Dept. 2024) (constitutional challenges are not properly brought pursuant to CPLR article 78).

**B. *Phelps v. Bosco* Did Not Involve Second Amendment or Due Process Claims**

*First*, *Phelps* is a summary order that has no precedential effect.[9] *Second*, Phelps did not raise a constitutional challenge on appeal, which the Second Circuit noted, if he had, "would present complex issues, whether under the Second Amendment or the Due Process Clause." *Phelps*, 711 F. App'x at 65 ("We therefore do not consider whether the state violated any of his constitutional rights when it reported his hospitalizations to the FBI or whether concern for these constitutional rights might change our interpretation of the word "commitment" under New York's scheme. Cf. *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012) (determining that recent

---

[9] "RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL." *Phelps v. Bosco*, 711 F. App'x 63 (2d Cir. 2018).

developments in Second Amendment law should affect the treatment, under federal law, of a "commitment" under Maine law).").

Third, Phelps was properly in New York State's NICS reporting database (OMH) because he had a previous hospitalization under MHL § 9.37[10] which authorizes the involuntary admission of an individual who "*has a mental illness* for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others." (emphasis added).

### C. *Escamilla* is Flawed – and Not Controlling

*Escamilla v. United States*, 62 F.4th 367, 373 (7th Cir. 2023) is also not controlling precedent. There, the Seventh Circuit determines that an admission to a New York hospital under MHL 9.39 met the standard of a "commitment to a mental institution." Its reasoning was flawed, however.

Relying on state court interpretation of MHL 9.39  as an involuntary admission, it ignored the fact that a hospital under MHL 9.39 is not an adjudication of 'dangerousness.'

Moreover, the court failed to engage in any historical analysis under the test announced in *NYSRPA v. Bruen*, 597 U.S. 1 (2022) of whether the government had identified a national historical tradition of permanently disarming individuals who were merely alleged to be mentally ill, or who were subject to a period of observation and discharged.

Indeed, even where the factual allegations presented at admission might lead one to believe that an individual is a danger to themselves or others at that moment, the 'cool down' period of observation and evaluation allow the staff psychiatrist to determine whether the person is, in fact,

---

[10] *Phelps*, 711 F. App'x at 64.

mentally defective and in need of conversion to an involuntary commitment under MHL 9.27 or 9.37 – or whether the circumstances were situational in nature, requiring the person's discharge for failure to meet the standard for admission under 9.27 or 9.37.

That temporary period of disarmament (by virtue of being confined in a hospital) may pass constitutional muster, but once a psychiatrist determines after evaluation that the MHL 9.39 person does not meet the MHL 9.27 or 9.37 standard for involuntary commitment, meaning that they do not pose a danger to themselves or others, the person must be discharged. At that point, disarming such individual violates the Second Amendment.

*Escamilla* also did not address the exemption from federal law for confinement for "observation." MHL 9.37 commitments are 'involuntary' but require a finding that the individual *has* a mental illness…" Again, adopting the idea that MHL 9.39 admissions fall within the federal standard, which delineates between "voluntary admissions" and admissions for "observation" in its exemptions, would mean that any "emergency observation" in a New York hospital – voluntarily or otherwise -  will result in permanent disarmament – even if you are discharged without being converted to a finding of dangerousness under MHL 9.37.

## IV.  PLAINTIFF'S FOURTH AMENDMENT CLAIMS ARE PROPER

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56 (1992) quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "The language of the Fourth Amendment—which protects people from unreasonable searches and seizures of "their persons, houses, papers, and effects"… and this Court's cases unmistakably hold that the Amendment protects property even where privacy or liberty is not implicated." *Id.* citing *Katz v. United States*, 389 U.S. 347, 350 (1967).

By erroneously reporting Plaintiff to NICS as a prohibited person, Defendants have caused a meaningful interference with Plaintiff's possessory interest in his firearms. By dispossessing him of his firearms, because he may no longer legally possess or purchase firearms, Defendants' conduct has implicated Plaintiff's Fourth Amendment rights.

## V.  PLAINTIFF WAS NOT REQUIRED TO SEEK STATE COURT REMEDIES

### A. Exhaustion Not Required

As the Supreme Court has clearly held, the "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." *Wilbur v. Harris*, 53 F.3d 542, 544 (2d Cir. 1995) quoting *Patsy v. Board of Regents of the State of Fla.*, 457 U.S. 496, 516 (1982); *Heck v. Humphrey*, 512 U.S. 477 (1994) ("§ 1983 contains no exhaustion requirement beyond what Congress has provided"); *Monroe v. Pape*, 365 U.S. 167, 183 (1961) (§ 1983 plaintiff need not exhaust state court remedies); *Butcher v. City of McAlester*, 956 F.2d 973, 979 (10th Cir.1992) (existence of state unfair labor practice procedures does not create exhaustion requirement in suit under § 1983 by municipal employees alleging "union busting" by city in violation of First Amendment); *Clark v. Yosemite Community College Dist.*, 785 F.2d 781, 790–91 (9th Cir.1986) (exhaustion not required).

### B. Plaintiff's Due Process Claims Have No Statutory Remedy in New York

Contrary to the State's representation to this Court [State Br. at 20], Plaintiff's pre- and post-deprivation challenges are not grounded in Defendants' denial of Plaintiff's application for a certificate of relief. The denial of his application is grounded the Second Amendment, which does not require Plaintiff to seek or exhaust administrative remedies.

Plaintiff's pre- and post-deprivation due process claims involve the failure of Defendants to provide any notice and an opportunity to be heard before he was reported to NICS as a prohibited

person. Plaintiff was reported to OMH and entered into the state NICS reporting database upon his admission to Samaritan Hospital on January 28, 2019 [Complaint at ¶ 83]. Upon his discharge from Samaritan hospital, Plaintiff returned to the Infantry Unit of the United States Army where he completed his service and, later, received an Honorable Discharge in April 2020 [Complaint at ¶¶ 93-94]. Plaintiff had no knowledge that his firearm rights were terminated until September 12, 2022 [Complaint at ¶99].

While § 1983 claims for due process violations may require analysis of state remedies, New York state law does not provide an avenue for Plaintiff to seek or receive due process for the violations complained of herein. See, *Zinermon v. Burch*, 494 U.S. 113, 125–26 (1990) (due process claims require analysis of state remedies because the constitutional violation on which to base a § 1983 claim is not complete until life, liberty, or property is deprived without due process of law).

Neither the MHL nor any other state statute, including Article 78, provides individuals who have been added to the OMH NICS reporting database with an avenue for pre-deprivation due process, nor has the State identified any.

Likewise, there is no statute that provide Plaintiff with the ability to challenge the fact that Defendants' failure to provide any notice that he was being reported to the NICS database and that his firearm rights were terminated by New York State (OMH) violated his right to post-deprivation due process. If Plaintiff had not attempted to purchase another firearm, he would never have known that his right to possess his existing firearms and to purchase new ones had been terminated – or that by then-possessing his [previously owned] firearms, he was violating federal law.

Case 1:23-cv-00344-AJB-DJS    Document 50    Filed 10/25/24    Page 23 of 29

The lack of any notice from OMH before and/or after an individual is put into the state database and reported to NICS (terminating Second Amendment rights) violates the Fourteenth Amendment right to pre- and post-deprivation due process.

Plaintiff's due process claims should not be dismissed.

## VI.  PLAINTIFF'S DUE PROCESS CLAMS ARE TIMELY[11]

Section 1983 claims accrue when a plaintiff learns or has reason to learn of the alleged injury that forms the basis of the action. *Mione v. McGrath*, 435 F. Supp. 2d 266, 269 (S.D.N.Y. 2006) citing *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir.1994).

"Notice, to comply with due process requirements, ... must set forth the alleged misconduct with particularity." *Spinelli v. City of New York*, 579 F.3d 160, 171–72 (2d Cir. 2009) quoting *In re Gault*, 387 U.S. 1, 33 (1967) (internal quotation marks omitted). The particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case; however, due process notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations. The degree of required specificity also increases with the significance of the interests at stake." *Id.* citing *Galvin v. N.Y. Racing Ass'n*, 70 F.Supp.2d 163, 176 (E.D.N.Y.1998).

The interests implicated here – enumerated, basic Second Amendment rights to possess firearms – is "substantial." See, e.g., *Spinelli v. City of New York*, 579 F.3d at 172 (finding the interest in that case - "the practice of one's chosen profession" – to be "substantial").

Plaintiff's due process claims are grounded in the absence of any "notice" by Defendants. Plaintiff did not know, nor did he have reason to know until 2022, that Defendants were reporting him to NICS as a prohibited person.

---

[11] Defendants only challenge Plaintiff's due process claims as untimely.

Plaintiff's admission was only for "observation and evaluation" under MHL 9.39, he requested that he be brought to Samaritan Hospital for an evaluation – a voluntary admission; when he was discharged he returned to the Infantry Unit of the U.S. Army to continue his duties, he never saw a judge nor was adjudicated as a danger to himself or others, continued to have access to firearms, and continued to serve the remainder of his commitment to the United States Army and received an Honorable Discharge in 2020 [Complaint ¶¶ 82-95].

Defendants provided **no notice** to Plaintiff.

It was not until he attempted to purchase a firearm that Plaintiff learned was denied by the NICS system and, upon requesting the reasons from the FBI, learned that he was being reported to NICS by New York (Defendants) as a person who has been "adjudicated as a mental defective or who has been committed to a mental institution" and advised to contact the Office of NICS Appeals and SAFE Act (Defendants).

Plaintiff filed an application with Defendants for a certificate of relief, which was denied on July 28, 2022; this action was commenced on March 17, 2023.

## VII. INDIVIDUAL CAPACITY CLAIMS SHOULD NOT BE DISMISSED

### A. The State is Far Afield of the Four Corners of the Complaint

In support of their qualified immunity argument, Defendants improperly insert factual allegations into their motion that are not contained within the complaint.

When considering a motion under Fed.R.Civ.P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

For instance, the State's representations about the tasks and duties of the panel members is improperly included, and inaccurate. The State posits that the "determination of whether an official

is entitled to absolute immunity must be based on a functional approach" [State Br. at 10] – but Defendants have not been subject to discovery to be questioned above their exact functions as panel members. It is known that the three (3) panel members consists of a psychiatrist (Lee), an attorney (Barber) and a consumer services representative (Trahan). As set forth below, which is also outside of the Complaint but provided because the State has forced Plaintiff's hand, Defendants are not entitled to judicial immunity – quasi- or otherwise.

**B. Defendants are Not Entitled to Judicial Immunity**

Defendants do not act in a quasi-judicial capacity. Unlike an administrative hearing officer who presides over disputes between parties, Defendants are not reviewing evidence, or adjudicating claims, they review the documents required to be presented under the statute. Nor are they applying a "legal standard."

Quasi-judicial immunity extends to administrative officials like administrative law judges and hearing examiners because they perform judicial functions like presiding over disciplinary proceedings, 207-c hearings, worker's compensation hearings, wherein they hear and receive evidence from the parties, rule on the admissibility of evidence, and performing discretionary acts of a judicial nature. See, *Wetzel v. Town of Orangetown*, No. 06 CIV. 6117 SCR, 2010 WL 743039, at \*15 (S.D.N.Y. Mar. 2, 2010) (citing cases).

There are no 'parties' or 'adversaries' in an application for a certificate of relief to restore firearm rights. The applicant submits the documents required by the statute and waits for a response. Sometimes, after the packet is accepted, the applicant is required to undergo a clinical evaluation by an OMH doctor (remotely) and the panel might request additional documentation from the applicant before forming a decision. But, there is no hearing, no "evidence," no rulings, no appearances, no adversarial process, no legal arguments, and no "adjudication" of the

applicant's rights. There is a decision made that will affect an applicant's constitutional rights, but his rights are not being "adjudicated" by the panel members.

Nor are Defendants comparable to Parole Board members, who are granted quasi-judicial immunity because of their proximity to the judicial criminal process. In holding that parole board members are entitled to quasi-judicial immunity, the Second Circuit in *Peoples v. Leon* observed that the "Supreme Court has extended absolute immunity to others who perform functions closely associated with the judicial process, such as federal hearing examiners and administrative law judges. *Leon*, 63 F.4th 132, 138 (2d Cir. 2023) citing *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999) ("[W]e join our sister circuits and hold directly that parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole."). Defendants do not have any nexus to the judicial process.

To the extent that the State is arguing that the Panel members adjudicate the mental fitness of an applicant to possess firearms, that frivolous theory must be rejected. Of the three (3) panel members only one is a psychiatrist – Dr. Lee. The other two members – an attorney (Barber) and a customer service representative (Trahan) have no more experience or credentials to assess and render a determination of whether an applicant's mental health is such that restoring their firearm rights would or would not be contrary to the public interest than anyone else. The non-doctors are not "adjudicating" an applicant's mental status.

Shrouding the defendants with immunity will leave individuals with no recourse for vindicating the permanent termination of enumerated constitutional rights by Defendants. And state CPLR Article 78 proceedings, as noted above, *do not* allow a petitioner to pursue claims for violations of the United States constitution. See also, CPLR 7803, *et seq.*

Nor can Defendants receive absolute immunity simply because they fear the consequences of their violations of individual's constitutional rights. To impose that shield would erroneously insulate them from their unconstitutional acts, and harm the People for whom the constitution was enacted.

Moreover, there is no common law counterpart for granting Defendants immunity.

Congress gave "no clear indication" in passing § 1983 that it "meant to abolish wholesale all common-law immunities." *Pierson v. Ray*, 386 U.S. 547, 554 (1967). When an official asserts absolute immunity, the court must conduct "a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976). This inquiry involves "consulting the common law to identify those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed." *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012) (cleaned up) citing *Burns v. Reed*, 500 U.S. 478, 484-86 (1991) (citations omitted). While the scope of immunity at common law in 1871 does not exclusively define its scope under § 1983, the inquiry nevertheless remains grounded in historical analogy. Judges "do not have a license to create immunities based solely on [their] view of sound policy." *Rehberg,* 566 U.S. at 363. A court must first determine whether an official claiming immunity under § 1983 can point to a common-law counterpart to the privilege he asserts; if a sufficiently analogous counterpart exists, the court is then to consider whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions. *Malley v. Briggs*, 475 U.S. 335, 339-40 (1986) (cleaned up). The absence of support at common law is dispositive. *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 n. 5 (1993) (denying absolute immunity for state actor where "there is no common-law tradition of immunity for it").

21

## VIII. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

A determination of qualified immunity at this early stage in the proceedings is unwarranted. *First,* the facts as alleged make out a constitutional right, particularly the Second Amendment claim which cannot be dismissed at this stage. Plaintiff has met his burden of demonstrating that he is seeking to engage in conduct protected by the plain text – possessing arms. Defendants must justify the regulation they are enforcing against Plaintiff by proving that their regulations are consistent with this nation's historical tradition of firearm regulations. *Bruen*, 597 U.S. at 17.

While there is a historical tradition of temporarily disarming people who pose a danger to others [*Rahimi*, 144 S. Ct. at 1901("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed")], that is not the case here. Plaintiff was never a threat to others and, to the extent that he sought a mental health evaluation at a hospital, he was in a rational state of mind to request such assistance and was evaluated by a psychiatrist and discharged because he did not meet the criteria to me involuntarily committed under MHL 9.37.  Plaintiff has no criminal convictions, no allegations of threats to others, and he had access to weapons and received an Honorable Discharge from the military after his hospitalization.

Continuing to report Plaintiff to NICS as a "dangerous" person by denying his application, and placing him in the database in the first instance, both violate established Second Amendment rights.

The issue is not that Plaintiff is "entitled to a certificate of relief" [State Br. at 15]. The issue is that Plaintiff has protected, preexisting rights under the Second Amendment that cannot be taken away unless he has been adjudicated to be a "dangerous" person (initial reporting) or remains a "dangerous person" (denial of his application). In other words, Defendants are reporting a non-dangerous person to the NICS database, continuing to pose an absolute barrier to Plaintiff's

exercise of presumptively protected rights. But "the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Rahimi*, 144 S. Ct. at 1902. No such finding was made against Plaintiff.

## CONCLUSION

Defendants' motion to dismiss should be denied in its entirety, except where expressly consented to.

Dated: October 25, 2024
      Scarsdale, New York

                              THE BELLANTONI LAW FIRM, PLLC
                              *Attorneys for Plaintiff*

By:    *Amy L. Bellantoni*
                              Amy L. Bellantoni
                              2 Overhill Road, Suite 400
                              Scarsdale, New York 10583
                              abell@bellantoni-law.com