**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

ISAAC RICHEY,

    Plaintiff,

   -v-         1:23-CV-344 (AJB/DJS)

ANN MARIE T. SULLIVAN *et al.*,

    Defendants.
_____

**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION and ORDER

## I.  INTRODUCTION

On March 17, 2023, plaintiff Isaac Richey ("Richey"), a resident of the state of Texas, filed this 42 U.S.C. § 1983 action seeking injunctive, declaratory, and monetary relief for violations of his civil rights under the Second, Fourth, and Fourteenth Amendments. Richey's initial complaint named the New York State Office of Mental Health ("OMH"), the New York State Office of NICs Appeals and SAFE Act (the "NICS Appeals Office"); Ann Marie T. Sullivan, M.D., the Commissioner of OMH ("Commissioner Sullivan"); and Does 1-10 as defendants. Dkt. No. 1. Richey alleged various civil rights violations and challenged provisions of the New York Mental Hygiene Law, both facially and as applied. *See* Dkt. No. 1 ¶¶ 40–65.

Defendants answered Richey's complaint on June 9, 2023, and the case proceeded to discovery. Dkt. No. 9.

Richey ascertained the identities of three of the Doe defendants and was granted leave to amend his complaint. Dkt. No. 31. Richey filed an amended complaint on August 27, 2024, *see*

Am. Compl., Dkt. No. 39,[1] again naming OMH, the NICS Appeals Office, and Commissioner

Sullivan as defendants, and adding Li-Wen Grace Lee, M.D., Carmen Barber, Tony Trahan,

Does 1-3 ("Panel Member defendants"), and Does 4 and 5 as defendants.  Richey alleged

violations of his Fourth and Fourteenth Amendment rights and challenged Section 7.09(j) of the

New York Mental Hygiene Law ("MHL § 7.09(j)"), facially and as applied to him, on Second

Amendment grounds.

Broadly speaking, Richey argues that defendants unlawfully applied provisions of the

Mental Hygiene Law to permanently disarm him, based solely on a single temporary mental

health-related hospitalization in 2019.  He further contends that defendants violated his

constitutional rights by including and maintaining a record of that hospitalization in the National

Instant Criminal Background Check System ("NICS database") without notifying him.

On October 4, 2024, defendants moved to dismiss the amended complaint pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  *See* Defs.' Mem., Dkt. No. 45-2.[2]

Defendants' motion has been fully briefed, Dkt. Nos. 50–51, and will be considered on

the basis of the submissions without oral argument.

## II.    BACKGROUND

Given the complexity of the statutory regime encompassing the provision challenged by

Richey, the Court begins with a brief overview of the relevant federal and state legislative

background.

---

[1]   The amended complaint is sequentially numbered by line. Accordingly, citations to the pleading and exhibits correspond with that document's internal pagination.

[2]   Briefing pagination corresponds to the electronically generated CM/ECF headers.

## A.     Statutory Background

"The Gun Control Act of 1968 created a number of provisions designed 'to deny access to guns and ammunition to . . . defined special risk groups.'"  *Phelps v. Bosco*, 711 F. App'x 63, 64 (2d Cir. 2018) (summary order) (quoting Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. LEGAL STUD. 133, 152 (1975)).  "Among those 'special risk groups' who are not allowed to buy guns and to whom dealers are not allowed sell guns are those who 'ha[ve] been committed to any mental institution.'"  *Phelps*, 711 F. App'x at 64 (citing 18 U.S.C. § 922(g)(4)).

"In 1993, to better enable enforcement of its gun control laws, Congress enacted the Brady Handgun Violence Prevention Act ('Brady Act'), which is codified at 18 U.S.C. § 922(t)."  *Susman v. Sullivan*, 2025 WL 575515, at *4 (W.D.N.Y. Feb. 21, 2025).  "The Brady Act 'require[d] the Attorney General to establish a national instant background[ ]check system by November 30, 1998.'"  *Id.*  (quoting *Printz v. United States*, 521 U.S. 898, 902 (1997)).  "The result was NICS, which refers to the system managed by the FBI . . . that provides information 'on whether receipt of a firearm by a [particular person] . . . would violate [f]ederal or state law.'"  *Susman*, 2025 WL 575515, at *4 (citing 28 C.F.R. § 25.2).

"While NICS is a creation of the federal government, it operates with assistance from the states.  Indeed, as noted above, the NICS [database] includes records from both federal and state agencies."  *Susman*, 2025 WL 575515, at *4.  "In 2007, Congress passed the NICS Improvement Amendments Act, which aimed to make the federal background check system more comprehensive, including by providing grants to assist states in submitting all relevant records to NICS."  *Id.* at *5 (citing NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 122 Stat. 2559).

"In response to the NICS Improvement Amendments Act, 'New York State law was amended to allow relevant mental health records to be made accessible to NICS.'" *Susman*, 2025 WL 575515, at *5 (quoting *Montgomery v. Cuomo*, 291 F. Supp. 3d 303, 316 (W.D.N.Y. 2018)). New York's record-sharing statutory provision provides, in relevant part, that:

> (j)(1) The commissioner [of OMH] . . . shall collect, retain or modify data or records, and shall transmit such data or records:
>
>> (i) to the division of criminal justice services, or to the criminal justice information services division of the federal bureau of investigation, for the purposes of responding to queries to the [NICS databases] regarding attempts to purchase or otherwise take possession of firearms . . . or
>>
>> (ii) to the division of criminal justice services, which may re-disclose such data and records . . . for determining whether a person is no longer permitted under federal or state law to possess a firearm. Such records . . . shall include only names and other non-clinical identifying information of persons who have been *involuntarily committed to a hospital pursuant to article nine of this chapter* . . . .

N.Y. MENTAL HYG. LAW § 7.09(j)(1) (emphasis supplied).

The Mental Hygiene Law defines "hospital" as "the in-patient services of a psychiatric center under the jurisdiction of [OMH]," "a psychiatric in-patient facility maintained by a political subdivision of the state," "a ward, wing, unit, or other part of a hospital . . . operated as a part of such hospital for the purpose of providing services for the mentally ill," "or other facility providing in-patient care or treatment of the mentally ill . . ." N.Y. MENTAL HYG. LAW § 1.03.

OMH regulations define "committed to a mental institution" as:

> a formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. Such term includes a commitment to a mental institution involuntarily; commitment for mental defectiveness or mental illness; and commitments for other reasons, such as for drug use, provided, however, that such term does not include a person in a mental institution for observation or a voluntary admission to a mental institution. For purposes of this Part, committed to a mental institution shall include persons who have been

- 4 -

involuntarily committed or confined pursuant to article 9 or 10 of the Mental Hygiene Law . . . .

14 N.Y.C.R.R. § 543.4.

Finally, as required by the NICS Improvement Amendments Act, New York adopted MHL § 7.09(j)(2), which "sets forth a process for removing a name from the NICS list by seeking a certificate of relief from disabilities." *Houston v. Nassau Cnty. Police Dep't*, 2020 WL 7643132, at *3 (E.D.N.Y. Dec. 23, 2020). A certificate of relief from disabilities may be granted where the Commissioner of OMH or her designee(s) determine that a "person's record and reputation are such that such person will not be likely to act in a manner dangerous to public safety and where the granting of the relief would not be contrary to public safety." N.Y. MENTAL HYG. LAW § 7.09(j)(2).

## B.    Factual Background

The following facts are taken from the amended complaint and will be assumed true for the purpose of assessing the motion to dismiss.

Richey is a resident of Texas. Am. Compl. ¶ 4. In 2019, Richey was stationed at Fort Drum in Jefferson County as an active-duty member of the United States Army in the Infantry Division. *Id*. ¶ 82. Richey had access to firearms while stationed at Fort Drum. *Id*.

On January 28, 2019, Richey sought mental health counseling because he had been feeling depressed. Am. Compl. ¶ 82. At Richey's request, military police transported him to Samaritan Medical Center in Watertown, New York ("Samaritan"). *Id*. He was admitted to Samaritan under New York Mental Hygiene Law Section 9.39 ("MHL § 9.39"), which provides for the "emergency observation, examination, care, and treatment of . . . any person alleged to have a mental illness . . . which is likely to result in serious harm to himself or others" (the "2019

Admission"). *Id.* ¶ 85. Richey remained at Samaritan pursuant to MHL § 9.39 until he was released without conditions on February 5, 2019. *See id.* ¶ 86.

Notably, Richey had never been hospitalized for mental health reasons prior to the 2019 Admission. Am. Compl. ¶ 95. He has not been hospitalized for mental health-related treatment since the 2019 Admission. *Id.* After he was released from Samaritan, Richey returned to Fort Drum, where he continued to have access to firearms as he served out the remainder of his commitment to the U.S. Army. *Id.* ¶ 93. Richey was honorably discharged on April 15, 2020. *Id.* ¶ 94.

At some point in 2022, Richey attempted to purchase a firearm from a federal firearm licensee. Am. Compl. ¶ 97. In a letter dated September 12, 2022 (the "FBI Letter"), the FBI advised Richey that his purchase had been denied because he was identified in the National Instant Criminal Background Check System ("NICS database") as being prohibited from possessing a firearm due to either adjudication as a mental defective or commitment to a mental institution. *Id.* ¶ 99. The FBI Letter informed Richey that his firearm purchase could not be approved until his NICS record was updated or removed. *Id.* ¶ 101. It further advised Richey to contact the NICS Appeals Office "to obtain further information relating to the prohibiting record." *Id.*

Defendants claim that Richey applied for a certificate of relief from disabilities in November 2021.[3] Defs.' Mem. at 4. However, the amended complaint is silent as to when Richey submitted his application. *See generally* Am. Compl.

---

[3] This would suggest that Richey may have attempted to purchase a firearm in 2021, rather than 2022, receiving the FBI Letter on September 12, 2021. However, the Court must take the facts in the amended complaint as true for purposes of this motion, and the amended complaint is silent as to when Richey submitted his application for a certificate of relief from disabilities.

Sometime after Richey's release from Samaritan, but prior to July 28, 2022, Richey applied to the NICS Appeals Office for a certificate of relief from disabilities pursuant to MHL § 7.09(j)(2), which, if granted, would have prompted removal of the prohibiting record from the NICS database. *See* Am. Compl. ¶¶ 103-104; *see also* 14 N.Y.C.R.R. § 542.5(c)(2). The Panel Member defendants reviewed, considered, and made the final determination as to Richey's application. Am. Compl. ¶ 12. On or around July 28, 2022, the Panel Member defendants denied Richey's application for relief. Am. Compl. ¶ 108.

In sum, Richey alleges that he is unable to lawfully purchase or possess a firearm because his personal information is maintained within or transmitted to the NICS database by defendants due to the 2019 Admission. Am. Compl. ¶¶ 108, 110–11.

## III.    LEGAL STANDARDS

Defendants move to dismiss under Rule 12(b)(1) and 12(b)(6). The standards of review under these two provisions are "substantively identical." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003), *abrogated on other grounds by Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 94 n.5 (2d Cir. 2019). Even so, courts usually tackle 12(b)(1) arguments first: jurisdictional challenges go to the ability to entertain a dispute, so they should be resolved before reaching any merits-based questions, such as plausibility. *See, e.g., Daly v. Citigroup Inc.*, 939 F.3d 415, 426 (2d Cir. 2019).

### A.    Fed. R. Civ. P. 12(b)(1)

The Federal Rules of Civil Procedure permit a party to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.

2000).  The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence.  *Id*.

"'In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true[ ] and draw all reasonable inferences in favor of the party asserting jurisdiction.'"  *Cayuga Nation v. New York State Gaming Comm'n*, 2025 WL 959204, at *3 (N.D.N.Y. Mar. 31, 2025) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).

## B.    Fed. R. Civ. P. 12(b)(6)

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*; *see also Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) ("[T]he '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" (quoting *Twombly*, 550 U.S. at 555)).

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and

matters of which judicial notice may be taken.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV.    DISCUSSION

Defendants have moved to dismiss the amended complaint in its entirety.  Defs.' Mem. at 3.  Specifically, defendants argue that (1) OMH and the NICS Appeals office are immune from suit under the Eleventh Amendment; (2) plaintiff has not plausibly alleged a Fourth Amendment violation; (3) plaintiff's due process claims are untimely, but regardless, plaintiff has not plausibly alleged a due process violation; (4) to the extent plaintiff makes a facial constitutional challenge, it fails; and (5) the Panel Member defendants and Commissioner Sullivan are entitled to either quasi-judicial or qualified immunity.

In opposition, plaintiff argues that (1) he has stated a claim for violations of his Fourth and Fourteenth Amendment rights; (2) he has plausibly alleged that MHL § 7.09(j) is unconstitutional on its face; and (3) the Panel Members and Commissioner Sullivan are not entitled to quasi-judicial or qualified immunity.

### A.    Sovereign Immunity

First, the Court considers whether OMH and the NICS Appeals Office are entitled to sovereign immunity, warranting dismissal on jurisdictional grounds.

#### 1.    New York State Agency defendants

Defendants contend that plaintiff's § 1983 claims against OMH and the NICS Appeals Office are barred by the Eleventh Amendment.  Defs.' Mem. at 10–11.  Richey does not oppose defendants' motion insofar as it seeks dismissal of the named state agencies.  Pl.'s Opp., Dkt. No. 50, at 6, n. 5.

"The Eleventh Amendment prohibits the 'Judicial power of the United States' from extending to 'any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'" *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (quoting U.S. Const. amend. XI.).

"This jurisdictional bar also immunizes a state entity that is an 'arm of the State.'" *In re Deposit Ins. Agency*, 482 F.3d at 617 (citing *N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.,* 547 U.S. 189 (2006)); *see also Kisembo v. New York State Off. of Child. & Fam. Servs.*, 285 F. Supp. 3d 509, 519 (N.D.N.Y. 2018) ("'As a general rule, state governments and their agencies may not be sued in federal court unless they have waived their Eleventh Amendment immunity or there has been a valid abrogation of that immunity by Congress.'" (quoting *Jackson v. Battaglia*, 63 F.Supp.3d 214, 219–20 (N.D.N.Y. 2014)).

Richey's amended complaint names OMH as a defendant.  However, "OMH is an arm of the state[,]  [and] New York State has not waived its sovereign immunity.  Nor has Congress, through § 1983, abrogated the state's immunity." *Lane v. New York State Off. of Mental Health*, 2012 WL 94619, at *2 (S.D.N.Y. Jan. 11, 2012) (citing *Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 31 (2d Cir. 1991)).

Richey also names as a defendant the New York State Office of NICS Appeals and Safe Act, but the same bar applies: the NICS Appeals Office is an arm of the State, which is entitled to sovereign immunity.  *See Lane*, 2012 WL 94619, at *2.

Accordingly, OMH and the NICS Appeals Office must be dismissed as defendants because they are immune from suit under the Eleventh Amendment.

### 2.        Commissioner Sullivan in her official capacity[4]

"*Ex parte Young* established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution." *Brokamp v. James*, 573 F. Supp. 3d 696, 708 (N.D.N.Y. 2021) (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)), *aff'd*, 66 F.4th 374 (2d Cir. 2023). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [1] [the] complaint alleges an ongoing violation of federal law and[,] [2] seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296 (1997)).

### i.    Ongoing violation

Richey alleges that defendants continue "to maintain [his] personal identifying information" and "continue to knowingly and falsely communicate" his information to the NICS database. Am. Compl. ¶¶ 111, 119. He further alleges that defendants "have no statutory authority to communicate to, *inter alia*, NICS that Plaintiff was 'involuntarily committed' to a mental health facility; and that [defendants'] refusal to remove Plaintiff from the SAFE Act database is violating his constitutional rights." Am. Compl. ¶ 116.

These allegations sufficiently state an ongoing violation of federal law. "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction." *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 281. In particular, plausible allegations that a plaintiff's records are being maintained in violation of

---

[4] Defendants seek dismissal of Commissioner Sullivan based on quasi-judicial immunity. Defs.' Mem. at 19-21. However, as discussed *infra* Section IV.D.1-2, there is no allegation that Commissioner Sullivan had any personal involvement in evaluating Richey's application for a certificate of relief from disabilities. Am. Compl. ¶¶ 11-12.

federal law satisfy the "ongoing violation" requirement.  *Cf. T.W. v. New York State Bd. of L. Examiners*, 110 F.4th 71, 94 (2d Cir. 2024) ("[I]f [plaintiff] had alleged that the Board's maintenance of records violated Title II, her claim may well have survived."), *cert. denied sub nom. T. W. v. New York Bd. of L. Examiners*, No. 24-714, 2025 WL 1426672 (U.S. May 19, 2025).

Defendants' argument that Commissioner Sullivan lacks the authority to remedy the allegedly ongoing violation is unavailing.  Defs.' Mem. at 19–20.  Section 7.09 of the Mental Hygiene Law explicitly provides that, "[t]he commissioner . . . shall collect, retain or modify data or records, and shall transmit such data or records . . . for determining whether a person is no longer permitted under federal or state law to possess a firearm."  N.Y. MENTAL HYG. LAW § 7.09 (j)(1); *see also* Am. Compl. ¶ 38.  Further, under 14 N.Y.C.R.R. § 543.6,

> [t]he Office of Mental Health, on being made aware that the basis under which a record was made available by the Office [NICS] does not apply or no longer applies, shall, as soon as practicable:
>
> (a) update, correct, modify or remove the record from any database that the Federal or State government maintains . . . .

14 N.Y.C.R.R. § 543.6.

In short, Richey has plausibly alleged that OMH's maintenance and/or transmission of his information to the NICS database violates the Second Amendment, and that Commissioner Sullivan has a sufficient connection to the maintenance and transmission of OMH records to the NICS database.  Am. Compl. ¶¶ 38, 111, 116, 119.

### ii.  Prospective relief

Richey seeks, *inter alia*, [5] an order (1) "enjoining Defendants' inclusion and maintenance of Plaintiff's records information in the state database," and (2) "enjoining Defendants' reporting to NICS. . . information concerning Plaintiff that identifies him as a person prohibited from possession, purchasing, transferring, or receiving firearms in connection with his 2019 [A]dmission."  Am. Compl. at p. 24.

"[T]he doctrine of *Ex parte Young* permits federal courts to grant injunctions against state officials, but it only permits injunctions to prevent future violations of federal law."  *T.W. v. New York State Bd. of L. Examiners*, 110 F.4th at 94.

Richey's prayer for injunctive relief can be sufficiently characterized as prospective.  If granted, it would require Commissioner Sullivan to terminate the ongoing maintenance and communication of Richey's information insofar as it concerns the 2019 Admission.  Richey maintains that "[w]ithout the requested injunctive relief, Plaintiff will continue to suffer concrete and actual constitutional harm, to wit, the inability to purchase, possess, and/or receive firearms."  Am. Compl. ¶ 132.

Accordingly, this action may proceed against Commissioner Sullivan in her official capacity under the *Ex parte Young* doctrine.

**B.     Plaintiff has failed to plead a Fourth Amendment violation**

Next, the Court will determine whether plaintiff has plausibly alleged a violation of his Fourth Amendment rights.

---

[5] Richey also seeks declaratory relief.  "Declaratory judgments form part of the injunctive relief allowed for under *Ex parte Young*." *Brown v. New York*, 975 F. Supp. 2d 209, 225 (N.D.N.Y. 2013).  "However, declaratory relief is not permitted under *Ex parte Young* when it would serve to declare only past actions in violation of federal law."  *Id*. Although some of the declaratory relief sought by Richey would appear to be retrospective, his official-capacity claims against Commissioner Sullivan survive because he also seeks relief fairly characterized as prospective.

Richey asserts a § 1983 claim alleging a violation of his Fourth Amendment rights "[u]nder the theory that Defendants are liable. . . for failing to train, supervise, monitor, and discipline."  Am. Compl. ¶ 134.  Defendants have moved to dismiss this claim on the grounds that Richey has failed to state a claim upon which relief can be granted.  Defs.' Mem. at 21-22.

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  Reasonableness in this context is "generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) (cleaned up).

Upon review, this § 1983 claim must be dismissed.  The Court is unaware of any legal basis for a Fourth Amendment claim predicated solely on an alleged failure to train, supervise, monitor, and discipline.

In a fruitless attempt to reframe this claim, Richey asserts that it is based on the theory that defendants violated his Fourth Amendment rights by "dispossessing him of his firearms."  Pl.'s Opp., Dkt. No. 50 at 21.  However, Richey's amended complaint lacks any allegation of a search or a seizure, reasonable or otherwise.

Accordingly, Richey's § 1983 claim under the Fourth Amendment must be dismissed.

## C.    Plaintiff's Fourteenth Amendment due process claims

Next, the Court turns to Richey's Fourteenth Amendment due process claims. Richey brings both pre-deprivation and post-deprivation due process claims.  Am. Compl. ¶¶ 138, 140.

### 1.    Timeliness

Defendants argue that Richey's pre-deprivation due process claim should be dismissed as untimely.  *See* Defs.' Mem. at 25.

"[I]n New York, the statute of limitations for Section 1983 claims is New York's general statute of limitations for personal injury actions, N.Y. C.P.L.R. § 214(5), which is three years." *Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 108 (2d Cir. 2023). "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. The claim accrues when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001).

Richey summarizes his due process claim as follows:

> Defendants have no process or procedure to notify individuals when (and that) their personal identifying information (i) has been entered into the SAFE Act database for NICS reporting purposes, or (ii) is being communicated to NICS to prevent Second Amendment-protected activity, which violates the Fourteenth Amendment right to due process.

Am. Compl. ¶ 112.

Based on that description, the "harm" upon which Richey's due process claim rests is the initial entry and ongoing maintenance of his personal identifying information in the NICS database on account of the 2019 Admission, thereby preventing him from exercising his Second Amendment rights. Accordingly, his claim accrued when he discovered that he was ineligible to possess or acquire a firearm due to his inclusion in the NICS database. *See, e.g.*, *D.B. v. Sullivan*, 2023 WL 2456070, at *7 (N.D.N.Y. Mar. 9, 2023) (holding plaintiff's § 1983 claim accrued when plaintiff "knew or had reason to know that he was listed in the NICS database"); *Brewer v. New York State Dep't of Health*, 2018 WL 718411, at *2 (N.D.N.Y. Feb. 5, 2018) ("Plaintiff knew, or at least had reason to know, that NYSDOH had reported allegedly erroneous information to the NICS database. Accordingly, the statute of limitations for his § 1983 claims began running on that date.").

It is undisputed that Richey was admitted to Samaritan on January 28, 2019, where he remained until February 5, 2019. Am. Compl. ¶¶ 83–86; Def.'s Mem. at 3–4. Likewise, it is

undisputed that Richey's application for a certificate of relief from disabilities was denied on

July 28, 2022.  Am. Compl. ¶ 108; Def.'s Mem. at 4.  Richey alleges that he attempted to

purchase a firearm sometime in 2022.  Am. Compl. ¶ 97.  Richey was advised by the FBI on

September 12, 2022, that his purchase was denied.  Am. Compl. ¶ 99.

"[A]ffirmative defenses, like the statute of limitations, 'often require[ ] consideration of

facts outside of the complaint and thus [are] inappropriate to resolve on a motion to dismiss.'"

*Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 149–50 (2d Cir. 2024) (quoting

*Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)) (alterations in original).  "Dismissal

under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint,

and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a

matter of law.'"  *Michael Grecco Prods., Inc.*, 112 F.4th at 150 (quoting *Sewell v. Bernardin*,

795 F.3d 337, 339 (2d Cir. 2015).

Per the amended complaint, Richey became aware of his inclusion in the NICS database

sometime between January 28, 2019, and July 28, 2022.  *See* Am. Compl. ¶¶ 83, 108.

Defendants argue that Richey's opportunity to be heard regarding his inclusion in the database

was at the time of the 2019 Admission. Defs.' Mem. at 24. However, given that Richey was

permitted to access firearms at least until the end of his military service on April 15, 2020, the

Court is skeptical of defendants' claim that Richey had reason to be aware of his inclusion in the

NICS database before then.  A more reasonable reading of the amended complaint suggests that

Richey became aware sometime after April 15, 2020.  Richey filed the present action on March

17, 2023.  Under this interpretation, Richey's claims were filed within the three-year statute of

limitations.

However, because it is not clear from the face of the amended complaint exactly when Richey became aware, or reasonably should have become aware, of his inclusion in the NICS database, the Court declines to dismiss Richey's due process claims as time-barred at this early stage of the litigation.

### 2.    Failure to state a claim

Defendants argue that, regardless, Richey has not stated a plausible procedural due process claim. Defs.' Mem. at 22–24.

### i.    Pre-deprivation

Defendants do not explicitly address the plausibility of Richey's pre-deprivation due process claim. Instead, they emphasize that the post-deprivation procedures available are all that the Constitution requires. Defs.' Mem. at 22– 24. The Court finds that Richey could not state a pre-deprivation due process claim under the circumstances alleged.

The Supreme Court has "usually held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). "In some circumstances, however, the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id.* at 128.

"As the Second Circuit explained, the 'necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process . . . coupled with the availability of some meaningful means by which to assess the propriety of the State's action after the initial taking, can satisfy the requirements of procedural due process.'" *Torcivia v. Suffolk Cnty., New York*, 409 F. Supp. 3d 19, 40 (E.D.N.Y. 2019) (quoting *Spinelli v. City of New York*, 579 F.3d 160, 170 (2d Cir. 2009)), *aff'd*, 17 F.4th 342 (2d Cir. 2021); *see also Doe I v.*

*Evanchick*, 355 F. Supp. 3d 197, 223 (E.D. Pa. 2019) ("Even if a pre-deprivation hearing were practical or relevant, the cost of allowing a potentially unstable individual to retain a dangerous weapon while he waits for a pre-deprivation hearing far outweighs any potential benefits of a pre-deprivation hearing . . ."), *aff'd sub nom. Doe I v. Governor of Pennsylvania*, 977 F.3d 270 (3d Cir. 2020).

A recent Second Circuit decision makes clear that no individualized dangerous determination is required where someone is disarmed as part of a prohibited class. *See Zherka v. Bondi*, No. 22-1108-cv, ___ F. 4th ___, 2025 WL 1618440 (2d Cir. June 9, 2025). In *Zherka*, the plaintiff-appellant challenged the federal felon-in-possession law, arguing in part that he was entitled to an individualized dangerousness determination prior to the loss of his Second Amendment rights. *Zherka*, slip op. at 2. The Second Circuit disagreed, holding that an individual "has no right to individualized process prior to the application of a categorical criminal prohibition." *Id.*

As Richey acknowledges, *see* Am. Compl. ¶ 99, he was disarmed as part of a categorical prohibition. *See* 18 U.S.C. § 922(g)(4) (criminalizing possession of a firearm by "has been adjudicated as a mental defective or who has been committed to a mental institution"); *see also* N.Y. Penal Law § 400.00 (j) (categorically prohibiting those who have been "involuntarily committed to a facility under the jurisdiction of an office of the department of mental hygiene pursuant to article nine or fifteen of the mental hygiene law," from lawfully obtaining a firearm).

Thus, he is not entitled to any pre-deprivation process.

### ii.  Post-deprivation

Defendants argue that Richey cannot plausibly allege a post-deprivation procedural due process violation because the availability of Article 78 review of the certificate of relief from disabilities determination is constitutionally adequate.  Defs. Mem at 22– 24.

"The Supreme Court in *Mathews* identified three factors bearing on the constitutional need for procedural protections."  *Black v. Decker*, 103 F.4th 133, 147 (2d Cir. 2024).  "In determining how much process is due, a court must weigh (1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the government's interest."  *Spinelli*, 579 F.3d at 170 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

### a.  Private interest at stake

The right to bear arms is undoubtedly a compelling private interest, as evidenced by the Supreme Court's decision in *Bruen*.  *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 26 (2022) ("The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.") (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)) (emphasis in original).

### b.  Risk of erroneous deprivation and value of other safeguards

The risk of erroneous deprivation is minimal in light of the many procedural protections available to challenge misclassification as a prohibited person.

At the outset, a patient may only be admitted pursuant to MHL § 9.39 where "a staff physician of the hospital[,] upon examination of such person[,] finds that such person qualifies under the requirements of this section."  N.Y. MENTAL HYG. LAW § 9.39.  Any person admitted

pursuant to MHL § 9.39 "shall be served, at the time of admission, with written notice of his status and rights as a patient under this section." *Id.*

To retain a patient admitted under MHL § 9.39 for longer than forty-eight hours, the initial physician's finding must be "confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital."  N.Y. MENTAL HYG. LAW § 9.39.  "If at any time after admission, the patient . . . gives notice to the director in writing of request for court hearing on the question of need for immediate observation, care, and treatment, a hearing shall be held . . . as soon as practicable but in any event not more than five days after such request is received." *Id.*

Further, under MHL § 33.16, a patient "may challenge the accuracy of information maintained in the clinical record and may require that a brief written statement prepared by him/her concerning the challenged information be inserted into the clinical record."  N.Y. MENTAL HYG. LAW § 33.16.  OMH regulations provide the following process for amendment or correction of an OMH record:

> (1) Within 30 business days of a request from a data subject for amendment or correction of a record . . . the Privacy Compliance Officer and/or Deputy Privacy Compliance Officer shall:
>
>> (i) make the amendment or correction in whole or in part and inform the data subject that upon request, such amendment or correction will be provided to any person or governmental unit to which the record or personal information has been or is disclosed . . . ; or
>>
>> (ii) inform the data subject in writing of its denial of the request to amend or correct the record, including the reasons therefor and the right to appeal such denial.

14 N.Y.C.R.R. § 520.5.  As noted in 14 N.Y.C.R.R. § 520.5(b)(1)(ii), a patient can appeal the denial of a request to amend or correct a record.

Moreover, and as previously discussed, the certificate of relief from disabilities procedure allows an individual "whose records were submitted to the NICS system by the Office of Mental Health" to petition for "administrative review by the Office to have his or her civil rights restored." 14 N.Y.C.R.R. § 543.5(a)(1). Finally, Article 78 review is available on the event that an individual's request for certificate of relief from disabilities is denied. § 543.5(c)(2)(ii)(a).

The risk of erroneous deprivation is low in light of the procedural safeguards. A patient admitted under MHL § 9.39 and retained beyond forty-eight hours, like Richey, has received written notice of their status and rights at the time of admission, and has been found by two physicians, including a psychiatrist, as posing either (1) a "substantial risk of physical harm to himself," or (2) "a substantial risk of physical harm to other persons . . . " N.Y. MENTAL HYG. LAW § 9.39(a)(1)-(2).

Importantly, a finding under MHL § 9.39 is based upon both the examining physicians' impressions *and* the patient's conduct, as the risk of harm must be "manifested by threats of or attempts at suicide or serious bodily harm," or "homicidal or other violent behavior." N.Y. MENTAL HYG. LAW § 9.39 (a)(1)–(2). Beyond that, the Mental Hygiene Law prescribes multiple processes for either correcting erroneous information in OMH records or curing the erroneous communication of OMH records to the NICS database. *See* N.Y. MENTAL HYG. LAW §§ 33.16, 7.09(j)(2).

Richey does not allege that he was unapprised of these extensive procedural rights or otherwise prevented from exercising them. Am. Compl. ¶¶ 82–86. In fact, Richey acknowledges that he took advantage of one of the available procedures by applying for a certificate of relief from disabilities. Am. Compl. ¶¶ 103–04. In sum, there are significant protections against erroneous deprivation and sufficient avenues for post-deprivation relief.

To be sure, in *Houston v. Nassau Cnty. Police Dep't*, the plaintiff brought a procedural due process claim based on his allegation "that he received no hearing or notification of [his] placement [on the NICs list]." 2020 WL 7643132, at *3 (alteration in original) (internal quotation omitted). The court relied on the availability of the certificate of relief from disabilities process and Article 78 review to conclude that the plaintiff "failed to state a claim under the Fourteenth Amendment for a due process violation." *Id.*

Likewise, in *Montalbano v. Port Auth. of N.Y. and N.J.*, the court rejected the plaintiff's challenge to the assessment of a firearm restriction determination on due process grounds, observing that "[i]t is settled law in this Circuit that '[a]n Article 78 proceeding provides the requisite post-deprivation process—even if [a plaintiff] failed to pursue it.'" 843 F. Supp. 2d 473, 485 (S.D.N.Y. 2012) (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 121 (2d Cir. 2011)).

The same conclusion applies here. Richey has not offered any non-conclusory factual allegations tending to establish that Article 78 review was unavailable or inadequate under the circumstances. Therefore, the risk of erroneous deprivation was minimal.

### c. The government's interest

Lastly, the government maintains a significant interest in "banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *United States v. Rahimi*, 602 U.S. 680, 682 (2024); *see also Torcivia*, 409 F. Supp. 3d at 40 ("The government has a compelling and pressing interest in quickly removing firearms, and the license permitting the carrying of firearms, from those whom it deems unqualified to carry firearms.").

Consideration of the *Mathews* factors establishes that pre-deprivation procedures are not warranted, as the available post-deprivation processes are constitutionally adequate. Accordingly, Richey's due process claims must be dismissed.

## D.    Facial Challenge to MHL § 7.09(j)(1)

Defendants do not believe plaintiff has raised a constitutional challenge to any statute, and thus, do not explicitly seek dismissal plaintiff's facial challenge.  Defs.' Mem. at 7. However, the amended complaint does appear to challenge the facial constitutionality of MHL § 7.09(j)(1), Am. Compl. ¶ 76, so the Court addresses it here.

Commissioner Sullivan, in her official capacity as commissioner of OMH, is the proper defendant to this challenge.  *See Meyers v. Sullivan*, 2017 WL 5125767, at *2 n. 4 (E.D.N.Y. Aug. 23, 2017) *report and recommendation adopted sub nom. Meyers v. Health & Hosp. Corp.*, 2017 WL 5125526 (E.D.N.Y. Nov. 2, 2017) ("Ann Marie T. Sullivan, in her official capacity as Commissioner of the New York State Office of Mental Health, was the proper defendant for plaintiff's facial challenge.").

"To prevail on a facial challenge, the plaintiff must 'establish that no set of circumstances exists under which the [challenged] Act would be valid.'"  *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir.) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), *cert. denied sub nom. Cmty. Hous. Improvement Program v. City of New York*, 144 S. Ct. 264, 217 L. Ed. 2d 113 (2023).  "In other words, the plaintiff must show that the statute 'is unconstitutional in all of its applications.'"  *Cmty. Hous. Improvement Program, 59 F.4th* at 548 (quoting *Wash. State Grange v. Wash. State Rep. Party*, 552 U.S. 442, 449 (2008)).

Richey's own opposition establishes that there are at least two constitutional applications of MHL § 7.09(j)(1).  Richey acknowledges that circumstances exist where individuals may be

properly reported to the NICS database pursuant to an Article 9 admission, namely, those "'involuntarily committed' under MHL § 9.27 or 9.37." Pl.'s Opp. at 8. Accordingly, insofar as Richey challenges the facial constitutionality of MHL § 7.09(j)(1), that challenge must be dismissed.

### E.    Individual Capacity claims

Next, the Court assesses the affirmative defenses raised as to the individual defendants. Only Richey's Second Amendment claims remain. Defendants do not seek dismissal of Richey's Second Amendment claims outright. Instead, they argue that the Panel Member defendants and Commissioner Sullivan are entitled to absolute quasi-judicial immunity, or, alternatively, to qualified immunity. Defs.' Mem. at 11– 19. Given that the factual allegations against the Panel Member defendants are distinguishable from those against Commissioner Sullivan, the Court addresses them in turn.

#### 1.    The Panel Member defendants

Defendants seek dismissal of the named[6] Panel Member defendants, sued only in their individual capacities, on quasi-judicial or, alternatively, qualified immunity grounds. *See* Defs.' Mem at 11-19. Since quasi-judicial immunity, like absolute judicial immunity, is an immunity from suit altogether, the Court addresses it first.

"Although quasi-judicial immunity is an affirmative defense, '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) . . .'" *DeSouza v. Kennedy*, No. 3:16-CV-01126, 2017 WL 3431393, at *4 (D. Conn. Aug. 9, 2017) (quoting *Pani v. Empire*

---

[6] Although defendants only request dismissal of the named Panel Member defendants, Plaintiff identifies three additional defendants, Does 1-3, as Panel Members. Am. Compl. ¶ 15 ("Upon information and belief, Doe 1, Doe 2, and/or Doe 3 are also Panel Members who considered, and denied, Plaintiff's request to be removed from the NYS reporting database."). The allegations against Does 1-3 are identical to those against the named Panel Member defendants. *See generally* Am. Compl. Accordingly, if the named Panel Member defendants are entitled to quasi-judicial immunity, Does 1-3 are entitled to quasi-judicial immunity on the same basis.

*Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)). Courts routinely dismiss on quasi-judicial immunity grounds at the pleading stage. *See Mir v. Bogan*, 2015 WL 1408891, at *12 (S.D.N.Y. Mar. 27, 2015) (dismissing officials involved in direct medical license revocation proceedings), *aff'd*, 668 F. App'x 368 (2d Cir. 2016) (summary order); *Anghel v. New York State Dep't of Health*, 947 F. Supp. 2d 284, 299 (E.D.N.Y. 2013) (dismissing state officials who participated in Bureau of Professional Medical Conduct disciplinary proceedings), *aff'd*, 589 F. App'x 28 (2d Cir. 2015) (summary order); *Taylor v. Brentwood Union Free Sch. Dist.*, 908 F. Supp. 1165, 1170 (E.D.N.Y. 1995) (dismissing teacher disciplinary panel members).

"[O]fficials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999); *see Mireles v. Waco*, 502 U.S. 9, 11 (1991) ("Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages.") (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, (1985)).

Additionally, in a § 1983 action "brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983. Absolute "judicial immunity is conferred in order to insure 'that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.'" *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) (quoting *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 347 (1871)). "Thus, even allegations of bad faith or malice cannot overcome judicial immunity." *Bliven*, 579 F.3d at 209.

Absolute judicial immunity "extends to administrative officials performing functions closely associated with the judicial process because the role of the 'hearing examiner or

administrative law judge . . . is functionally comparable to that of a judge.'" *Montero*, 171 F.3d at 760 (quoting *Butz v. Economou,* 438 U.S. 478, 513 (1978)) (internal quotation omitted).

"Judicial and quasi-judicial immunity are both absolute immunities." *Gross v. Rell*, 585 F.3d 72, 81 (2d Cir. 2009), *certified question answered*, 40 A.3d 240 (Conn. 2012). "The official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Victory v. Pataki*, 814 F.3d 47, 65–66 (2d Cir. 2016), *as amended* (Feb. 24, 2016).

### i.   14 N.Y.C.R.R. §§ 543.1-543.6

Courts may take judicial notice of rules or regulations governing certain proceedings to determine whether they are quasi-judicial in nature. *See, e.g. D.B. v. Sullivan*, 2025 WL 1033883, at *9 (taking notice of 14 N.Y.C.R.R. §§ 543.1-543.6); *Bonura v. Chiarlitti*, 2010 WL 11712789, at *14 (S.D.N.Y. Mar. 31, 2010) (taking judicial notice of police policy and procedure manual for disciplinary proceedings).

Per defendants' request, Defs.' Mem. at 11, the Court takes judicial notice of 14 N.Y.C.R.R. §§ 543.1-543.6, which establish the certificate of relief from disabilities process. *See Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972) (finding that the district court properly took notice of New York Correction Rules and Regulations at motion to dismiss stage of 42 U.S.C. § 1983 action).

Under 14 N.Y.C.R.R. 543.5,

[a]n individual who has been or may be disqualified from attempting to purchase or otherwise possess a firearm in accordance with the provisions of subdivision (j) of section 7.09 of the Mental Hygiene Law and whose records were submitted to the NICS system by the Office of Mental Health, may request administrative review by the Office to have his or her civil rights restored for such limited purpose.

14 N.Y.C.R.R. § 543.5(a)(1).

A request for relief pursuant to 14 N.Y.C.R.R. § 543.1 consists of a publicly available form requiring an applicant to answer questions under penalty of perjury relating to their legal, criminal, and mental health history. 14 N.Y.C.R.R. § 543.5(a)(2). Alongside this form, an applicant must also furnish (1) a HIPAA compliant authorization, 14 N.Y.C.R.R. § 543.5(a)(6); (2) "true and certified copies of medical records detailing the applicant's psychiatric history"; (3) "a true and certified copy of all criminal history information maintained on file at the New York State Division of Criminal Justice Services and the Federal Bureau of Investigation"; (4) character evidence pertaining to the applicant's reputation, "which may include notarized letters of reference from current and past employers, family members or personal friends, affidavits from the applicant or other character evidence"; and (5) "any further information specifically requested by the Office." 14 N.Y.C.R.R. § 543.5(a)(3)(i)–(v).

An applicant may elect to provide a psychiatric evaluation, "performed no earlier than 90 calendar days from the date the request for the certificate of relief was submitted." 14 N.Y.C.R.R. § 543.5(a)(4). Additionally, OMH may "request that the applicant undergo a clinical evaluation and risk assessment." 14 N.Y.C.R.R. § 543.5(a)(5).

Once an application is submitted and the requisite information has been gathered, "[t]he Commissioner or his/her designee(s) shall perform . . . a review of all information submitted by the applicant that was required or requested by the Office." 14 N.Y.C.R.R. § 543.5(b)(1). "The scope of the review shall be to determine, from the materials submitted, whether the applicant will not be likely to act in a manner dangerous to public safety and granting the relief will not be contrary to the public interest." 14 N.Y.C.R.R. § 543.5(b)(3).

After reviewing an application, "the Commissioner or his/her designee(s) shall prepare a written determination" as to whether or not the relief is granted including, *inter alia*, "an opinion

as to whether or not the applicant's record and reputation are such that the applicant will or will not be likely to act in a manner dangerous to public safety and whether or not the granting of the relief would be contrary to the public interest."  14 N.Y.C.R.R. § 543.5(c)(1)(vi)–(vii).

### ii.  Analysis of quasi-judicial immunity factors

To determine whether an official is entitled to quasi-judicial immunity, courts consider the following factors:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (citing *Butz*, 438 U.S. at 512).

Here, the first factor, ensuring the official's ability to function without harassment, weighs heavily in favor of absolute immunity.  The determination at issue is of great consequence; a certificate of relief from disabilities would remove a legal barrier that prohibited a person from acquiring a firearm.  Thus, there is a compelling need for the Panel Member defendants to perform their functions free from the threat of harassment or intimidation.

The second factor, the presence of safeguards, similarly weighs in favor of absolute immunity.  A determination pursuant to MHL § 7.09(j)(2) is subject to Article 78 review.  *See* N.Y.C.R.R. § 543.5(c)(2)(ii)(a) ("[I]f the relief is denied: (*a*) the applicant must be notified of the right to have the decision reviewed in accordance with applicable State law.").  Aside from the availability of Article 78 review, an applicant may reapply for a certificate of relief from disabilities one year after a denial.  *See* N.Y.C.R.R. § 543.5(c)(2)(ii)(b).  Article 78 review is typically a sufficient safeguard against unconstitutional conduct because "constitutional issues

can be decided in Article 78 proceedings." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996).

The third factor contemplates insulation from political influence.  This factor ordinarily weighs against absolute immunity where the official seeking immunity is a politician, or where the determination directly impacts the surrounding community, and the official is a member of that community.  *See, e.g.*, *Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead ex rel. Bd. of Trs. of Vill. of New Hempstead*, 98 F. Supp. 2d 347, 357 (S.D.N.Y. 2000) ("The roles of building inspector and mayor are not functionally comparable to those of judge or prosecutor— and they certainly are not insulated from political influence—and thus the rationale of *Butz* does not apply.").  There is no suggestion that the Panel Member defendants are insulated from political influence, but there is no indication that the Panel Member defendants are subject to any political influence, either.  Thus, this factor does not tip the scales in either direction.

The fourth factor, the importance of precedent, weighs slightly against absolute immunity.  There is no obvious indication that the Panel Member defendants are bound by prior decisions.  *See* N.Y.C.R.R. § 543.5.  However, the Panel Member defendants must identify and summarize the information relied upon in making their decision and furnish a written opinion in support of their determination.  *See* N.Y.C.R.R. § 543.5(c)(1).  These measures mitigate the risk of arbitrary or otherwise unjustified denials.

The fifth factor, which concerns the adversarial nature of the proceeding, weighs in favor of absolute immunity.  "In order for a quasi-judicial process to be truly adversarial in nature, it must possess some of the traditional features of an actual trial."  *Malerba v. Selsky*, 872 F. Supp. 1136, 1139 (N.D.N.Y. 1995) (citing *Butz,* 438 U.S. at 512).  Here, an applicant initiates the process by submitting an application.  *See* N.Y.C.R.R. § 543.5(a).  Certain evidence, like an

applicant's criminal and mental health records, must be provided to the Panel Members.  *See* N.Y.C.R.R. § 543.5(a)(3)(i)–(iii).  The applicant is permitted to explain, or perhaps rebut, the information contained in those records by proffering reputational evidence, which can include affidavits from the applicant; letters from family, friends, and employers; or other character evidence.  *See* N.Y.C.R.R. § 543.5(a)(3)(iv).  While there is no mechanism for the applicant to cross-examine witnesses, the certificate of relief from disabilities process does not involve opposing witnesses, rendering the need for cross-examination superfluous.

The sixth factor, correctability on appeal, also weighs in favor of absolute immunity.  As noted above, the Panel Member defendants' determination is subject to Article 78 review.  *See* N.Y.C.R.R. § 543.5 (c)(2)(ii)(a).  Where an Article 78 proceeding is "brought to review a determination, the judgment may annul or confirm the determination in whole or in part, or modify it, and may direct or prohibit specified action by the respondent."  N.Y. C.P.L.R. 7806.  Accordingly, an erroneous denial may be corrected through Article 78 review.

### iii.  Functional approach

In sum, a balancing of the *Butz* factors weighs in favor of absolute immunity.  But the *Butz* factors are "just a few of the many checks on malicious action by judges."  *Butz*, 438 U.S. at 512.  Ultimately, to ascertain whether an official is entitled to quasi-judicial immunity, courts take "a functional approach and look to the particular acts or responsibilities that the official performed."  *King v. Simpson*, 189 F.3d 284, 287–88 (2d Cir. 1999).

To that end, courts must conduct "'[s]ome factual inquiry' to determine if the duties of the defendants were judicial or prosecutorial, which entitles them to absolute immunity, or administrative, which may entitle them to qualified immunity."  *King*, 189 F.3d at 288 (quoting *Stewart v. Lattanzi,* 832 F.2d 12, 13 (2d Cir.1987)).  For instance, "a parole board

official is absolutely immune from liability for damages when he 'decide[s] to grant, deny, or revoke parole,' because this task is functionally comparable to that of a judge." *Scotto v. Almenas*, 143 F.3d 105, 111 (2d Cir. 1998) (quoting *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir. 1981)).

The Panel Member defendants point to a number of decisions where courts have applied quasi-judicial immunity to officials tasked with rendering administrative determinations like that at issue here, including parole board officials, hearing examiners, and members of professional licensing boards. *See* Defs.' Mem. at 12.

Further, and contrary to Richey's contentions, *see* Pl.'s Opp. at 25, the certificate of relief from disabilities process involves reviewing extensive evidentiary material. The evidence includes an applicant's sworn responses to questions on the request for relief form, certified criminal and medical records, and notarized documentary "evidence of the applicant's reputation." 14 N.Y.C.R.R. § 543.5 (c)(3). These documents exemplify the sort of evidence proffered in a traditional judicial proceeding.

While 14 N.Y.C.R.R. § 543.5 requires submission of some evidentiary material, applicants may voluntarily submit a psychiatric evaluation in support of their application. 14 N.Y.C.R.R. § 543.5 (c)(4). Applicants may also demonstrate their entitlement to relief by submitting affidavits; notarized letters from family, friends, and employers; or any other evidence of their character or reputation. 14 N.Y.C.R.R. § 543.5 (c)(3)(iv).

Richey argues that the Panel Member defendants do not act in a quasi-judicial capacity because they do not apply a fixed legal standard in making their determination. Pl.'s Opp. at 25. But 14 N.Y.C.R.R. § 543.5(b)(3) explicitly provides an applicable legal standard: "whether the

applicant will not be likely to act in a manner dangerous to public safety and granting the relief will not be contrary to the public interest."  14 N.Y.C.R.R. § 543.5(b)(3).

Recently, the Second Circuit held that county firearm licensing officers are entitled to absolute judicial immunity for their role in approving and denying firearm license applications. *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 124 (2d Cir. 2020), *abrogated on other grounds by Bruen*, 597 U.S. 1.  The panel in *Libertarian Party of Erie Cnty.* reasoned that:

> where there was a petition for "a declaration on rights as they stand," and in that context the court had "taken cognizance of the petition," had "considered the petitioner's petition on its merits," and had issued "an order which [was] validated by the signature of the presiding officer," there was a decision that was truly judicial.

*Libertarian Party of Erie Cnty.*, 970 F.3d at 124 (quoting *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 478 (1983)).

Here, too,  Richey submitted an application for a certificate of relief from disabilities and, as Richey acknowledges, the "Panel Members reviewed, considered, and made the final determination to deny Plaintiff's request."  Am. Compl. ¶ 12.  Given the weight of the *Butz* factors and in consideration of the Panel Member defendants' responsibilities and duties, the Court finds that the Panel Member defendants are entitled to absolute quasi-judicial immunity.[7]

Accordingly, Richey's § 1983 claim for money damages must be dismissed.  Moreover, because Richey "alleges neither the violation of a declaratory decree, nor the unavailability of declaratory relief [,] [his] claim for injunctive relief is therefore barred under § 1983."  *Montero*, 171 F.3d at 761.

---

[7] Because the Panel Member defendants are entitled to absolute quasi-judicial immunity, the Court need not consider defendants' qualified immunity arguments.

### 2.        Commissioner Sullivan

First, defendants assert that Commissioner Sullivan is entitled to quasi-judicial immunity from Richey's Second Amendment claim.  Defs.' Mem. at 11–16.  However, Richey does not allege that Commissioner Sullivan was on the panel that considered his application or otherwise personally participated in the denial of his application for a certificate of relief from disabilities.  Am. Compl. ¶¶ 11–12 ("Sullivan *designated* the Panel Members. . . *[t]he defendant Panel Members* reviewed, considered, and *made the final determination* to deny Plaintiff's request.") (emphasis added).  Accordingly, Commissioner Sullivan is not entitled to quasi-judicial immunity.

Second, and in the alternative, defendants argue that Commissioner Sullivan is entitled to qualified immunity.  Defs.' Mem. at 16-19.  However, "the Court reaches the question of qualified immunity only if Plaintiffs are able to demonstrate[ ] that an individual defendant had some personal involvement in a cognizable Section 1983 claim."  *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *7 (N.D.N.Y. Feb. 2, 2005) (citing *Hope v. Pelzer*, 536 U.S. 730, 736 (2002)).

To the extent Richey brings § 1983 claims against Commissioner Sullivan in her individual capacity, the Court need not reach qualified immunity, as Richey has failed to plead the requisite level of personal involvement in the alleged constitutional violations.  Prior to the Second Circuit's decision in *Tangreti v. Bachmann* 983 F.3d 609 (2d Cir. 2020),

> [t]he liability of a supervisor under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).

However, in *Tangreti*, the Second Circuit made clear that "[t]here is no special rule for supervisory liability."  983 F.3d at 618.  "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 676).

"While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement."  *Taranto v. Putnam Cnty.*, 2023 WL 6318280, at *14 (S.D.N.Y. Sept. 28, 2023) (internal quotation omitted).  Similarly, "[a] supervisory official 'may not be held liable for damages merely because [s]he held a high position of authority.'"  *Marshall v. Annucci*, 2024 WL 1835959, at *4 (N.D.N.Y. Apr. 1, 2024) (quoting *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996)) *report and recommendation adopted by* 2024 WL 1833604 (N.D.N.Y. Apr. 26, 2024).

Broadly speaking, Richey alleges that Commissioner Sullivan: (1) designated the Panel Member defendants to issue a determination on Richey's application for a certificate of relief from disabilities; (2) created, oversaw, and implemented policies and procedures that "resulted in the violation of Plaintiff's constitutional rights"; and (3) failed to train, supervise, and discipline her staff.  Am. Compl. ¶¶ 11, 24, 70.

Richey's first allegation, *i.e.*, that Commissioner Sullivan *designated* the Panel Member defendants who "reviewed, considered, and made the final determination to deny Plaintiff's request to be removed from the NYS reporting database, thereby violating his Second

Amendment rights," Am. Compl. ¶¶ 11-12, cannot support individual liability for money damages under § 1983. This allegation directly belies the conclusion that Commissioner Sullivan, herself, was personally involved in making the allegedly unlawful determination.

The second allegation, *i.e.*, that Commissioner Sullivan created, oversaw, and implemented policies that caused the alleged violations, similarly falls short. Richey contends that "OMH and the SAFE Act Office . . . have a policy and procedure established and/or implemented by Commissioner Sullivan and/or DOES 1-10 of transmitting the mental health records and personal identifying information to NICS of individuals who were not involuntarily committed . . ." Am. Compl. ¶ 56. In support of this contention, Richey alleges merely that Commissioner Sullivan held a high position of authority. *Id*. ¶ 8 ("Commissioner Sullivan was responsible for and directly created. . . policies. . . for OMH and the Office of NICS Appeals and SAFE Act in accordance with the New York State Mental Hygiene Law. . ."). That is not enough to establish personal liability, especially after *Tangreti*.

Further, "[a]s a corollary to the personal-involvement rule, complaints that rely on 'group pleading' and 'fail[ ] to differentiate' as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." *Josie v. City of New York*, No. 21-CV-2486 (ARR/RER), 2023 WL 3765063, at *4 (E.D.N.Y. June 1, 2023) (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order)).

Accordingly, Richey has failed to plausibly allege that Commissioner Sullivan personally created a policy which caused a violation of his constitutional rights.

Lastly, Richey repeatedly avers that Commissioner Sullivan failed to train, supervise, and/or discipline her staff. Am. Compl. ¶¶ 68–71, 118. But after *Tangreti*, "there is no longer a

separate cause of action for failure to supervise." *Nixon v. City of New York*, 668 F. Supp. 3d

143, 152 (E.D.N.Y. 2023) (citing *Tangreti*, 983 F. 3d at 618 (quoting *Iqbal*, 556 U.S. at 676)).

In sum, Richey has not pleaded sufficient allegations to support a plausible claim for

relief against Commissioner Sullivan in her individual capacity.  As such, the claim against her

must be dismissed.

### 3.       Does 4 and 5

Defendants have not moved to dismiss Does 4 and 5, who are identified in the amended

complaint as employees or agents of OMH.  Am. Compl. ¶ 18.  However, because Richey fails

to plead that Does 4 and 5 were "personally involved" in any violation, his claims against them

likewise must be dismissed.

Courts may dismiss Doe defendants on the pleadings where a plaintiff has failed to state

a claim against them.  *See Darby v. Greenman*, 14 F.4th 124 (2d Cir. 2021) (affirming district

court's dismissal of Doe defendants who had not appeared in the action where claims against

the appearing defendants and the Doe defendants were based on the same legal theories); *Baker

v. Spinner*, 2019 WL 3430918, at *6 (N.D.N.Y. July 30, 2019) (dismissing unidentified and

unserved Doe defendants *sua sponte* where defendants sought dismissal of entire complaint and

their failure to appear on behalf of Does was likely "an oversight") *aff'd*, 826 F. App'x 105 (2d

Cir. 2020); *see also Bynum v. Doe*, 2019 WL 1259568, at *4 (E.D.N.Y. Mar. 19, 2019); *see also

Carelock v. United States*, 2015 WL 5000816, at *4 (S.D.N.Y. Aug. 20, 2015); *Hanks v. City of

Syracuse*, 2022 WL 4619877 (N.D.N.Y. Sept. 30, 2022), *aff'd*, No. 22-2819, 2023 WL 8889764

(2d Cir. Dec. 26, 2023).

Notably, Richey's allegations against Does 4 and 5 are largely the same as those asserted

against Commissioner Sullivan.  Am. Compl. ¶¶ 68–71 ("Sullivan, Doe 4 and Doe 5 failed to

train, supervise and/or discipline . . . [t]he failure of Sullivan, Doe 4 and Doe 5 to train, supervise and/or discipline . . . [t]he failure of Sullivan, Doe 4 and Doe 5 to train, supervise and/or discipline . . . [t]he failure of Sullivan, Doe 4 and Doe 5 to train, supervise and/or discipline.").

The Court has already deemed these conclusory supervisory allegations insufficient to demonstrate personal involvement.  *See* discussion *supra* Section IV.D.2.  Beyond that, Richey alleges that Does 4 and 5 "have personal knowledge and information concerning individuals who are listed in the NYS reporting database," "knew . . . that Plaintiff's personal identifying information was populated into the NYS reporting database," "failed to provide Plaintiff with Notice that he was now listed in the NYS reporting database," and "failed to provide Plaintiff with an opportunity to be heard concerning the loss of rights . . . ."  Am. Compl. ¶¶ 18–21.

The latter two allegations pertain to Richey's procedural due process claims.  Thus, the Court considers only the first two allegations to determine that Richey has not plausibly alleged that Does 4 and 5 were personally involved in the remaining Second Amendment claim.

"[P]resumed knowledge, without more, is [ ] insufficient to establish personal involvement."  *Anderson v. Connell*, 2009 WL 3165541, at *3 (N.D.N.Y. Sept. 29, 2009); *see also Morrison v. Johnson*, 2006 WL 2811802, at *20 (N.D.N.Y. Sept. 28, 2006) ("[K]nowledge alone is insufficient to establish any of the elements of personal involvement.").  "Moreover . . . general and conclusory allegations of knowledge based upon a supervisory position are also insufficient to establish personal involvement."  *Barnes v. Prack*, 2012 WL 7761905, at *6 (N.D.N.Y. Sept. 7, 2012) *report and recommendation adopted* by 2013 WL 1121353 (N.D.N.Y. Mar. 18, 2013).

Richey alleges that Does 4 and 5 knew of the individuals, including Richey, who are or were listed in the database.  Am. Compl. ¶¶ 18-19.   However, mere knowledge that Richey was listed in the database does not amount to knowledge that Richey was listed in the database in violation of his Second Amendment rights.

Accordingly, Richey's Second Amendment claim against Does 4 and 5 must be dismissed because Richey has failed to plausibly allege that they were aware of, let alone personally involved in, any misconduct.

## F.    Surviving claims

Richey's surviving claims can be characterized broadly as Second Amendment claims stemming from the maintenance of his information in the NICS database, which precludes him from obtaining a firearm.  Prospective injunctive and declaratory relief are the only available remedies, as these claims proceed solely against Commissioner Sullivan in her official capacity.

Richey has plausibly alleged either: (1) that MHL § 7.09(j)(1) has been unconstitutionally applied to improperly identify him as a person "involuntarily committed" and therefore "no longer permitted under federal or state law to possess a firearm," due to the 2019 Admission, entitling him to removal from the NICS database; or, alternatively, (2) that even if the 2019 Admission served as proper grounds for his initial inclusion in the NICS database, he is no longer "likely to act in a manner dangerous to public safety" pursuant to MHL § 7.09(j)(2), entitling to a certificate of relief from disabilities.

### 1.       As-applied challenge to MHL § 7.09(j)(1) – "involuntarily committed"

Richey has plausibly alleged that MHL § 7.09(j)(1) has been unconstitutionally applied to him through OMH's interpretation of the term "involuntarily committed," which he argues

improperly identifies him as a person "no longer permitted under federal or state law to possess a firearm," based on the 2019 Admission.  Am. Compl. ¶¶ 37, 48–53.

In a pre-*Bruen* summary order, the Second Circuit addressed whether a plaintiff-appellant was entitled to injunctive relief directing that his name be removed from the NICS database because his eleven-day hospitalization pursuant to MHL § 9.39 could not be characterized as a "commitment."  *See Phelps*, 711 F. App'x 63.  The Second Circuit affirmed the district court's denial, noting that "Section 9.39 is understood as a 'commitment' by New York courts."  *Id.*

However, and as particularly relevant here, the *Phelps* summary order did "not consider whether the state violated any of his constitutional rights when it reported his hospitalizations to the FBI or whether concern for these constitutional rights might change [their] interpretation of the word 'commitment' under New York's scheme."[8]  *Phelps*, 711 F. App'x at 65.  *Phelps* cited *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012), for the proposition that "recent developments in Second Amendment law should affect the treatment, under federal law, of a 'commitment' under [state] law."  *Id.*

Thus, the Second Circuit explicitly left open the question of whether classification of MHL § 9.39 hospitalizations as "commitments" for NICS reporting purposes is constitutional, noting concerns over developments in Second Amendment jurisprudence.  *Phelps*, 711 F. App'x at 65.  Given that *Phelps* was decided in a summary order four years before the Supreme Court's

---

[8] Other courts have similarly cautioned that statutes permitting permanent disarmament following a single temporary involuntary commitment may run afoul of the Second Amendment. *See United States v. Rehlander*, 666 F.3d 45, 49 (1st Cir. 2012) (finding Second Amendment concerns where interpretation of "commitment" resulted in plaintiffs being "permanently deprived of a right to bear arms based solely on procedures suitable for temporary hospitalization under emergency conditions."); *Doe I v. Evanchick*, 355 F. Supp. 3d 197, 218 (E.D. Pa. 2019) ("Although the Supreme Court in *Heller* articulated that prohibition on the right to own a gun by the mentally ill is presumptively lawful, a temporary emergency commitment to a mental institution is not sufficient to consider the individual "mentally ill" for the purposes of the *Heller* mental health exception."); *Keyes v. Lynch*, 195 F. Supp. 3d 702, 722 (M.D. Pa. 2016) ("[T]he illogical contradiction of being able to possess firearms in his professional capacities but not being able to possess a firearm for protection in his own home puts in relief a factual scenario where an as-applied Second Amendment challenge to this statute may succeed.").

landmark decision in *Bruen*, contemporary Second Amendment jurisprudence may require a narrower interpretation of "commitment" under state law.

In *Bruen*, the Supreme Court held that, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. More recently, the Court reiterated that "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 602 U.S. at 691 (citing *Bruen*, 597 U.S. at 24).

Richey plausibly pleads that he is "is part of 'the people' whom the Second Amendment protects," and that his "proposed course of conduct falls within the Second Amendment." *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 55 (N.D.N.Y. 2024). Taking his factual allegations as true, Richey is an "ordinary, law-abiding, adult citizen." *See Bruen*, 597 U.S. at 31–32; Am. Compl. ¶ 107 ("Plaintiff has no prior arrests, charges, or convictions.").

Further, his proposed course of conduct, purchasing a firearm through a federal firearm licensee, *see* Am. Compl. ¶ 97, falls squarely within the scope of the Second Amendment. *See Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) (acknowledging "the ability of law-abiding, responsible citizens to acquire firearms" as "necessary to a citizen's effective exercise of Second Amendment rights"), *cert. denied,* 144 S. Ct. 2659 (2024).

"Since the relevant provisions implicate conduct the Second Amendment protects, they are presumptively unconstitutional unless the government can meet its burden to demonstrate that the provisions are 'consistent with the Nation's historical tradition of firearm regulation.'" *Mintz*, 724 F. Supp. 3d at 56 (quoting *Bruen*, 597 U.S. at 24). "To carry its burden, the

government must provide 'historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation.'"  *Mintz*, 724 F. Supp. 3d at 56.

Because the government has not set forth sufficient historical precedent to carry its burden at this early stage, plaintiff's as-applied challenge to § 7.09(j)(1) must proceed to discovery.

### 2. As-applied challenge to MHL § 7.09(j)(2) – "likely to act in a manner dangerous to public safety"

Richey also plausibly alleges that he is entitled to a certificate of relief from disabilities, as a prior temporary emergency mental health admission, by itself, may be insufficient to justify permanent, or at least indefinite, disarmament.

Richey claims that the Panel Member defendants "reviewed, considered, and made the final determination to deny Plaintiff's request to be removed from the NYS reporting database, thereby violating his Second Amendment rights."  Am. Compl. ¶ 12.  In support of this argument, Richey emphasizes that: (1) the 2019 Admission was voluntary; (2) he has no prior arrests, charges, convictions, or other disqualifiers to firearm possession; and (3) and he has not been hospitalized for mental health treatment either before or since the 2019 Admission.  Am. Compl. ¶¶ 106–07, 95.

Taking these allegations as true, Richey has plausibly alleged that the Panel Member defendants improperly deemed him "likely to act in a manner dangerous to public safety," pursuant to MHL § 7.09(j)(2), and that their July 28, 2022, denial of his application for a certificate of relief from disabilities resulted in the continued retention of Richey's information in the NICS database in violation of his Second Amendment rights.

V.    **CONCLUSION**

The Eleventh Amendment bars Richey's claims against OMH and the NICS Appeals Office, mandating dismissal of those defendants for lack of subject matter jurisdiction.  The Panel Member defendants are entitled to quasi-judicial immunity and must also be dismissed. While Commissioner Sullivan is not entitled to quasi-judicial immunity, she, along with Does 4 and 5, are dismissed for lack of personal involvement.  Further, Richey's § 1983 claims under the Fourth and Fourteenth Amendments must be dismissed for failure to state a claim upon which relief can be granted.  Similarly, Richey's facial challenge to MHL § 7.09(j)(1) must also be dismissed for failure to state a claim.

Richey's Second Amendment claims arising out of the maintenance of his information in the NICS database pursuant to the 2019 Admission proceed, but only as to Commissioner Sullivan, in her official capacity, pursuant to the *Ex parte Young* doctrine.

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss (Dkt. No. 45) is GRANTED in part and DENIED, in part;

2.  OMH and the NICS Appeals Office are dismissed pursuant to Rule 12(b)(1);

3.  Plaintiff's Fourth Amendment claim (Count II), Fourteenth Amendment claims (Counts III & IV), and facial challenge to MHL § 7.09(j)(1) are dismissed pursuant to Rule 12(b)(6); and

4.  the Panel Member defendants, Does 1-5, and Commissioner Sullivan, in her individual capacity, are dismissed;

5.  The Clerk of the Court is directed to terminate from the docket report:

a. "New York State Office of Mental Health," "New York State Office of NICS

Appeals and SAFE Act," "Li-Wen Grace Lee, M.D.," "Carmen Barber,"

"Tony Trahan," and "Does 1-5" as defendants; and

b. "Ann Marie T. Sullivan," in her Individual Capacity, as a defendant.

**IT IS SO ORDERED.**

Dated: <u>July 3, 2025</u>
     Utica, New York.

Anthony J. Brindisi
U.S. District Judge