UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ISAAC RICHEY,

*Plaintiff*,

-against-

1:23-cv-344

ANN MARIE T. SULLIVAN, MD,

(AJB/DJS)

*Defendant.*

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341

Benjamin L. Loefke
Special Litigation Counsel, of Counsel

Date: August 31, 2026

**Table of Contents**

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 1

A. Background Regarding the Prohibition on Firearm Possession by Persons Involuntarily Committed to Mental Institutions ........ 1

B. Mental Hygiene Law § 9.39 is New York's Statute for Emergency Commitment ........ 3

C. Obtaining relief from the 18 U.S.C. § 922(g)(4) prohibition ........ 4

D. Plaintiff's Hospitalization, His Application for a Certificate of Relief, and the Panel's Denial ........ 5

E. Procedural History. ........ 7

ARGUMENT ........ 7

POINT I PLAINTIFF LACKS STANDING ........ 7

POINT II INVOLUNTARY ADMISSION PURSUANT TO MHL § 9.39, AND SUBSEQUENT INCLUSION IN THE NICS DATABASE, DOES NOT VIOLATE THE SECOND AMENDMENT ........ 10

A. MHL § 9.39 admissions are involuntary as a matter of law. ........ 12

B. The Second Amendment permits disarmament of persons who have been involuntarily committed ........ 14

i. Mental health restrictions to firearm possession do not implicate the Second Amendment's text. ........ 14

ii. The temporary disarmament of institutionalized persons is fully consistent with American history and tradition ........ 17

C. The administrative process for seeking a certificate of relief from disabilities does not violate the Second Amendment. ........ 22

CONCLUSION ........ 25

## Table of Authorities

**Cases** **Page(s)**

*Bruen*. *Giambalvo v. Suffolk County*,
155 F.4th 163 (2d Cir. 2025) ....................16, 22

*Escamilla v. United States*,
62 F.4th 367 (7th Cir. 2023) ....................13

*Frey v. City of New York*,
157 F.4th 118 (2d Cir. 2025) ....................16, 22

*Gazzola v. Hochul*,
645 F. Supp. 3d 37 (N.D.N.Y. 2022)....................14, 16

*Giannavola v. Lee*,
No. 24 Civ. 6096, 2025 1932020 (W.D.N.Y. July 14, 2025) ....................8

*Giannavola v. Lee*,
No. 24 Civ. 6096, 2025 WL 1932020 (W.D.N.Y. July 14, 2025)....................9-10, 13

*K.I. v. Sullivan*,
No. 1:25-CV-00264, 2026 WL 571301 (N.D.N.Y. Mar. 2, 2026) ....................8-9

*Mai v. United States*,
952 F.3d 1106 (9th Cir. 2020) ....................15

*Matter of Colihan v. New York*,
211 A.D.3d 1432 (3d Dep't 2022)....................12

*Matter of Gardner v. Bassett Med. Ctr.*,
148 A.D.3d 1331 (3d Dep't 2017)....................12

*Md. Shall Issue, Inc. v. Moore*,
116 F.4th 211 (4th Cir. 2024) ....................22

*Mills v. New York City*,
No. 23 Civ. 7460, 2024 WL 4979387 (S.D.N.Y. Dec. 4, 2024)....................14, 22

*N.Y. State Firearms Ass'n v. James*,
No. 23 Civ. 6524, 2024 WL 1932050 (W.D.N.Y. May 2, 2024) ....................22-23

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)....................12, 17, 22

*Nat'l Ass'n for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025) ....................17

*Olivier v. Robert L. Yeager Mental Health Ctr.*,
398 F.3d 183 (2d Cir. 2005).....4, 13

*Phelps v. Bosco*,
711 F. App'x 63 (2d Cir. 2018).....3, 13

*Rodriguez v. City of New York*,
72 F.3d 1051 (2d Cir. 1995).....3

*Susman v. Sullivan*,
No. 24-CV-1281-LJV, 2025 WL 575515 (W.D.N.Y. Feb. 21, 2025)
.....2, 9, 12-13, 22

*Susman v. Sullivan*,
No. 24-CV-1281-LJV, 2026 WL 878874 (W.D.N.Y. Mar. 31, 2026).....8

*Tienken v. Benedictine Hosp.*,
110 A.D.3d 1389 (3d Dep't 2013).....12

*Transunion LLC v. Ramirez*,
594 U.S. 413 (2021).....8

*United States v. Franzky*,
No. 23 Cr. 40022, 2024 WL 4494988 (D.S.D. Oct. 15, 2024).....17

*United States v. Gonzalez*,
No. 23 Cr. 6210, 2024 WL 5336649 (W.D.N.Y. Nov. 13, 2024).....16

*United States v. Gould*,
163 F.4th 795 (4th Cir. 2026).....16-18, 20-21

*United States v. Laykovich*,
No. 24 Cr. 35, 2024 WL 4376265 (E.D. Ky. Oct. 2, 2024).....17

*United States v. Veasley*,
98 F.4th 906 (8th Cir. 2024).....18-21

*United States v. Walker*,
No. 24 Cr. 22, 2024 WL 4024204 (D. Minn. Sept. 3, 2024).....17

*United States v. Weathers*,
No. 23 Cr. 31, 2024 WL 2871356 (N.D. Ga. Mar. 11, 2024).....17

*Zherka v. Bondi*,
14 F.4th 68 (2d Cir. 2025).....15, 20, 23

## Constitutions

Second Amendment ........ 1, 7, 11-12, 14-16, 20, 22

## State Statutes

1881 Fla. Laws 87 ........ 21

1883 Kan. Sess. Laws 159 ........ 21

1795 Mass. Acts ........ 23

Mass. Gen. Laws
ch. 240 § 1 (1837) ........ 14

Me. Pub. Laws 424
§ 5 ........ 15

Mental Hygiene Law
§ 7.09 ........ 2
§ 7.09(j) ........ 2, 7-9, 17
§ 7.09(j)(1) ........ 1, 7, 10, 14, 21
§ 7.09(j)(2) ........ 1, 5, 7, 10, 11-12
§ 9.13 ........ 13
§ 9.13(b) ........ 13
§ 9.27 ........ 10
§ 9.39 ........ 1, 3-4, 6, 11-14, 19

1776-1777 Pa. Laws
ch. XXI, §§ 1, 4 ........ 23

1843 R.I. Pub. Laws 1
§ 1 ........ 15

1842 Vt. Acts & Resolves 37 ........ 15

## Federal Statutes

18 U.S.C.
§ 922 ........ 2
§ 922(d)(4) and (g)(4) ........ 2, 5
§ 922(g) ........ 9, 13, 18
§ 922(g)(4) ........ 1, 4-5, 8, 14, 16-18, 21
§ 922(g)(8) ........ 23

34 U.S.C.
§ 40915 ....................................................................................................................4, 21
§ 40915(a)(2) ...................................................................................................................4
§ 40915(b) ..................................................................................................................... 4-5

42 U.S.C.
§ 1983..............................................................................................................................7

NICS Appeals and SAFE Act ........................................................................................4, 7

NICS Improvement Amendment Act of 2007 ....................................................................2

NICS Improvement Amendments Act ..............................................................................2

Pub. L. 275, 72 Stat. 650, 652 (1932) .............................................................................21

Vagrancy Act of 1745 .......................................................................................................19

## State Regulations

14 N.Y.C.R.R. 543.4(b) ....................................................................................................1

14 N.Y.C.R.R. 543.5(b)(1), (3)...........................................................................................4

14 N.Y.C.R.R. 543.5(c)(1)..................................................................................................5

14 N.Y.C.R.R. 543.5(c)(2)(i)(A), (B) ...............................................................................5

14 N.Y.C.R.R.
pt. 543 ...............................................................................................................................4

## Federal Regulations

27 C.F.R. 478.11 ...............................................................................................1, 8, 11, 14

## Rules

Fed. R. Civ. P. 5.1(a) .........................................................................................................8

Federal Rule of Civil Procedure 56(a) ...............................................................................1

N.Y. C.P.L.R.
article 78.............................................................................................................................5

Rule 5.1 ...........................................................................................................................10

## Miscellaneous Authorities

Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon The Legislative Power of the States of the American Union* 28 (2d ed. 1871) ........................15

1 William Blackstone, *Commentaries on the Laws of England* 304 (Clarendon Press 1770) ........................19

4 William Blackstone, *Commentaries on the Laws of England* 25 (Clarendon Press 1770) ........................19

7 William W. Hening, *The Statutes at Large, Being a Collection of all the Laws of Virginia* 35-36 (Richmond: Franklin Press 1809) ........................22

## PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of Defendant Anne Marie T. Sullivan, MD, in her official capacity, in support of her motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). Plaintiff Isaac Richey's remaining claims are as applied challenges to New York Mental Hygiene Law (MHL) §§ 7.09(j)(1) and (2) as violative of the Second Amendment. Defendant Sullivan is entitled to summary judgment for lack of standing because the laws that Plaintiff challenges are not the reason that he is prohibited from possessing a firearm. Alternatively, Plaintiff's admission to a psychiatric hospital under MHL § 9.39 was an involuntary civil commitment within the meaning of all the relevant statutes and his subsequent inclusion in the National Instant Criminal Background Check System (NICS) database and the denial of his subsequent application for a certificate of relief from disabilities under MHL § 7.09(j)(2) do not violate the Second Amendment.

## STATEMENT OF FACTS

### A. Background Regarding the Prohibition on Firearm Possession by Persons Involuntarily Committed to Mental Institutions

Under federal law, it is unlawful for a person to possess a firearm or ammunition if that person "has been adjudicated as a mental defective or . . . has been committed to a mental institution." 18 U.S.C § 922(g)(4). "Committed to a mental institution" is defined by federal regulation as "[a] formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority," which includes "commitment to a mental institution involuntarily," and "commitment for mental defectiveness or mental illness." 27 C.F.R. 478.11; *see* 14 N.Y.C.R.R. 543.4(b).

New York and federal law provide a system to ensure both that persons involuntarily committed to mental institutions are kept from possessing firearms, and that persons who have

recovered from the illness that led to their commitment may regain their access. NICS, which is part of that system, was established pursuant to federal law so that prospective gun purchasers' backgrounds can be searched for information that would disqualify them from possessing firearms. *See generally* 18 U.S.C. § 922. Federal law also provides that those who are "adjudicated as a mental defective" or who have "been committed to a mental institution," are not permitted to possess or purchase firearms or ammunition. *Id.* § 922(d)(4), (g)(4).

Following Congress' passage of the NICS Improvement Amendment Act of 2007, the New York State Legislature amended MHL § 7.09 to require the Office of Mental Health (OMH) to transmit to the federal NICS database identifying information of individuals who have been involuntarily committed to a hospital in New York State. *See* MHL § 7.09(j).[1] When an individual is involuntarily committed, the records of the admission are submitted to the NICS database by the admitting hospital. *See* Shapiro Decl. ¶ 13. The process is automated and does not require a determination or any action by OMH or the New York State Department of Health (DOH). *See id.* Hospitals enter information about qualifying admissions to the Person-based Electronic Response Data System (PERDS) in DOH's secure Health Commerce System portal, which is then immediately transmitted electronically to OMH's NICS Database. *See id.* The information provided by the hospital is then electronically bundled into an automatic data batch process which is forwarded to the Criminal Justice Information System Division (CJISD) of the Federal Bureau of Investigations for inclusion in the federal NICS Database through a process facilitated by the New York State Office of Information Technology Services. *See id.* ¶ 13.

---

[1] "In 2007, Congress passed the NICS Improvement Amendments Act, which aimed to make the federal background check system more comprehensive, including by providing grants to assist states in submitting all relevant records to NICS." *Susman v. Sullivan*, No. 24-CV-1281-LJV, 2025 WL 575515, at *5 (W.D.N.Y. Feb. 21, 2025) (citing NICS Improvement Amendments Act of 2007, Pub. L. 110-180, 122 Stat. 2559)).

### B. Mental Hygiene Law § 9.39 is New York's Statute for Emergency Commitment

This case concerns an admission to a psychiatric hospital pursuant to MHL § 9.39, which "creates a procedure to admit an individual against her will when her mental illness presents a serious danger to herself or others." *Phelps v. Bosco*, 711 F. App'x 63, 64 (2d Cir. 2018). MHL § 9.39 allows the director of a mental health hospital to "receive and retain" for a period of fifteen days "any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to themself or others." *Id.* § 9.39(a). "Likelihood of serious harm" is defined as, among other things, "substantial risk of physical harm to themselves as manifested by threats of or attempts at suicide or serious bodily harm." *Id.*; *cf. Rodriguez v. City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995). A patient can only be admitted under MHL § 9.39 if a staff physician examines the patient and finds that his or her condition meets the statutory requirements; the patient can only be retained beyond 48 hours, as in the Plaintiff's case, if a second physician "who shall be a member of the psychiatric staff" separately examines the patient and concurs with the first physician. *Id.*

Section 9.39 includes robust protections for the individual, including judicial review and state-provided legal representation. Upon an MHL § 9.39 admission, the hospital must provide notice to the patient, to up to three other persons designated by the patient, and to the Mental Hygiene Legal Service (MHLS), an arm of the New York State Courts that provides representation to institutionalized persons at state expense. *See* MHL § 9.39(a). At any time after the admission, the patient, a friend or relative, or the MHLS can request a hearing; if a request is made, a hearing must be held "as soon as practicable but in any event not more than five days after such request," in the Supreme Court or County Court where the facility is located. *Id.* The Second Circuit has

"held that section 9.39 facially satisfies Fourteenth Amendment due process requirements." *Olivier*, 398 F.3d at 188 (citing *Project Release v. Prevost*, 722 F.2d 960, 972-74 (2d Cir. 1983)).

**C. Obtaining relief from the 18 U.S.C. § 922(g)(4) prohibition.**

The disarmament of involuntarily committed persons under 18 U.S.C. § 922(g)(4) is not permanent, and an individual may apply for a certificate of relief from disabilities, which may restore firearm rights. *See* 34 U.S.C. § 40915; Shapiro Decl. ¶¶ 27-28; 14 N.Y.C.R.R. pt. 543. In 2009, the United State Department of Justice certified that New York's certificate of relief from disabilities process met all the requirements of federal law. *See* Shapiro Decl. ¶ 29. Under this federal-state system, when a certificate of relief is granted, "the adjudication or commitment, as the case may be, is deemed not to have occurred." 34 U.S.C. § 40915(b). The Office of NICS Appeals and SAFE Act, an office within OMH, oversees the application and review process. *See* Shapiro Decl. ¶ 31.

After an application is received, a panel of individuals, including a forensic psychiatrist, a lawyer, and a senior consumer affairs advocate, review the materials on behalf of the Commissioner and apply the federal statutory standard to determine, from the information provided, "whether the applicant will not be likely to act in a manner dangerous to public safety and granting the relief will not be contrary to the public interest." 34 U.S.C. § 40915(a)(2); *see* 14 N.Y.C.R.R. 543.5(b)(1), (3).

After the panel has reviewed the application, it must "prepare a written determination," which by regulation must explain "the information utilized in reaching the decision," "the applicant's criminal history (if any)," "the psychiatric evaluation prepared to support the request for relief (if any)," "the applicant's mental health history," "the circumstances surrounding the firearms disability imposed by 18 U.S.C. Sections 922 and (g)(4)," whether relief is warranted

under the legal standard set by Congress, and "a determination as to whether or not the relief is granted." 14 N.Y.C.R.R. 543.5(c)(1).

When an application for a certificate of relief is granted, OMH provides an update to the federal NICS database to indicate that the relief was granted, removing the federal law disqualification from firearms purchase and possession under 18 U.S.C. § 922(d)(4) and (g)(4). 34 U.S.C. § 40915(b); *see* Shapiro Decl., ¶ 34. When an application for a certificate is denied, the applicant is informed of his or her right to have the decision reviewed in state court, and is advised that he or she may not apply again until a year after the date of the written determination denying the certificate of relief. *See* 14 N.Y.C.R.R. 543.5(c)(2)(i)(A), (B); Shapiro Decl. ¶ 35. Individuals regularly apply for and obtain a certificate of relief enabling them to carry a firearm. *See* Shapiro Decl. ¶ 36. Between 2019 and 2023, individuals filed 199 applications and OMH granted 113 — or 57% — of them. *See id.* If a certificate of relief is denied, the applicant can challenge the denial in state court via a N.Y. C.P.L.R. article 78 proceeding. *See* MHL § 7.09(j)(2); Shapiro Decl. ¶ 37.

### D. Plaintiff's Hospitalization, His Application for a Certificate of Relief, and the Panel's Denial

In 2019, while stationed at the Fort Drum military base, Plaintiff expressed thoughts of suicidal ideation (SI) to a fellow soldier. *See* Loefke Decl., Ex. A at 28-29. Military police were notified of the situation and police officers transported Plaintiff to Samaritan Hospital in Watertown, New York on January 28, 2019, where Plaintiff was admitted to the hospital for observation. *See* Shapiro Decl., Ex. 1 at 699; *see also* Loefke Decl. Ex. A at 30-31. Two medical professionals executed emergency admission forms indicating that they found reasonable cause to believe that Plaintiff had a mental illness for which immediate observation, care and treatment in a mental hospital was appropriate and that Plaintiff was likely to cause serious harm to himself or

others. *See* Shapiro Decl., Ex. 1 at 702,[2] 706. Neither Plaintiff nor anyone on his behalf requested a hearing to challenge his MHL § 9.39 commitment during his admission, nor has he disputed that he met the legal standard for an emergency commitment under the statute. Plaintiff was discharged eight days later, on February 5, 2019, with follow-up treatment scheduled at the Army base. *See id.* at 99-100. In short, Plaintiff was involuntarily committed for psychiatric treatment pursuant to MHL § 9.39.

Plaintiff alleges that on an unspecified date in 2022, he attempted to purchase a firearm in Oregon. *See* Am. Compl. ¶ 97, Dkt. No. 39; Loefke Decl., Ex. A at 43. His purchase was denied because a NICS background check revealed his involuntary commitment in 2019. *See* Am. Compl. ¶ 98. On November 17, 2021, Plaintiff submitted an application to OMH seeking a certificate of relief from disabilities. *See* Shapiro Decl., Ex. 1 at 1-8. OMH's Office of NICS Appeals requested additional records and documentation including, among other things, Plaintiff's treatment records from Ft. Drum Behavioral Health and notes from sessions with a psychologist, Robert Rogers. *See id.* at 38. In addition to the records from Fort Drum, the panel reviewed mental health treatment notes from Plaintiff's time in high school, which reflected diagnoses of depression and anxiety and a troubling fixation on firearms and killing for justice. *See id.* at 359, 400, 406, 430, 482, 588. The Panel issued a written determination dated July 28, 2022, denying the application and finding that:

> Based on available information, it cannot be established that [Plaintiff] ha[s] sufficiently resolved the problems that contributed to his involuntary commitment, nor that [he] ha[s] gained the skills and understanding necessary to manage symptoms appropriately and safely on an ongoing basis. After a thorough review and analysis of the materials submitted and a subsequent investigation,

---

[2] The form entitled "NOTICE OF STATUS AND RIGHTS EMERGENCY ADMISSION" was also expressly provided to Plaintiff. *See* Shapiro Decl., Ex 1 at 702 ("THE ABOVE PATIENT HAS BEEN GIVEN A COPY OF THIS NOTICE").

> OMH cannot conclude that [Plaintiff's] record and reputation are such that [he] will not be likely to act in a manner dangerous to public safety.

*Id*. at 35. Plaintiff has never challenged this determination, by an article 78 proceeding or otherwise. *See* Loefke Decl., Ex. A at 50, 65.

### E. PROCEDURAL HISTORY.

Plaintiff commenced this action on March 17, 2023. *See* Dkt. No. 1. The Complaint initially named Defendant Sullivan, OMH, the three members of the NICS panel, and the Office of NICS Appeals and SAFE Act, alleging violations of the Second, Fourth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. *See generally id.* Plaintiff subsequently amended his pleading and all Defendants moved to dismiss. *See generally* Am. Compl.; *see* Dkt. No. 45. On July 3, 2025, the Court granted, in part, and denied, in part, Defendants' motion to dismiss. The only surviving claims are as-applied challenges to MHL § 7.09(j)(1) and (2) as violative of the Second Amendment against Defendant Sullivan, in her official capacity, for equitable relief. These discrete claims survived because of Plaintiff's allegations that his commitment was not involuntary*, see* Dkt. No. 53 at 38-41, however, Plaintiff now acknowledges that his commitment was, in fact, involuntary, *see* Loefke Decl., Ex. A at 33. Defendant Sullivan now moves for summary judgment on the surviving claims.

## ARGUMENT

## POINT I

## PLAINTIFF LACKS STANDING

As a threshold matter, summary judgment should be granted because Plaintiff lacks standing to sue Defendant Sullivan for a violation of the Second Amendment vis-à-vis MHL § 7.09(j), which, as relevant here, pertains to the transmission of data or records to NICS that an individual was involuntarily committed to a hospital and creates an administrative process by

which a person may petition for relief from disability. Fundamentally, MHL § 7.09(j) does not create the impediment to Plaintiff's possession of firearms.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularize, and actual or imminent, (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Transunion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Even assuming that Plaintiff can establish an injury in fact, he cannot establish that his injury is traceable to or redressable by Defendant Sullivan.

Instead, Plaintiff's injury stems from a federal statute, 18 U.S.C. § 922(g)(4), that prohibits the possession of firearms or ammunition by anyone who has been "committed to a mental institution." It is a federal regulation, 27 C.F.R. 478.11, that establishes that the statutory language of § 922(g)(4) "includes a commitment to a mental institution involuntarily." Federal law — that Defendant Sullivan did not establish and does not enforce — imposes the impediment to firearm possession, and Plaintiff "has not sued the United States, one of its agencies, or one of its officers or employees in an official capacity," Fed. R. Civ. P. 5.1(a), nor has he provided the United States Attorney General with notice of any constitutional challenge and the right to intervene, as required by the Federal Rules of Civil Procedure.[3] *See Giannavola v. Lee*, No. 24 Civ. 6096, 2025 1932020, at *6 (W.D.N.Y. July 14, 2025).

To the extent that Plaintiff complains that his injury stems from OMH's transmittal of the fact of his hospitalization to the federal NICS system, the hospitalization took place in 2019, well

---

[3] The United States government has vigorously defended the governing federal statute and regulation, filing dispositive motions on the merits in two recent cases brought by similarly-situated plaintiffs. *See, e.g.*, *K.I. v. Sullivan*, No. 1:25-CV-00264, 2026 WL 571301 (N.D.N.Y. Mar. 2, 2026); *Susman v. Sullivan*, No. 24-CV-1281-LJV, 2026 WL 878874 (W.D.N.Y. Mar. 31, 2026).

outside the limitations period, *see* Am. Compl. ¶ 82, and the transmittal process took place automatically, without any involvement by Defendant Sullivan. *See* Shapiro Decl. ¶ 13. More fundamentally, it was Plaintiff's involuntary commitment to Samaritan Hospital, not the transmittal of that fact, that disqualified him from possessing firearms. There is no equitable relief that Defendant Sullivan could effectuate that would change the way federal law operates against Plaintiff, nor would it prevent a potential prosecution by federal authorities.

The U.S. District Court for the Western District of New York recently rejected a preliminary injunction against OMH on the same theory presented, here, finding that "OMH's report is not even a but-for cause of [the plaintiff]'s possession of firearms being illegal. Instead, [the plaintiff]'s injury is the result of 'the independent action of a third party not before the court'—namely, the federal government—and therefore not traceable to Sullivan [or OMH]." *Susman v. Sullivan*, No. 24-CV-1281-LJV, 2025 WL 575515 at *10 (W.D.N.Y. Feb. 21, 2025). Similarly, Judge D'Agostino of this Court recently dismissed claims against Defendant Sullivan for lack of standing on the same theory as presented here. *See K.I. v. Sullivan*, No. 1:25-CV-00264, 2026 WL 571301, at *6-10 (N.D.N.Y. Mar. 2, 2026) ("Indeed, the Court finds Plaintiff's challenges to MHL § 7.09(j) and 14 N.Y.C.R.R. § 543.5 suffer from the same defects as those in *Susman*."). As in *Susman* and *K.I.*, federal law, namely 18 U.S.C. § 922(g), is the cause of Plaintiff's injury and would apply regardless of the outcome of this matter. Similarly, last year in *Giannavola v. Lee*, No. 24 Civ. 6096, 2025 WL 1932020 (W.D.N.Y. July 14, 2025), Judge Vacca of the Western District of New York dismissed a functionally identical claim based in part on a failure to "set forth a clear constitutional challenge" to the federal statute and to provide notice to the United States Attorney General under Rule 5.1, *see id.* at *6, and noted that any claim based on the initial report of the plaintiff's hospitalization was "untimely." *Id.* at *9.

Notably, Plaintiff does not challenge OMH's denial of his application for a certificate of relief from disabilities. Instead, he seeks an injunction prohibiting: the inclusion of his "records information in the state database," "reporting to NICS and any other database information concerning [him] that identifies him as a person prohibited from possessing, purchasing, transferring, or receiving firearms in connection with his 2019 admission to Samaritan Hospital," and "collecting, retaining, modifying, and/or transmitting the records . . . to NICS, the FBI, or any other law enforcement agency and third party of individuals who have been admitted to a mental health facility for emergency evaluation and observation under MHL 9.39 and thereafter discharged without conversion to MHL 9.27 or 9.37." Am. Compl. at 24-25. Each of these requests find their origin in Plaintiff's disagreement with federal law, and Defendant Sullivan is not empowered to provide the relief Plaintiff seeks. The surviving claims must be dismissed for lack of standing.

## POINT II

## INVOLUNTARY ADMISSION PURSUANT TO MHL § 9.39, AND SUBSEQUENT INCLUSION IN THE NICS DATABASE, DOES NOT VIOLATE THE SECOND AMENDMENT

The only claims that survived Defendants' motion to dismiss are as-applied challenges to MHL § 7.09(j)(1) and (2) "stemming from the maintenance of [Plaintiff's] information in the NICS database, which precludes him from obtaining a firearm." Dkt. No. 53 at 38-41. As defined by the Court, Plaintiff's first surviving claims is "that MHL § 7.09(j)(1) has been unconstitutionally applied to improperly identify him as a person 'involuntarily committed' and therefore 'no longer permitted under federal or state law to possess a firearm,' due to the 2019 Admission, entitling him to removal from the NICS database." *Id.* at 38. The second surviving claim is that, alternatively, "even if the 2019 Admission served as proper grounds for his initial inclusion in the NICS database, he is no longer 'likely to act in a manner dangerous to public safety' pursuant to

MHL § 7.09(j)(2), entitling [him] to a certificate of relief from disabilities." *Id.* Both claims are premised on Plaintiff's allegations, strewn throughout the pleading but refuted by his own testimony, that his commitment was, in fact, voluntary. Both claims fail as Plaintiff admits, and the records establish, that he was involuntarily committed in 2019.

Plaintiff now tacitly admits that his 2019 commitment to Samaritan Hospital was, in fact, involuntary under MHL § 9.39. *See* Loefke Decl., Ex. A at 33 (admitting, when questioned about whether his commitment was involuntary, that "New York considers that an involuntary commitment"). Given Plaintiff's change in position with respect to the voluntariness of his hospitalization in 2019, it is impossible for him to maintain the surviving claims, both of which were premised on the allegation, which the Court was constrained to credit in its July 3, 2025 Decision and Order, that his commitment was voluntary. Plaintiff's original theory as pleaded was that his commitment was *voluntary*, and, therefore, did not meet the definition of "committed to a mental institution" under 27 C.F.R. 478.11, which expressly excepts "a person in a mental institution for observation or a voluntary admission to a mental institution." *See, e.g.*, Am. Compl. ¶¶ 83, 84, 89, 90. As demonstrated in the emergency admission records, Plaintiff's commitment, premised on his SI, was plainly involuntary pursuant to MHL § 9.39. *See* Shapiro Decl., Ex. 1 at 701-06. With the benefit of the factual record now before the Court, it is apparent that Plaintiff's as-applied challenges fail.

Even if Plaintiff had not abandoned his allegation about the voluntariness of his commitment, his claims are premised on an erroneous interpretation of the Second Amendment. Plaintiff first asserts that a temporary prohibition from possessing firearms following an involuntary commitment violates the Second Amendment. *See* Am. Compl. ¶¶ 54-55. He alternatively argues that his Second Amendment rights are impaired because he is purportedly no

longer likely to act in a manner dangerous to public safety pursuant to MHL § 7.09(j)(2). Neither argument is persuasive as temporarily depriving a person involuntarily committed from possession firearms is well supported by the historical precedent of firearm regulation in this country.

The temporary disarmament of involuntary psychiatric patients stands at the nexus of two of the most well-established categories of constitutional firearm regulation: "longstanding prohibitions on the possession of firearms by . . . the mentally ill," which are "presumptively constitutional," *Heller*, 554 U.S. at 626-27 & n.26, and administrative processes "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens,'" which are constitutional unless "lengthy wait times" or "exorbitant fees deny ordinary citizens their right to public carry." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022).

**A. MHL § 9.39 admissions are involuntary as a matter of law.**

Before considering whether the Second Amendment was violated, it is necessary to understand that the commitment at issue here was involuntary. There can be no serious dispute that Plaintiff's admission to Samaritan Hospital pursuant to MHL § 9.39 was "involuntary" as a matter of state and federal law. *See Susman* 2025 WL 575515 at *11 ("[C]ourts have repeatedly held that commitments under section 9.39 are involuntary as a matter of law."). New York State courts continue to regularly confirm that MHL § 9.39 commitment is an involuntary commitment for the purposes of firearm dispossession. *See Matter of Colihan v. New York,* 211 A.D.3d 1432, 1436 (3d Dep't 2022) ("We reject any claim that petitioner's Mental Hygiene Law § 9.39 admission was not an involuntary commitment within the meaning of federal law"); *Matter of Gardner v. Bassett Med. Ctr.,* 148 A.D.3d 1331, 1334 (3d Dep't 2017); *Tienken v. Benedictine Hosp.*, 110 A.D.3d 1389, 1390 (3d Dep't 2013); *see also Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 183, 188 (2d Cir. 2005) (explaining that § 9.39 "provides for the temporary

involuntary commitment of persons to mental health facilities"). Federal Courts of Appeals have reached the same holding, including the Second Circuit in *Phelps v. Bosco*, 711 F. App'x 63, 65 (2d Cir. 2018), and the Seventh Circuit, applying New York law, in *Escamilla v. United States*, 62 F.4th 367, 373 (7th Cir. 2023).

Even if Plaintiff went to the hospital voluntarily prior to his MHL § 9.39 commitment, it is of no significance because "the fact that a particular individual may have been cooperative with the admission process does not render a section 9.39 admission 'voluntary' under section 922(g)." *Susman*, 2025 WL 575515, at *11 (citing *Colihan*, 211 A.D. 3d at 1437); *see Escamilla*, 62 F.4th 367 at 374 ("[C]ommitment under § 9.39 is involuntary, regardless of the committed person's subjective intent."). This is because "[r]egardless of how an individual arrives at the hospital or his [or her] subjective intent, it is the hospital's decision whether to commit the person under MHL § 9.39, and if it does so, the commitment is decidedly involuntary." *Giannavola*, 2025 WL 1932020 at *8. Commitment under MHL § 9.39 stands in stark contrast to admission under MHL § 9.13, the statute providing for "voluntary admissions," under which "the [hospital] director shall promptly release the patient" upon request. MHL § 9.13(b); *see Escamilla*, 62 F.4th at 376 ("[I]f [the plaintiff]'s hospitalization had been deemed voluntary, he would have been admitted under § 9.13, which governs 'Voluntary Admissions.'").

The same conclusion follows from the specific facts of Plaintiff's case, as his evaluating physician admitted Plaintiff because he had "SI w/ plan to shoot self." Shapiro Decl., Ex. 1 at 705. "Pertinent and Significant Factors" in support of Plaintiff's MHL § 9.39 involuntary admission were depression and SI. *Id.* at 706. Plaintiff also had "a tendency to cause serious harm to him[]self," noted as "SI w/ plan OD." *Id.* There is no basis to view Plaintiff's admission under

MHL § 9.39 as anything but involuntary within the meaning of 18 U.S.C. § 922(g)(4), 27 C.F.R. 478.11, or MHL § 7.09(j)(1).

**B. The Second Amendment permits disarmament of persons who have been involuntarily committed.**

**i. Mental health restrictions to firearm possession do not implicate the Second Amendment's text.**

"*Bruen* requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk*, 120 F.4th at 968 (quoting *Bruen*, 597 U.S. at 19). In the first stage, the plaintiff bears the burden of demonstrating that his or her conduct is covered by the Second Amendment's text. *See Gazzola v. Hochul*, 645 F. Supp. 3d 37, 64 (N.D.N.Y. 2022), *aff'd*, 88 F.4th 186 (2d Cir. 2023). If the text is not implicated, "that ends the inquiry: the Second Amendment does not apply." *Mills v. New York City*, No. 23 Civ. 7460, 2024 WL 4979387, at *7 (S.D.N.Y. Dec. 4, 2024) (quoting *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024)).

18 U.S.C. § 922(g)(4), which prohibits firearms possession by persons who have been involuntarily committed to a mental institution, does not implicate the text of the Second Amendment. While the law has an impact on the "right to keep and bear arms," history demonstrates that the mentally ill were not part of "the people" to whom the Amendment applied, nor could they be part of the "well-regulated militia" that the Second Amendment was designed to ensure. *See Heller*, 554 U.S. at 599 (noting that "the Second Amendment's prefatory clause announces the purpose for which the right was codified"). While the scope of the Founding-era militia was broad, it did not include the mentally ill. *See, e.g.*, Mass. Gen. Laws ch. 240 § 1 (1837), Loefke Decl., Ex. B, Historical Source Compilation at 1-4 ("Every able-bodied white male citizen

resident within this Commonwealth . . . excepting idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia."); 1837 Me. Pub. Laws 424 § 5, Loefke Decl., Ex. B, Historical Source Compilation at 5-8 (similar); 1843 R.I. Pub. Laws 1 § 1, Loefke Decl., Ex. B, Historical Source Compilation at 9-35 (similar); 1842 Vt. Acts & Resolves 37, Loefke Decl., Ex. B, Historical Source Compilation at 36-38 (similar); *cf.* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon The Legislative Power of the States of the American Union* 28 (2d ed. 1871) ("[c]ertain classes have been almost universally excluded" from the term "the people," including "the idiot [and] the lunatic").[4] The Second Circuit in *Antonyuk* found that laws treating people with mental illness differently demonstrated "that individuals with behavioral or substance dependence disorders have historically been viewed as a vulnerable population justifying firearm regulation." 120 F.4th at 1012; *see Mai v. United States*, 952 F.3d 1106 (9th Cir. 2020) ("[Section] 922(g)(4) does not burden the public at large; it burdens only a narrow class of individuals who are not at the core of the Second Amendment—those previously involuntarily committed." (quotation omitted)).

While viewing the mentally ill as outside the scope of "the people" is consistent with "the plain text of the Amendment as historically understood," *Antonyuk*, 140 F.4th at 968, it does not necessarily follow that a mentally ill person will remain so permanently. *See United States v.*

[4] Defendant Sullivan does not endorse the language or perspective used in these laws, nor does she think these terms describe Plaintiff. The nature of the *Bruen* historical test, which prioritizes historical analogy over modern policy considerations, necessarily requires the consideration of sources that do not share our modern values. *See Zherka v. Bondi*, 14 F.4th 68, 90 (2d Cir. 2025) (acknowledging that many historical sources are "offensive to contemporary morals and rooted in prejudiced stereotypes," but that courts must nonetheless consider them "according to the analysis the Supreme Court has directed we undertake, as examples of a historical tradition"). Notably, Justice Scalia in *Heller* cited and quoted Thomas Cooley's *Treatise* extensively. *See* 554 U.S. at 616-17 (discussing Cooley as "[t]he most famous" of the 19th century legal scholars, block-quoting his work, and asserting that "[a]ll other post-Civil War 19th-century sources we have found concurred with Cooley.").

*Gould*, 163 F.4th 795, 800 (4th Cir. 2026) (upholding § 922(g)(4) but affirming that "we emphatically do not subscribe to the notion that 'once mentally ill, always so'"). Accordingly, the federal-state relief from disabilities process allows for a swift and effective administrative process akin to the "presumptively constitutional shall-issue licensing regimes" endorsed by the Supreme Court in *Bruen*. *Giambalvo v. Suffolk County*, 155 F.4th 163, 181 (2d Cir. 2025); *see Frey v. City of New York*, 157 F.4th 118, 141 (2d Cir. 2025) (explaining that New York City's permit requirement "does not amount to constitutional harm" at *Bruen*'s plain text stage). While obtaining a certificate of relief may involve "endur[ing] another application process" and "impose[] a brief delay on an individual's ability to carry concealed firearms," the existence of an administrative requirement, absent extreme delays or procedural abuses, is not "sufficient to rebut the presumption of constitutionality and satisfy the step-one plain-text requirements." *Frey*, 157 F.4th at 141.

The conclusion that the mentally ill are outside the scope of "the people" is fully consistent with Supreme Court's Second Amendment jurisprudence, which has determined that regulatory measures limiting the mentally ills' access to firearms are presumptively lawful. *See United States v. Gonzalez*, No. 23 Cr. 6210, 2024 WL 5336649, at *1 (W.D.N.Y. Nov. 13, 2024) (quoting *Heller*, 554 U.S. at 626-27 & n.26), *R&R adopted by* 2025 WL 219112 (W.D.N.Y. Jan. 16, 2025). The Second Circuit has made clear that such regulatory measures create a legal presumption like any other: a "presumption of legality" that "can be overcome," but only if a regulation has "the effect of eliminating the ability of law abiding, responsible citizens to acquire firearms." *Gazzola*, 88 F.4th at 196. Accordingly, although there have been few post-*Bruen* challenges to 18 U.S.C. § 922(g)(4), several courts have affirmed its constitutionality at the textual step based on the Supreme Court's repeated instruction that such measures do not implicate the Constitution. *See,*

*e.g.*, *United States v. Laykovich*, No. 24 Cr. 35, 2024 WL 4376265, at *4 (E.D. Ky. Oct. 2, 2024); *United States v. Weathers*, No. 23 Cr. 31, 2024 WL 2871356, at *16-17 (N.D. Ga. Mar. 11, 2024) ("the rights of those who have been committed to a mental institution are not addressed by *Bruen*, and regulations restricting those peoples' ability to possess firearms are presumably lawful"), *R&R adopted by* 2024 WL 2864678 (N.D. Ga. June 6, 2024).

**ii. The temporary disarmament of institutionalized persons is fully consistent with American history and tradition.**

An analysis of America's historical tradition of gun regulation likewise supports the constitutionality of both 18 U.S.C. § 922(g)(4) and MHL § 7.09(j). Indeed, federal courts across the country have been unanimous in upholding 18 U.S.C. § 922(g)(4), the statute that disarms Plaintiff, as justified by our nation's history of firearms regulation. *See, e.g.*, *Gould*, 163 F.4th 795; *Weathers*, 2024 WL 2871356 at *19; *United States v. Walker*, No. 24 Cr. 22, 2024 WL 4024204, at *5 (D. Minn. Sept. 3, 2024); *United States v. Franzky*, No. 23 Cr. 40022, 2024 WL 4494988, at *4 (D.S.D. Oct. 15, 2024). The same result is warranted here.

As a threshold matter, the intersection between gun rights and mental illness is an "unprecedented societal concern" that requires "a more nuanced approach" to the *Bruen* historical analysis. *Bruen*, 597 U.S. at 27; *see Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 236 (2d Cir. 2025) ("[B]ecause the challenged legislation addresses novel societal problems stemming from newly developed technology, a nuanced analysis is warranted."). It is true, of course, that mental illness was a fact of life during the Founding era, but "[s]ociety's understanding of mental illness has advanced in the centuries since the founding," as have the methods used to treat it. *Gould*, 163 F.4th at 802 n.10. For instance, "[t]he forms, causes, and treatments of various mental illnesses were largely unknown in the eighteenth century," *id.*, and it is difficult to evaluate what

Founding-era Americans would have thought about the legal effect of treatment at a mental institution because of "a lack of mental institutions generally during that period," *id.* at 807.

The relevant history is discussed below, but the Court is referred in particular to three sources that survey the history of the legal interaction between mental illness and firearm rights. First, the report of Defendant Sullivan's expert, Dr. Robert Spitzer of SUNY-Cortland; second, the Eighth Circuit's decision in *United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024), which surveyed the history of firearms and mental health regulation to conclude that "[t]he 'burden' imposed by [18 U.S.C.] § 922(g)(3) is 'comparable,' if less heavy-handed, than Founding-era laws governing the mentally ill," *id.* at 915; and third, the Fourth Circuit's decision in *Gould*, which upheld the constitutionality of § 922(g)(4) based on America's "unambiguous history and tradition of disarming and incarcerating those whose illness made them a danger to themselves or others," 163 F.4th at 805.

In addition to excluding mentally ill persons from the militia service that served as the Second Amendment's animating purpose, mental health law during the Founding Era included other invasions of rights far more injurious than a temporary bar from firearms possession. As summarized in Dr. Spitzer's expert report, "persons who exhibited aberrant or abnormal behavior were singled out in law as a suspect category with respect to weapons acquisition and use. In early American law, this included people often identified as vagrants, tramps, and the intoxicated." Spitzer Decl. Ex. ¶ 13. Dr. Spitzer concludes that "[t]hose who were societal pariahs in early America because of what we now recognize as mental illness would obviously have fallen outside of those considered eligible to exercise full rights, including anything resembling a right to have firearms or other dangerous weapons." *Id.* ¶ 16.

The leading piece of legislation in colonial times was the Vagrancy Act of 1745, which allowed any two justices of the peace to cause anyone suffering "lunacy" to "be apprehended, and be kept safely locked up in some secure place," and "to be there chained," with his or her property seized to pay for expenses. 17 George II c. 5, Loefke Decl, Ex. C. Blackstone's *Commentaries* recognized this as an expression of Britain's common-law tradition, writing that "[i]t was the doctrine of our antient law, that persons deprived of their reason might be confined till they recovered their senses, without waiting for the forms of commission or other special authority from the crown: and now, by the vagrant acts, a method is chalked out for imprisoning, chaining, and sending them to their proper homes." 4 William Blackstone, *Commentaries on the Laws of England* 25 (Clarendon Press 1770). In keeping with the era's limited understanding of mental illness, the term "lunatic" swept much more broadly than our modern understanding of persons suffering from mental illness (let alone the very limited subset of persons subject to involuntary civil commitment under MHL § 9.39), including persons with only intermittent symptoms. *See* 1 William Blackstone, *Commentaries on the Laws of England* 304 (Clarendon Press 1770).

History from the Founding Era shows that an involuntary emergency admission (with the extensive due process protections of MHL § 9.39) followed by a temporary disarmament until completion of a swift and effective administrative process would have been viewed as entirely constitutional, and indeed far more compassionate than the kinds of procedures then employed. If someone was both mentally ill and potentially dangerous, early America treated them in a manner we would view as barbaric: such persons were "'confined in barred cells in the basement,' and 'particularly violent individuals' were 'restrained . . . using a 'strait-waistcoat' or 'mad shirt,' or heavy arm and leg chains.' It should come as no surprise that confinement did not include access to guns." *Veasley*, 98 F.4th at 913 (citations omitted). The process provided was often minimal.

As the *Veasley* court recounted, persons alleged to be mentally ill could be confined at the discretion of "selectmen," "justices of the peace, many of whom had no formal legal training," as was the case in New York, and, even at times, a "friend" with no legal authority whatsoever. *Id.* at 914 (summarizing laws and secondary sources).[5]

The Fourth's Circuit decision in *Gould* also surveyed the historical confluence of firearms and mental health regulation and concluded that:

> history shows that legislatures had the authority, consistent with the understanding of the individual right to keep and bear arms, to disarm categories of people based on a belief that the class posed a threat of dangerousness. And when combined with the historical treatment of those who suffered from mental illness, we perceive unambiguous history and tradition of disarming and incarcerating those whose illness made them a danger to themselves or others.

163 F.4th at 805. As the court recounted, in colonial America, disarming entire groups of people based on a perceived danger to society was commonplace. *See id*. at 430-31; *Zherka*, 140 F.4th at 93 ("[H]istory reveals a tradition of categorical legislative bans on firearms possession by classes of people perceived as dangerous."). For example, in 1642, the Governor of Virginia issued orders "generally disarm[ing]" the Puritans, based on their "perceived status as a potential threat." *Gould*, 163 F.4th at 804. The Second Amendment ratification debates included arguments that right to bear arms should be excluded to persons "for crimes committed, *or real danger of public injury from individuals*." *Id*. at 805. The Court further noted that although it could "find little evidence in the historical record of keeping firearms out of the hands of people released from mental institutions in the founding era, that dearth stems from a lack of mental institutions generally during that period." *Id*. at 807.

[5] No one today would view such laws as morally acceptable, but originalism places historical practice above modern values. *Cf. Rahimi*, 602 U.S. at 717 (Gorsuch, J., concurring) (explaining that judges must "examine[] the laws, practices, and understandings from before and after ratification" because "[h]istory, not policy, is the proper guide").

As weapons technology advanced throughout the 19th Century, states began passing laws specifically prohibiting the mentally ill from acquiring or possessing firearms. For instance, in 1881, Florida made it "unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife." 1881 Fla. Laws 87, Loefke Decl. Ex. B at 39-40. Two years later, Kansas similarly established criminal liability for "[a]ny person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol . . . or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons . . . to any person of notoriously unsound mind." 1883 Kan. Sess. Laws 159, Loefke Decl. Ex. B at 41-43. Similar laws were passed in other jurisdictions in the late 19th and early 20th centuries, and, in 1932, Congress passed such a law to apply in the District of Columbia. *See* Pub. L. 275, 72 Stat. 650, 652 (1932) (forbidding anyone to "sell any pistol to a person who he has reasonable cause to believe is not of sound mind").

The statutory purpose of 18 U.S.C. § 922(g)(4) is entirely consistent with the longstanding tradition of preventing mentally ill persons from harming themselves or others. *See Veasley*, 98 F.4th at 915-16; *Gould*, 163 F.4th at 805. And the method utilized by 18 U.S.C. § 922(g)(4) — a temporary disarmament of institutionalized persons, pending an effective administrative process for rights restoration under 34 U.S.C. § 40915 — is significantly less burdensome and "less heavy-handed, than Founding-era laws governing the mentally ill." *Veasley*, 98 F.4th at 915. The same is true of MHL § 7.09(j)(1), which, as relevant here, requires transmission of a person's involuntary commitment to CJISD for inclusion in the NICS database. *See* Shapiro Decl. ¶ 9. Without such a statute, the federal government would lack access to critical information to effectively screen prospective firearms purchasers through the NICS background check system.

*See Susman*, 2025 WL 575515, at *5. These laws are entirely "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

**C. The administrative process for seeking a certificate of relief from disabilities does not violate the Second Amendment.**

Reasonably speedy and effective administrative processes "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" do not infringe the right to keep and bear arms, as a matter of law. *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 552 U.S. at 635); *see Giambalvo*, 155 F.4th at 181; *Frey*, 157 F.4th at 141; *N.Y. State Firearms Ass'n v. James*, No. 23 Civ. 6524, 2024 WL 1932050, at *6 (W.D.N.Y. May 2, 2024). The Second Amendment's text is not infringed where "none of the predominantly administrative regulations here operates to permanently deprive applicants of their right to own and carry firearms." *Mills*, No. 2024 WL 4979387, at *7-8. Accordingly, federal courts, including in New York, have found that administrative procedures "generally do not 'infringe' the right to keep and bear arms" absent procedural abuses not alleged in this case. *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024)).

The requirement that committed persons go through an administrative process for seeking relief from disabilities prior to carrying a deadly weapon would also pass muster at *Bruen*'s second step, as it is fully "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. From the earliest days of colonial America, governments have prevented the carriage of weapons by potentially dangerous persons, while allowing for individualized assessments of dangerousness analogous to the ones conducted in the certificate for relief from disabilities process. *See, e.g.*, 1 Records of Mass. 1628-1641, at 211-12 (Nathaniel B. Shurtleff, ed. 1853), Loefke Decl. Ex. B at 44-47; 7 William W. Hening, *The Statutes at Large, Being a Collection of all the Laws of Virginia* 35-36 (Richmond: Franklin Press 1809), Loefke Decl. Ex.

B at 48-53; *see N.Y. State Firearms Ass'n,* 2024 WL 1932050 at *6 ("For example, where states disarmed Catholics, some Catholics were able to overcome disarmament by taking an oath of loyalty."). This pattern repeated at the time of the Revolution, when colonies frequently disarmed individuals who were members of groups perceived as dangerous (often without any basis for individual suspicion), but allowed them to keep weapons if they could show themselves not to be a threat. *See Zherka*, 140 F.4th at 85-89 (tracing these laws through English and early American history); 1776-1777 Pa. Laws ch. XXI, §§ 1, 4, at 61-63, Loefke Decl. Ex. B at 60-65; *see also* Loefke Decl. Ex. B at 54-59, 66-72. Many states at the Founding Era also enacted "surety laws," a form of preventive justice where persons who might be considered threats to public safety could provide "a surety of the peace," meaning that the defendant pledged to keep the peace and often posted a bond as security for his good conduct. *See Rahimi*, 602 U.S. at 695-96; *see also, e.g.*, 1795 Mass. Acts & Laws 436, Loefke Decl. Ex. B at 73-74. The eight-justice majority in *Rahimi* found that these sureties were a sufficient analogue to sustain the constitutionality of 18 U.S.C. § 922(g)(8), another subsection of the same statute disarming involuntarily committed persons. *See* 602 U.S. at 695.

Individualized administrative assessments of dangerousness are also the central feature of licensing laws, which developed over the course of the 19th Century as guns became more concealable and more deadly. In fact, "[f]or as long as licenses to carry concealed weapons have been issued in this country, the officials administering those systems have been tasked with making individualized assessments of each applicant." *Antonyuk*, 120 F.4th at 989. These laws operated similarly to the relief from disabilities process in that they "condition the ability to lawfully carry a concealed weapon on obtaining a permit based in part on an individualized assessment by a[n

administrative] official." *Id.* at 990. New York's law of involuntary commitment and its administrative system for lifting firearms restrictions comfortably pass historical muster.

Finally, although Plaintiff does not challenge the denial of his application for a certificate of relief from disabilities in July 2022, there was an ample factual basis for it too. As set forth in the letter denying Plaintiff's application, Plaintiff had a history of serious mental health issues requiring treatment for depression and anxiety prior to his involuntary commitment for SI, which dated back to 2016. *See* Shapiro Decl., Ex. 1 at 35. Plaintiff also had documented "problems with lack of empathy, extensive interest in firearms, and themes of killing for justice." *Id.* Plaintiffs' treatment following his involuntary commitment was spotty, and, as recently as 2021, Plaintiff was "again diagnosed with recurrent major depressive disorder, and symptoms of depression, anger, and agitation were identified as areas of focus in treatment, as well as interpersonal relationships." *Id.* Based on the information Plaintiff provided to OMH, the panel was unable to conclude that he had "sufficiently resolved the problems that contributed to [his] involuntary commitment, nor that [he] ha[d] gained the skills and understanding necessary to manage symptoms appropriately and safely on an ongoing basis." *Id.*

## CONCLUSION

Based upon the forgoing, Defendant Sullivan respectfully requests that her motion for summary judgment be granted and that the amended complaint be dismissed in its entirety, with prejudice, together with any further relief that this Court deems just and proper.

Dated: Albany, New York
August 31, 2026

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341

By: */s/ Benjamin L. Loefke*
Benjamin L. Loefke
Special Litigation Counsel, of Counsel
Bar Roll No. 516796
Telephone: (518) 776-2739
Email: Benjamin.Loefke@ag.ny.gov

TO: All Counsel Via: CM/ECF