UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ISAAC RICHEY,

Plaintiff,

-against-

Case No. 1:23CV344
(AMN-DJS)

ANN MARIE T. SULLIVAN, MD, in her Individual and Official Capacity, NEW YORK STATE OFFICE OF MENTAL HEALTH, NEW YORK STATE OFFICE OF NICS APPEALS AND SAFE ACT, DOES 1-10 in their individual capacities,

Defendants.

**RULE 26(A)(2) EXPERT REPORT OF ROBERT SPITZER**

# EXPERT REPORT AND DECLARATION OF ROBERT SPITZER

I, Robert J. Spitzer, being duly sworn, deposes and says that the following is true and correct:

1. I have been asked to render an opinion by the Office of the Attorney General of New York State on the context and history of mental illness-related weapons laws restrictions, focusing in particular on the antecedents of mental illness, historical weapons laws relating to tramps and vagrants, and to alcohol intoxication.

2. This declaration is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3. I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an adjunct professor at the College of William and Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia. A copy of my complete curriculum vitae is attached as Exhibit A.

4. I am the author of 16 books on American politics subjects, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985. In addition to six books, I've written over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and

criminology. The ninth edition of the book was published in August 2023 by Routledge Publishers. My two most recent books on gun policy, *Guns across America* (Oxford University Press in 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For over twenty years, I have been a member of the National Rifle Association and of the Brady Campaign to Prevent Gun Violence.

5. I have provided written testimony an expert witness in *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the constitutionality of Massachusetts' restrictions on assault weapons. I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq, et al. v. Beaty, et al.*, U.S. Supreme Court 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago*, U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar*, Illinois Supreme Court, No. 08 CR 12069 (2012).

6. I have been invited to submit written testimony and serve as an expert witness in the following cases: Hanson v. District of Columbia, Civil Action No. 1:22-cv-02256-RC, United States District Court for the District of Columbia, 2022; Brumback v. Ferguson, No. 22-cv-3093 (E.D. Wash.); Sullivan v. Ferguson, No. 3:22-cv-05403-DGE (W.D. Wash.); Miller v. Bonta, No. No. 3:19-cv-1537 (S.D. Cal.); Duncan v. Bonta, No. 17-cv-1017 (S.D. Cal.); Fouts v. Bonta; Rupp v. Bonta; Gates et al. v. Polis (U.S.D.C. Colo. Case No. 1:22-cv01866-NYW-SKC); Oakland Tactical Supply LLC v. Howell Township, Case No.: 18-cv-13443; State v. Misch, No. 173-2-19 Bncr (Bennington County Criminal Case) in Vermont Superior Court; National Association for Gun Rights, Inc. v. City of Highland Park, 22-cv-4774 (N.D. Ill.); National

Association for Gun Rights & Capen v. Campbell, U.S. District Court No. 22-cv-11431-FDS; Abbott et al. v. Connor, Civil Action No. 20-00360 (RT), In The United States District Court for The District Of Hawaii; National Association for Gun Rights v. Shikada, U.S. District Court District of Hawaii, CASE #: 1:22-cv-00404-DKW-RT; Santucci v. Honolulu, U.S. District Court District of Hawaii, CASE #: 1:22-cv-00142-DKW-KJM; Yukutake v. Shikada, U.S. District Court District of Hawaii, CASE #: 1:22-cv-00323-JAO-KJM; Nat'l Ass'n for Gun Rights v. Lopez, U.S. District Court District of Hawai'i (Civil No. 1:22-CV-00404-DKW-RT); Abbot v. Lopez, U.S. District Court District of Hawai'i (Civil No. 20-00360 RT); Santucci v. City & County of Honolulu (Civil No. 1:22-cv-00142-DKW-KJM); Yukutake v. Lopez (Civil No. 1:22-cv-00323-JAO-KJM); Baird v. Bonta (E.D. Cal.); Nichols v. Newsom (C.D. Cal.); Delaware State Sportsmen's Association, Inc. v. Delaware Department Of Safety And Homeland Security (C.A. No. 1:22-cv-00951-RGA); Mark Fitz, Grayguns, Inc. v. Ellen Rosenblum, Attorney General of the State of Oregon; Harrel v. Raoul (Case No. 23-141-SPM, Southern District of Illinois); Mitchell, et al. v. Atkins, et al.; Court/Cause No.: 3:22-cv-5403; 1:22-cv-03093; Gates et al. v. Polis (U.S.D.C. Colo. Case No. 1:22-cv01866-NYW-SKC); Keneally et al., v. Raoul, et al., 23-cv-50039 (N.D. Ill.); McGregor v. County of Suffolk; Rocky Mountain Gun Owners, et. al. v. The Town of Superior (CO); Wiese v. Bonta; Harrel v. Raoul, Case No. 23-cv-141-SPM (S.D. Ill.); Langley v. Kelly, Case No. 23-cv-192-NJR (S.D. Ill.); Barnett v. Raoul, 23-cv-209-RJD (S.D. Ill.); Federal Firearms Licensees of Illinois v. Pritzker, 23-cv-215-NJR (S.D. Ill.); and Herrera v. Raoul, 23-cv-532 (N.D. Ill.); Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al., Docket No. 3:18-cv-10507, DOL No. 18-01760; Cheeseman et al. v. Platkin et al., Docket No. 1:22-cv-04360, DOL No. 22-01993; Ellman et al. v. Platkin et al., Docket No. 3:22-cv-04397, DOL No. 22-02057; Banta v. Ferguson, Eastern District of Washington; Hartford

v. Ferguson, Western District of Washington; RMGO/Mosgrove v. Polis; Koppel v. Bonta, 8:23-cv-00813 (C.D. Cal.); Calce v. City of New York, Case 1:21-cv-08208-ER.

7. I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

8. I have been retained by the Office of the Attorney General of New York to render expert opinions in this case and the related case of *D.B. v. Sullivan*, No. 22-CV-282 (MAD)(CFH) (N.D.N.Y.). I am being compensated at a rate of $500 per hour.

## I. Introduction

9. In the Supreme Court's ruling in *D.C. v. Heller* (2008), the majority opinion noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill. . . ."[1] This conclusion conforms to the longstanding history in American law of disarming dangerous or irresponsible people.

10. American governments in the 1600s, 1700s, and 1800s, enacted extensive, wide-ranging, and varied laws regulating to whom, when, where, and under what circumstances firearms and other dangerous weapons would be available to Americans. They were applied to

[1] *D.C. v. Heller*, 554 U.S. 570, 678 (2008).

types or categories of people, or the behavior of people, or various activities.[2] In that respect, they are similar to modern gun regulations. These old laws and regulations, however, also reflected the specific values, concerns, and fears of a bygone era.

11. For example, numerous laws were enacted to keep firearms and other dangerous weapons from Indigenous people, for the obvious reasons that European settlers were often in a state of de facto war with them, whom they feared, mistrusted, and denigrated. Race bias notwithstanding, fears of Native attacks in what amounted to a multi-century inter-civilization war on the American continent between them and European settlers and their descendants were real, even though stained by racism and exacerbated by relentless western movement by those moving from the East.[3]

12. Yet historical weapons laws and regulations extended to far more individuals and categories of people than those discussed above, including non-residents, non-citizens, those considered disloyal to the country, vagrants and tramps, those considered of "unsound mind," minors, and those who violated concealed carry or hunting laws. Weapons laws regulated firearms' use, storage, and transport; restricted or barred dangerous or unusual weapons, regulated the manufacture, inspection, and sale of firearms, and imposed gun storage and discharge restrictions; prohibited the firing of firearms in or near towns, after dark, on Sundays, in public places, in cemeteries, near roads or buildings; punished firing that wasted gunpowder/shot, or while under the influence of alcohol.[4] In the sections below I focus on those that pertain directly to the mentally ill.

---

[2] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 55-83.
[3] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016).
[4] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 55-83.

II. Mental Illness and Historical Gun Laws Referencing Those Considered "Vagrants," "Tramps," or "Unsound"

13. Before the advent of modern psychology and the modern study of mental health, persons who exhibited aberrant or abnormal behavior were singled out in law as a suspect category with respect to weapons acquisition and use. In early American law, this included people often identified as vagrants, tramps, and the intoxicated. The identification of those considered mentally ill, referenced with the term "unsound mind," did not appear in weapons laws until the late nineteenth and early twentieth centuries, coinciding with the establishment of the modern field of psychology during the same time.

14. Prevailing beliefs in the 1600s and 1700s in America and elsewhere attributed mental illness to factors including "demonic possession, witchcraft, or an angry god."[5] A modern study of those condemned as witches at the Salem witch trials (1692-93) and other similar trials of the time found that those condemned as witches exhibited "neurological and psychiatric disorders, such as epilepsy and hysteria."[6] In other words, they often exhibited traits that would now be identified with mental illness. Witchcraft trials aside, typical "cures" for such maladies, even up through the early 1800s, included exorcisms, trephination (cutting a hole in the person's skull to release demons, relieve headaches, or otherwise try to improve the patient's mental health), bloodletting and purging (vomiting), and isolating people in asylums. In addition to these methods, "other practices involved execution or imprisonment of people with psychological disorders. Still others were left to be homeless beggars. . . . These people were considered to be

---

[5] "Mental Health Treatment: Past and Present," *Psychology,* OpenStaxCollege, https://pressbooks-dev.oer.hawaii.edu/psychology/chapter/mental-health-treatment-past-and-present/

[6] Beatriz Quintanilla, "Witchcraft or Mental Illness?" *Psychiatric Times*, June 10, 2010, https://www.psychiatrictimes.com/view/witchcraft-or-mental-illness

witches and were tried and condemned by courts. . . ."[7] Thus, these actions occurred under the aegis of law and through the authority of local officials, a fact reflected in a 1711 Massachusetts law that was enacted to provide legal protection for officials who had been involved in the witchcraft proceedings two decades earlier: "no Sheriffe, Constable Goaler or other officer shall be Liable to any prosecution in the Law for anything they then Legally did in the Execution of their respective offices."[8] This enactment was one evidence of the regret later felt over the excesses and injustice of those trials. The man who presided over the Salem witch trials, William Stoughton, was the Chief Justice of the Massachusetts colony.[9]

15. Advances in science, chemistry, medicine, psychology, and Sigmund Freud's breakthrough psychoanalysis treatments at the end of the nineteenth century all buttressed efforts to reform and enlighten the treatment of the mentally ill,[10] a movement spearheaded in part by reformer Dorthea Dix, who successfully lobbied the federal and state governments to establish more than thirty hospitals for the treatment of the mentally ill.[11]

---

[7] "Mental Health Treatment: Past and Present."

[8] Massachusetts – Acts, Laws, and Orders, 1710-1711, Private Acts, No. 26, 72 (October 17, 1711). This law, titled "AN ACT TO REVERSE THE ATTAINDERS OF GEORGE BURROUGHS AND OTHERS FOR WITCH-CRAFT," did not entirely repudiate the witchcraft trials, however, as its opening sentence began: "in the year of our Lord one Thousand Six hundred ninety two Several Towns within this Province were Infested with a horrible Witchcraft or Possession of devils. . . ." https://heinonline-org.proxy.wm.edu/HOL/Page?collection=ssl&handle=hein.ssl/ssma0517&id=66&men_tab=srchresults

[9] "William Stoughton," Famous Trials," University of Missouri-Kansas City Law School, https://famous-trials.com/salem/2032-sal-bsto

[10] "History & Timeline of Mental Health and Addiction Treatment," Sunrise House Treatment Center, November 28, 2022, https://sunrisehouse.com/addiction-info/history-evolution-mental-health-treatment/

[11] Manon S. Parry, "Dorothea Dix (1802-1887)," *American Journal of Public Health* 96(April 2006): 624–625.

16. This history yields at least one important conclusion. Those who were societal pariahs in early America because of what we now recognize as mental illness would obviously have fallen outside of those considered eligible to exercise full rights, including anything resembling a right to have firearms or other dangerous weapons. Yet an examination of early weapons laws does reveal other, proxy categories of persons who were identified as subject to weapons restrictions.

A. Tramps and Vagrants

17. Vagrancy, as defined at common law, referred to those "going about from place to place. . .without visible means of support" and incorporated those who were considered "idle, and who, though able to work" refused to do so.[12] The terms "vagrants" and "tramps" were typically used as synonyms. In prior centuries, vagrancy incorporated more than homelessness or being unemployed, as vagrancy laws often made it "a crime to be poor, idle, dissolute, immoral, drunk, lewd, or suspicious."[13] The mentally ill, identified in the 1800s and earlier as "people who exhibited strange behaviors" were often imprisoned or "left to be homeless beggars."[14]

18. Vagrancy, or what might now be defined as "homelessness" was also often regarded as the product of a personal deficiency or weakness, encompassing a "loss of character and a perceived emerging moral crisis. . . ."[15] Vagrancy laws became more prevalent in the nineteenth century as the population shifted from rural to urban locations and cities experienced a dramatic

---

[12] Henry C. Black, *Black's Law Dictionary*, 6th ed. (St. Paul, MN: West Publishing, 1991), 1075.
[13] Risa Goluboff and Adam Sorenson, "United States Vagrancy Laws," in *The Oxford Encyclopedia of American Urban History* (NY: Oxford University Press, 2019), 1350–1365, https://www.law.virginia.edu/scholarship/publication/risa-goluboff/640716
[14] "Mental Health Treatment: Past and Present."
[15] "The History of Homelessness in the United States," *Permanent Supportive Housing* (Washington D.C.: National Academies Press, 2018), https://www.ncbi.nlm.nih.gov/books/NBK519584/

rise in population as the result of the migration of people in search of work. People identified as vagrants or tramps in prior centuries undoubtedly included some who today would be considered as suffering from mental illness.

19. A revealing illustrative example of how such persons were identified is seen in this 1715 Maryland law:

> . . .any person or persons. . . that shall be of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned, shall forfeit and pay one thousand pounds of tobacco. . . .[16]

Terms like "evil fame" and "dissolute liver," listed along with "vagrant," were vague, umbrella terms that reflected little in the way of refinement regarding people whose actions and behaviors would today be identified with, or include, mental illness. Similarly, an 1809 Maryland law punished any who:

> having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rogue and vagabond. . . .[17]

In this law, those convicted of the aforementioned criminal acts were labeled "rogues" and "vagabonds"—terms treated as synonyms. That is, those found to have engaged in the listed criminal conduct were then labeled rogues and vagabonds.

---

[16] 1715 Md. Laws 90, An Act for the speedy trial of criminals, and ascertaining their punishment in the county courts when prosecuted there, and for payment of fees due from criminal persons, chap. 26, § 7.

[17] The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources; 1809.

20. An 1845 Illinois law illustrates in a different way how the category of "vagrant" was applied with respect to criminality and possession of a weapon:

> If any person shall be found, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, *shall, on conviction, be deemed a vagrant*, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months [emphasis added].[18]

An 1865 Mississippi law provided as fulsome and expansive a definition of "vagrant" as one might find from the time, indicating that it involved far more than people who today would be identified as homeless. Under the heading "Vagrant Laws" appeared this:

> That all rogues and vagabonds, idle and dissipated persons, beggars, jugglers, or persons practicing unlawful games or plays, runaways, common drunkards, common night-walkers, pilferers, lewd, wanton, or lascivious persons, in speech or behavior, common railers and brawlers, persons who neglect their calling or employment, misspend what they earn, or do not provide for the support of themselves or their families, or dependants [sic], and all other idle and disorderly persons, including all who neglect all lawful business, or habitually misspend their time by frequenting houses of ill-fame, gaming-houses or tippling shops, shall be deemed and considered vagrants under the provisions of this act. . . .[19]

Some of these laws make no mention of criminality or criminal actions in relation to vagrants. For example, an 1866 South Carolina law simply said, "no disorderly person, vagrant, or

---

[18] Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845).

[19] Laws of Mississippi, chap. VI, § 1, 90 (1865). Vagrancy laws were often enforced particularly against African Americans as one tool of racist governments. Brent Tarter, "Vagrancy Act of 1866," *Encyclopedia of Virginia,* https://encyclopediavirginia.org/entries/vagrancy-act-of-1866/

disturber of the peace, shall be allowed to bear arms."[20] An 1879 Delaware law said that "[a]ny tramp who. . .shall be found carrying any firearm or other dangerous weapon. . .shall be guilty of a misdemeanor, and punished accordingly."[21]

21. In all, at least 19 states in the 1700s, 1800s, and early 1900s enacted laws that punished vagrants or tramps found with firearms or other weapons.[22] A majority of these laws were enacted after the Civil War, when, as noted, migration to cities dramatically accelerated.[23] For example, an 1879 Delaware law listed a variety of weapons-related infractions, including the provision that any "tramps" who "shall be found carrying any firearm or other dangerous weapon. . . shall be guilty of a misdemeanor, and punished accordingly."[24] Similarly, an 1879

[20] S.C., Order of General Sickles, Disregarding the Code, January 17, 1866 – General Order No. 1, § 16 in A Handbook of Politics for 1868 at 36, 36-7 (1868 Philip & Solomons), XIV.
[21] Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879).
[22] Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845); Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; C.F.W. Dassler, The General Statutes of 1901 (Kan.), ch. 19, Art. 3, §§ 748, 1003, 1141; 1715 Md. Laws 90, chap. 26, § 7; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 1-3; Miss. Rev. Code ch. 77, § 2964 (1880); 1901 Neb. Laws 141, An Act, to Incorporate Cities of the First Class Having a Population of More Than Forty Thousand (40,000) and Less Than One Hundred Thousand (100,000) Inhabitants . . . , ch. 16, § 129, pt. 55; Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; S.C., Order of General Sickles, Disregarding the Code, January 17, 1866 – General Order No. 1, § 16 in A Handbook of Politics for 1868 at 36, 36-7 (1868 Philip & Solomons) XIV; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Ordinance No. 7, §§ 1, 6, 11, & 20, Selah Town Council (1919) (Selah, Washington); Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.
[23] ". . .homelessness first became a national issue in the 1870s. Facilitated by the construction of the national railroad system, urbanization, industrialization, and mobility led to the emergence of tramps 'riding the rails' in search of jobs." "The History of Homelessness."
[24] Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879).

Ohio law titled, "To define and suppress tramps" said that "any tramp" who "shall be found carrying any firearms or other dangerous weapons" was to be imprisoned for a term of one to three years.[25] Vermont mimicked the same language in its 1879 law that if any tramp "shall be found carrying any firearm or other dangerous weapon" such persons could be fined or imprisoned for up to two years.[26]

22. As noted earlier, coherent understanding of mental illness only developed in the late nineteenth and early twentieth centuries. Consistent with that, states began to enact weapons laws that included provisions to keep dangerous weapons, including firearms, from those of "unsound mind." Among the earliest of these laws was one passed in Florida in 1881, saying that "it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife."[27] (Note that *Black's Law Dictionary* defines "unsound mind" as a "[n]on-legal term referring to one who from infirmity of mind is incapable of managing himself or his affairs. The Term, therefore, includes insane persons."[28]) Between then and the early 1930s, at least 10 states enacted similar laws, generally referencing those of "unsound mind" or "insane" or "not of sound mind."[29] (see Exhibit B.)

---

[25] Act of June 12, 1879, § 2, 1879 Ohio Laws 192.
[26] Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 29-30.
[27] 1881 Fla. Laws 87, chap. 3285, § 1-2.
[28] Black, *Black's Law Dictionary*, 1071.
[29] Act of April 6, 1936, No. 82, § 8, Ala. Laws 51, 52; Washington D.C. 47 Stat. 650, 651-652 (1932), Sec. 4, drug addicts; 1933 Haw. Sess. Laws 39, § 8; 1883 Kan. Sess. Laws 159, ch. 105, §§ 1-2; Sam Kimble Revised Ordinances of the City of Manhattan and Rules of the Council Page 49-50, Image 51-52 (1887) available at The Making of Modern Law: Primary Sources. Ordinances of Manhattan, KS; Offenses Against the Public Peace, Health and Safety, Toy Pistols, §13; HOLTON, KAN. REV. ORDINANCES No. 169, §§ 18-21 at 130, 134-35 (1905) (effective Aug. 8, 1888), SEC. 18; 1715 Md. Laws 90, chap. 26, § 7; 1927 N.J. Laws 742; Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21, Sec. 52; Act of June 11, 1931, No. 158, § 8, PA. Laws 497, 499, Section 8; Uniform Firearms Act, ch. 208, § 8, 1935 S.D. Sess. Laws 355, 356,

23. In policy terms, these laws provide a significant parallel to modern laws barring weapons from the mentally ill, in that they identified categories of behavior or actions that were considered dangerous or a threat to public order or safety. In modern law, vagrancy is not a crime. But that does not undercut the significance or relevance of these laws as historical analogs to modern laws.

B. Guns and Intoxication

24. An instructive and analogous historical parallel to modern mental health laws is the intersection of historic gun laws pertaining to alcohol use and intoxication with weapons possession and use. These historic measures closely parallel modern weapons/mental health laws because, for the most part, they prevented gun acquisition or use owing to the behavioral consequences of intoxication, generally understood to be a condition of diminished capacity, judgment, and reason. Those considered mentally ill are similarly understood to reflect a kind of "diminished capacity" such that they also may be deprived of access to weapons.

25. It is no crime to be intoxicated from alcohol consumption—a fact no less true today than hundreds of years ago. Similarly, the purchase of alcohol for those eligible to drink is and has been perfectly legal, with the exception of the Prohibition period in the 1920s. When alcohol consumption is combined with other activities or circumstances, however, it has been and is subject to a variety of regulatory measures, including state sanctions, such as those arising from operating a motor vehicle while under the influence of alcohol. When inebriation ends, drivers may resume driving, subject to any restrictions imposed by the government for prior instances of driving while drunk, such as license suspension for a fixed period.

---

Section 8; Act of March 23, 1935, ch. 172, § 8, Wash. Sess. Laws 599, 601, SEC. 8.

26. That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), incorporating "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drink-driving countermeasures, modifying the drinking context, and treatment and early intervention."[30]

27. In the century and a half before the American Revolution, "the colonists of North America tended to regard heavy drinking as normal"[31] as such beverages "were considered important and invigorating foods, whose restorative powers were a natural blessing."[32] Reliance on alcoholic beverages was also common because of the baneful health effects of drinking contaminated water. Despite the normality of heavy drinking, drunkenness was also recognized even in this early period as a significant problem to be "condemned and punished."[33] Early weapons laws (see below) reflected this understanding. During this period, the adverse consequences of excessive drinking were mitigated to a significant degree because it largely occurred through community taverns where social pressures and a system of tavern licensing, dating to the 1600s, encouraged "responsible oversight"[34] by tavern owners.

28. The post-Revolution period, however, witnessed a dramatic change in alcohol products as cheaper and more abundant distilled spirits, like domestic whiskey, exploded in

---

[30] Thomas F. Babor, et al., *Alcohol: No Ordinary Commodity: Research and Public Policy,* 3rd ed. (NY: Oxford University Press, 2023), Ch. 1, p. 9.
[31] "Alcohol in America: Taking Action to Prevent Abuse," National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK217463/
[32] Paul Aaron and David Musto, "Temperance and Prohibition in America: A Historical Overview," in *Alcohol and Public Policy: Beyond the Shadow of Prohibition,* Mark H. Moore and Dean R. Gerstein, eds. (Washington, D.C.: National Academies Press, 1981), 131
[33] Aaron and Musto, "Temperance and Prohibition in America," 132.
[34] Aaron and Musto, "Temperance and Prohibition in America," 133.

production and demand. As production and consumption skyrocketed, earlier safeguards declined, and public drunkenness became much more common.[35] Coinciding with these changes, attitudes began to change as well, as alcohol came to be thought of increasingly as "an addicting and even poisonous drug," the excessive consumption of which led to a host of familial, behavioral, social, and other problems.[36] This growing societal awareness of the adverse consequences of alcohol consumption gave rise to the temperance movement and the Anti-Saloon Leagues of the nineteenth and early twentieth centuries, culminating in the adoption of the Eighteenth (Prohibition) Amendment to the Constitution in 1919, which was then repealed by the Twenty-first Amendment in 1933.

29. Even though attitudes about alcohol use evolved over time, laws restricting or punishing the handling, carrying, or use of firearms while intoxicated appeared among the very earliest weapons regulations in America. From the 1600s through the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated. At least 15 states regulated the commercial sale or distribution of alcohol when firearms were also present; at least two states barred gun sales to those who were intoxicated; at least six states enacted laws prohibiting drunkenness in connection with militia activity; and one state (Arizona) barred providing guns to Native Americans if intoxicated (see Exhibits C and D).

30. To parse the data chronologically, in the 1600s, at least three states (which at the time were colonies) enacted seven intoxication laws; in the 1700s at least seven states enacted

[35] Aaron and Musto, "Temperance and Prohibition in America," 134-36.
[36] "Alcohol in America"; W.J. Rorabaugh, *The Alcohol Republic* (NY: Oxford University Press, 1979), 125-46.

nine laws; in the 1800s at least 19 states enacted 28 laws; and in the 1900s at least 15 states enacted 32 laws (note that some states enacted laws across more than one century; see Exhibits C and D). As noted, a number of these measures appeared very early in the Nation's history, punctuating the country's enduring struggle with "demon rum."

31. In 1623, 1631, and again in 1632, for example, Virginia enacted measures all directing that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments."[37] One presumes that the expenditure of powder pertained both to firearms discharges and perhaps to the separate ignition of gun powder. Most important, however, is that the actions under regulation were barred when "drinking" was involved. In a 1655 Virginia law, alcohol-fueled revelry was subject to fines for any who would "shoot any guns at drinking," although the law carved out two special occasions for regulatory exemption: "marriages and funerals only excepted."[38]

32. In 1636 Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Any who did so would find themselves in the stocks or fined five shillings.[39] In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." The fine was a substantial twenty

[37] 1623 Va. Acts 127 Acts of March 5th, 1623, 29; 1631 Va. Acts 173, Acts of February 24th, 1631, Act L; 1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV.

[38] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII. Early in the country's history, alcoholic beverages played an especially important role in marrying and burying. Eric Burns, *The Spirits of America* (Philadelphia, PA: Temple University Press, 2004), 16-17.

[39] 1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636.

shillings for every gun so fired.[40] In 1750 Pennsylvania enacted a law “For Suppressing Idleness, Drunkenness, And Other Debaucheries” that punished with “penalties and forfeitures” any who fired guns or set off fireworks without a special license to do so.[41]

33. Such measures proliferated in the nineteenth and early twentieth centuries, most commonly as a bar to weapons carrying or discharging. For example, the Tennessee legislature granted a locality the authority to penalize “shooting and carrying guns” along with drinking in 1825.[42] In 1868, Kansas enacted a law to punish any found to carry a deadly weapon while “under the influence of intoxicating drink.”[43] Nevada enacted measures in 1881 and 1885 that punished any who discharged firearms in various public spaces while “under the influence of liquor.”[44] An 1883 Wisconsin law made it “unlawful for any person in a state of intoxication, to go armed with any pistol or revolver.”[45] In 1878, 1880, and 1908, Mississippi enacted laws that made it illegal “to sell to any minor or person intoxicated” any pistol or other named weapon[46]

---

[40] The Charters and General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663.

[41] 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries.

[42] 1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.

[43] *The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed* 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.

[44] 1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1; David E. Aily, *The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto* 1076, Image 1084 (1885) available at *The Making of Modern Law: Primary Sources. An Act to Prohibit the Use of Firearms in Public Places*, § 1.

[45] 1883 Wis. Sess. Laws 290.

[46] 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3; Josiah A.Patterson Campbell, *The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes* 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources; Laws regulating carrying and

(minors and those intoxicated were more than occasionally treated together within these laws[47]). In 1907, Arizona enacted a law making it "unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm."[48]

34. In 1879 and again in 1883, Missouri enacted a law to fine or imprison any who carried concealed or brandished "any kind of fire arms" or other listed weapons "when intoxicated or under the influence of intoxicating drinks."[49] Not content with these two state laws, at least 20 similar laws were also enacted in Missouri between 1873 and 1917 that applied to counties, cities, and towns (see Exhibits C and D).

35. A Maryland state law from 1884 pertaining to Baltimore stated that anyone found to be "drunk or disorderly" who was also carrying a concealed pistol or other weapon was subject to confiscation of the weapon and a fine.[50] Rhode Island enacted a similar law—fine plus weapon confiscation—in 1893.[51] An 1899 South Carolina law said that "any person who shall

---

brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).

[47] E.g. William H. Bridges, *Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix* 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

[48] 1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1. Arizona became a state in 1912.

[49] MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879); 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[50] John Prentiss Poe, *The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein* 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884.

[51] *General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State* Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893.

engage in any boisterous conduct, under the influence of intoxicating liquors" who discharged a firearm of any kind near a road would be subject to a fine and jail.[52] A 1909 Idaho law criminalized anyone who "shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks."[53]

36. While the focus of these laws was on regulating persons who had weapons while drinking or drunk, another category of laws in early America restricted the sale or distribution of alcohol in the proximity of persons with firearms. A 1679 Massachusetts law prohibited bringing or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart" on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.[54] In 1746, New Jersey enacted a law penalizing anyone who would "presume to sell any strong Liquor. . . in such Days or Times. . . at the Place of Mustering or Training [of militias], or within a Mile thereof. . . ."[55] Similarly, a 1756 Delaware law forbade militia companies from meeting within a half mile of any inn or tavern. It also punished any attempting to sell "any strong liquor" in a booth or tent in proximity of a militia training area.[56] Also in 1756, Maryland enacted a similar measure to penalize attempts to sell "strong liquor" at the time and location of militia musters.[57]

---

[52] 1899 S.C. Acts 97, An Act to Prevent Drunkeness and Shooting Upon The Highway, No. 67, § 1.
[53] 1909 Id. Sess. Laws 6, § 1.
[54] "Order p[ro]hibbiting retayling strong drinckes at traynings," Boston, May 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages.
[55] An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place.
[56] An Act for Establishing a Militia in this Government (Delaware, 1756).
[57] An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756).

Pennsylvania enacted the same type of measure in 1780.[58] Such measures extended into the nineteenth century.[59] These laws make abundantly clear that diminished capacity caused by alcohol consumption when gun carrying and use was also occurring was serious enough to proscribe the intersection of the two by law.

37. Aside from these laws restricting the civilian commercial sale of alcohol, colonies and then states also enacted laws that directly restricted or punished drunkenness among militia ranks[60] for the obvious reason that excessive alcohol consumption undermined military order, morale, and effectiveness.[61] To be sure, alcohol was also very much a part of soldiering during this time. For example, General George Washington "insisted on alcohol for his men"[62] during

---

[58] An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.

[59] Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852); An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853); Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856); 1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5; Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886); Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

[60] E.g. An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775); An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765); An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756); An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777); An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).

[61] This concern is reflected in Frederick William Baron von Steuben, *Baron von Steuben's Revolutionary War Drill Manual* (NY: Dover Publications, 1985; first pub. 1779, rev'd. 1794), 82, 105.

[62] Burns, *The Spirits of America*, 16.

the Revolutionary War, but like any good commander, he wanted to tightly control its dissemination and consumption. The normal daily alcohol ration for Washington's men was four ounces.[63]

38. States and localities enacted similar laws in the nineteenth and twentieth centuries. A Chicago, Illinois ordinance from 1851 imposed a series of strict and wide-ranging regulations concerning licensing for the storage, transport, and handling of gun powder and gun cotton that included this prohibition: "no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person."[64] St. Paul, Minnesota enacted a similar measure in 1858.[65] Delaware enacted laws in 1911 and 1919 that made it "unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges."[66]

III. Conclusion

39. Any search of early weapons laws for mention of the mental illness is a fruitless endeavor. But that is because the concept of mental illness as we understand it did not exist before the late nineteenth century. Yet Americans suffered from many mental illnesses, as people did back to ancient times. An examination of old weapons laws reveals proxy categories that,

---

[63] Burns, *The Spirits of America,* 16. During the terrible winter at Valley Forge, Pa., of 1777-78, Washington doubled the daily alcohol ration for the men to eight ounces per day.

[64] George Manierre, *The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois* 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources. *Black's Law Dictionary* defines intemperance as a "lack of moderation. Habitual intemperance is that degree of intemperance from the use of intoxicating liquor which disqualifies the person a great portion of the time from properly attending to business. . . ." (559).

[65] *The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City* 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858.

[66] Vol. 26 Del. Laws 28, 28- 29 (1911); Vol. 30 Del. Laws 55, 55-56 (1919).

when paired with early suspicions of, and hostility toward, the mentally ill, reveal that our ancestors considered them as within the category of high risk individuals subject to legislative restrictions. And the concomitant examination of the history of mental illness clarifies that people tried as witches, or subject to trephination treatments, for example, would have no expectation of possessing anything like gun rights.

40. As Jacob Charles has persuasively noted, "the absence of positive law. . . . tells us nothing about what our ancestors thought their elected representatives *could* do."[67] In other words, the fact that laws restricting access to weapons for those deemed of "unsound mind" did not appear until the late nineteenth century does not mean that governmental leaders would have somehow accepted gun rights for such people. In fact, the proxy categories of firearms restrictions pertaining to vagrants, tramps, and the intoxicated demonstrate the contrary.

41. The historic examples of weapons policy examined here provide historical analogues to contemporary laws reflecting society's (and the Supreme Court's) verdict that the "longstanding prohibitions on the possession of firearms by. . .the mentally ill"[68] are entirely consistent with weapons law history.

[67] Charles, Jacob D., The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History (January 23, 2023). 73 Duke Law Journal 67 (2023), Pepperdine University Legal Studies Research Paper No. 2023/7, Available at SSRN: https://ssrn.com/abstract=4335545 or http://dx.doi.org/10.2139/ssrn.4335545
[68] *D.C. v. Heller*, 554 U.S. 570, 678 (2008).

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _December 19____, 2023, at Williamsburg, Virginia.

/s/ Robert J. Spitzer
Robert Spitzer

# EXHIBIT A

# EXHIBIT A

November 2023

## Curriculum Vitae

## Robert J. Spitzer

## Distinguished Service Professor, Emeritus
## SUNY Cortland

Address: 5333 Center St.
Williamsburg, VA 23188
(607) 423-1781
Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
https://sites.google.com/site/robertspitzercortland/

Education: A.B. (Political Science), summa cum laude, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

Positions Held:

Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997-2021.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, Administrative Science Quarterly, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.

Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

Honors:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.
Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.
Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.
Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.
Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.
SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.
Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."
Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.
Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.
Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.
Who's Who in the World, 1996.
Dictionary of International Biography, 1995.
Who's Who in the East, 1995-96; 1997-98
Ex officio member, Cortland County Bicentennial Committee, 1987-89.
Chair, SUNY Cortland Bicentennial Committee, 1987-89.
Phi Eta Sigma, SUNY Cortland, 1994.
Phi Kappa Phi, SUNY Cortland, 1990.
Men of Achievement (1986)
Contemporary Authors, vol. 112 (1985) and subsequent updates.

International Authors and Writers Who's Who, 1985-present.
International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

Publications and Papers:

BOOKS:

The Presidency and Public Policy: The Four Arenas of Presidential Power (University, AL: The University of Alabama Press, 1983). A study of the President's relations with Congress in the making of domestic policy. Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987). A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto: Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution: Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial. Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

President and Congress: Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment “right to bear arms” from legal, historical, and political perspectives. Published as part of the “America’s Freedoms” Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Theodore Lowi, Margaret Weir, Caroline Tolbert, Andrea Campbell (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021; 14th ed. 2023).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015; revised paperback ed. 2017); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:

Daniel Hoffman, Our Elusive Constitution, (1997)
Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)
Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)

Robert Spitzer, ed., Politics and Constitutionalism, (2000)
Laura Langer, Judicial Review in State Supreme Courts (2002)
Ian Brodie, Friends of the Court (2002)
Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2002)
Artemus Ward, Deciding to Leave: The Politics of Retirement from the United States Supreme Court (2003)
James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)
Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).
Stephen Kershnar, Justice for the Past (2004).
Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).
Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)
Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).
G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).
Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).
G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).
Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).
Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).
David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).
Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).
Robert Blomquist, The Quotable Judge Posner (2010).
Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).
Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).
Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).
Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).
Stephen A. Simon, Universal Rights and the Constitution (2014).
Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).
Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).
Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit

of Moderation (2016).
Peter J. Galie, et al., eds., New York's Broken Constitution (2016).
Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).
Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).
Clyde H. Ray, John Marshall's Constitutionalism (2019).
Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).
Robert M. Howard, et al., Power, Constraint, and Policy Change: Courts and Education Finance Reform (2021).
Mark C. Dillon, The First Chief Justice (2022).

Book Series Editor, Presidential Briefing Books, Routledge, 2015-present.
Mary Stuckey, Political Rhetoric (2015)
Michael A. Genovese, Presidential Leadership in an Age of Change (2015)
Christopher Fettweis, Making Foreign Policy Decisions (2016)
Nancy Maveety, Picking Judges (2016)
Richard S. Conley, Presidential Relations with Congress (2017)
Andrew L. Stigler, Governing the Military (2019)
Graham G. Dodds, The Unitary Presidency (2020)

Member, Board of Editors for the Encyclopedia of Guns in American Society, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, Issues: Understanding Controversy and Society, ABC-CLIO, 2011-2016.

BOOK CHAPTERS:

"Third Parties in New York," in Governing New York State (formerly New York State Today), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.: SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in Social Regulatory Policy: Recent Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO: Westview Press, 1988), 111-141.

"The President's Veto Power," in Inventing the American Presidency: Early Decisions and Critical Precedents, ed. by Thomas Cronin (Lawrence, KA: University Press of Kansas, 1989), 154-179.

"President and Congress," in The CQ Guide to the Presidency, ed. by Michael Nelson (Washington, D.C.: Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in Encyclopedia of American Political Parties and Elections, ed. by L. Sandy Maisel (New York: Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY: Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York: Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in Multi-Party Politics and American Democracy, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, We the People (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in The Encyclopedia of American Third Parties, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in Prayers in the Precincts, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in The Clinton Scandal and the Future of American Politics, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in Politics and Constitutionalism, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the Encyclopedia of American Political History, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in The Constitution and Its Amendments, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in The Second Amendment in Law and History, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in Honor and Loyalty: Inside the Politics of the Bush White House, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the Encyclopedia of Guns in American Society, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the Encyclopedia of the American Presidency, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for The Encyclopedia of New York State, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," Transformed By Crisis: The Presidency of George W. Bush and American Politics, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in Debating the Presidency, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in Thinking About the Presidency, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Executing the Constitution, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in Social Issues in America: An Encyclopedia, 8 vols.,

ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," The Presidency and the Challenge of Democracy, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," Encyclopedia of American Civil Liberties, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in Leadership at the Crossroads, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

"Liberals and the Presidency," Contending Approaches to the American Presidency, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" The American Presidency in the 21st Century, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in Governing America, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for Issues: Understanding Controversy and Society, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," Encyclopedia of Applied Ethics, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" Winning the Presidency 2012, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." American Government. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," American Governance, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," American Presidents and the Constitution, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," The George W. Bush Presidency, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," Gun Control in the United States: A Reference Handbook, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," Guns: Interdisciplinary Approaches to Politics, Policy, and Practice, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," Presidential Leadership and the Trump

Presidency: Executive Power and Democratic Governance, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," The 2020 Presidential Election: Key Issues and Regional Dynamics, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," Developments in American Politics 9, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Guns, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2024).

ARTICLES:

"Jamestown: Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69. Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun

Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY: Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985): 611-17.

"Promoting Policy Theory: Revising the Arenas of Power" Policy Studies Journal, 15 (June 1987), 675-89. Reprinted in Public Policy Theories, Models, and Concepts, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module: The Politics of Abortion," NEWS for Teachers of Political Science, 53 (Spring, 1987).

"But for A Single Vote...," New York Delegate, July, 1987. Abridged version appeared on editorial page of the Rochester Times Union, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", Election Politics, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," Policy Studies Journal, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," Policy Studies Journal, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," PS: Political Science and Politics, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," PS: Political Science and Politics, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," Oklahoma City University Law Review, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," Congress and the Presidency, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," Pace Law Review, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" The Spectator, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," Political Science Quarterly, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," Presidential Studies Quarterly, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," PS: Political Science and Politics, 32 (September 1999).

"The Gun Dispute," American Educator, 23 (Summer 1999): 10-15. Reprinted in Annual Editions: Criminal Justice (Dushkin/McGraw-Hill, 2000); and in Criminology (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," Congress Monthly, September/October 2000.

"Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, Silveira v. Lockyer (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," Presidential Studies Quarterly 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson* Case," St. John's Law Review 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," Focus on Law Studies 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," Fordham Law Review 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," PS: Political Science and Politics 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, The PRG Report 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

"Understanding Gun Law History After *Bruen*: Moving Forward by Looking Back," Fordham Urban Law Journal 51 (2023): 57-115.

OP-ED ARTICLES:

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" Christian Science Monitor, September 19, 1997.

"Assault Weapons Ban," Christian Science Monitor, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," Syracuse Post-Standard, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," Syracuse Post-Standard, April 20, 1999.

"The Gun Saga in Congress," Intellectual Capital, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" Intellectual Capital, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," Intellectual Capital 5(February 10-17, 2000).

"Gun Control After Columbine," Intellectual Capital 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," The Catholic Review, March 30, 2000.

"Why Would Anyone Want the Job Now?" Chicago Tribune, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," Syracuse Post-Standard, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," Syracuse Post-Standard, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard,

June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also published in the Deseret News, Sacramento Bee, the Fresno Bee, the Modesto Bee, the Ithaca Journal, the Johnstown Breeze, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," Syracuse Post-Standard, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network (www.hnn.us), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" Syracuse Post-Standard, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network (www.hnn.us) January 7, 2008.

"The 'Pocket Veto' Peril," Los Angeles Times, January 8, 2008. Reprinted in the St. Louis Post-Dispatch, St. Paul Pioneer Press, Wilmington Star News (NC), News and Observer (NC), The Morning Call (Pa.), Contra Costa Times (CA), the Sun News (FL), The Vindicator, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, Cleveland Plain Dealer, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, Syracuse Post-Standard, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge (www.thefacultylounge.org), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network (www.hnn.us), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us),

January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard*, January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

“The GOP and Presidential Power,” *The Huffington Post*, January 3, 2012.

“The Disappearing Faculty,” *The Huffington Post*, February 1, 2012.

“The ‘Good-Guy-Bad-Guy’ Myth Laid Bare,” *The Huffington Post*, March 28, 2012.

“The NRA’s Silent Motive,” *Salon*, April 3, 2012.

“Why We’ve Learned Nothing from Watergate,” *The Huffington Post*, June 20, 2012.

“The NRA’s ‘Fast and Furious’ Gun Walking,’ *The Huffington Post*, June 29, 2012.

“Not so Fast: House Committee Wrong on Gun-Running Story,” *Syracuse Post-Standard*, July 4, 2012.

“Aurora Won’t Change Anything,” *Salon*, July 23, 2012.

“Not in New York,” *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

“Sex, Politics, and the Porn Star DA,” *The Huffington Post*, November 20, 2012.

“Who Gets Guns,” *The Blue Review* (thebluereview.org), December 19, 2012.

“Five Myths About Gun Control,” *The Washington Post*, Sunday Outlook Section, December 23, 2012.

“Government can Improve Gun Records,” *The Hill*, January 15, 2013.

“Doing Nothing on US Gun Laws No Longer an Option,” *The Independent* (Britain), January 17, 2013.

“The President’s Need for Speed,” *The New York Daily News*, January 17, 2013.

“No Need for Panic,” *Cortland Standard*, March 28, 2013.

“From *Duck Dynasty* to the *Ivory Tower*,” *The Huffington Post*, September 3, 2013.

“A History Lesson for Foes of N.Y. Gun Law,” *New York Daily News*, January 3, 2014.

“History Shows Gun Laws Were Common in U.S.,” *Syracuse Post-Standard*, January 7, 2014.

“An Assault Weapons Gambit Backfires,” *New York Daily News,* April 9, 2014.

“Sensible Regulation of Guns is Necessary,” *Rochester Democrat and Chronicle,* April 13, 2014.

“Cortland Can Help Shine Light on Crimes,” *Syracuse Post Standard,* April 27, 2014.

“The Jets, Michael Vick and a College Dilemma,” *The Huffington Post,* April 28, 2014.

“Obama’s Executive Orders: Can We Talk?” *The Huffington Post,* November 18, 2014.

“Leading By Veto,” *Los Angeles Times,* February 3, 2015.

“How Obama Can Use Veto Power Without Being President No,” *Syracuse Post Standard,* February 8, 2015.

“Stand Your Ground Makes No Sense,” *New York Times,* May 4, 2015.

“Gun Laws are as Old as Gun Ownership,” *ACS Blog*, American Constitution Society, May 18, 2015.

“Why Are Assault Weapon Sales Jumping? Because They’re Fun,” *Los Angeles Times,* June 12, 2015.

“Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today,” *History News Network,* June 14, 2015. Also in *Time Magazine,* June 15, 2015.

“Why Assault Rifle Sales Are Booming,” *Chicago Tribune,* June 15, 2015.

“Think the Charleston shooting will lead to new gun control laws? It won’t.” *Washington Post,* June 18, 2015.

“The Politics of the Fourth of July from Musical Theatre,” *Huffington Post,* June 29, 2015.

“Flanagan’s Gun Permit, and Mine,” *N.Y. Daily News,* August 31, 2015.

“Why the Oregon Shooting Likely Won’t Change Anything,” *U.S. News and World Report,* October 2, 2015.

“Obama’s Guantanamo Paradox,” with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

“Arming Everyone is Not the Answer,” *N.Y. Daily News,* December 6, 2015.

“Why Guns for all Is Not a Good Idea,” *Syracuse Post-Standard,* December 13, 2015.

“President Obama’s Recent Vetoes Were Unconstitutional. Congress Should Sue Him.” *Washington Post,* December 30, 2015.

“Obama Should be Sued over Unconstitutional Vetoes,” *Syracuse Post-Standard,* January 1, 2016.

“Nutty Gun Rhetoric Meets Reality,” *U.S. News and World Report,* January 7, 2016.

“Anti-Fluoride Advocate No Expert,” *Cortland Standard,* February 16, 2016.

“What the Orlando Shooting Shows About the Importance of Gun Laws,” *Washington Post,* June 14, 2016.

“Orlando Shooting: Reaction from Cortland Gun Law Expert,” *Syracuse Post Standard,* June 19, 2016.

“Even in the Wild West, There Were Rules About Carrying Concealed Weapons,” *Los Angeles Times,* June 19, 2016.

“Here’s What it Would Take for the U.S. to Ban Assault Weapons Again,” *MarketWatch,* June 24, 2016.

“Political Gridlock, Past and Present,” *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

“Guns Return to American Elections,” *US Election Analysis 2016: Media, Voters and the Campaign,* Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

“Gun Rules and Rights: Where’s the Problem?” Guns Issue, CLOG, 2017.

“Why Congress Will Let Trump Keep Business Ties—for Now,” *Syracuse Post Standard,* January 15, 2017.

“Why There Will Be No Trump Impeachment Now—Even Though There Should Be,” *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation*, February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com*, September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts*, The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network*, December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network*, January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot*, February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK*, February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK*, June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-Standard,* November 4, 2022.

"What our past tells us about young people and guns," *The Hill,* March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

"For Most of U.S. History We've Had Both Gun Rights and Gun Regulations," *TIME.com*, June 6, 2023.

"Is domestic abuse really protected by the Second Amendment?" *The Hill,* July 14, 2023.

"America's Original Gun Control," *The Atlantic Monthly,* August 12, 2023. 163

"The Unusual Thing About Hunter Biden's Indictment," *CNN.com*, September 15, 2023.

TESTIMONY, BRIEFS, AND REPORTS:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting: Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

“The Hidden History of the Second Amendment,” The National Press Club, Washington, D.C., May 12, 1998.

“The Second Amendment: A Source of Individual Rights?” Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

“The Gun Industry: The NRA’s Silent Partner,” National Press Briefing, Atlanta, GA, February 2, 1999.

“Program Review: SUNY Oswego Political Science Department,” prepared as part of the department’s review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article (“Lost and Found: Researching the Second Amendment,” Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals,

Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.*, U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago*, U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar*, Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety

Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker*, No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta*, U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

PAPERS AND PRESENTATIONS (NOT INCLUDING THOSE GIVEN ON THE CORTLAND CAMPUS):

"The President as Policy-Maker: The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party: The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic: Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet: Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power: Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power: The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto: Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete? An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November

1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes: The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"College and Life: Really the Same," SUNY Cortland Commencement Address, May 14, 2017.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC*, November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C.,

November 29-December 1, 2022.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., February 16, 2023.

"The Obama Presidency and Gun Policy," Paper Presented for Hofstra University's 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023.

"Gun Law History and Virginia," League of Women Voters, Williamsburg, Va., June 22, 2023.

"Gun Policy in the U.S.: Past, Present, Future," College of William and Mary, Williamsburg, Va., September 21, 2023.

"Historical Gun Laws Pertaining to Minors," 2023 Cooper-Walsh Colloquium, Conference on *Public Health, History, and the Future of Gun Regulation After Bruen*, Fordham University School of Law, New York City, NY, October 12-13, 2023.

"Presidential Impeachment: What It Is, How It Works, Why It Matters," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 19, 2023.

PANEL PARTICIPATION:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans: An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political

Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western

Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, “The Unitary Executive in a Separated System,” APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, “The Culpability of Congress,” Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, “Keeping the Modern Presidency in Check and Balance,” APSA, Chicago, August 30-September 2, 2007.

Discussant, “Presidential Endings: George W. Bush and the Final Two Years,” APSA, Chicago, August 30-September 2, 2007.

Discussant, “Staffing and Decisionmaking in the White House,” APSA, Boston, August 28-31, 2008.

Panel Chair, “Early Assessments of the Obama Presidency,” APSA, Washington, D.C., September 2-5, 2010.

Discussant, “Historical Perspectives on the Presidency,” APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, “Politics and Presidential Travel,” APSA, Washington, D.C., August 27-31, 2014.

Discussant, “The Obama Presidency and Constitutional Law,” APSA, San Francisco, Sept. 3-6, 2015.

Discussant, “Presidents, the Courts and the Law,” APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, “Executive Power and Democratic Functioning in the Trump Era,” APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, “Assessing the Presidency of Donald Trump,” APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, “Gun Law, Politics, and Policy,” Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, “Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race,” Midwest Political Science Association, Chicago, April 7, 2022.

BOOK REVIEWS:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142: An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers: Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions: Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies

Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives, Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans: The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).

SELECTED MEDIA APPEARANCES/QUOTATIONS:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN,

and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi"; "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.

PROFESSIONAL ASSOCIATIONS:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group), APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

TEACHING AREAS:

American Government: courses taught include Law and Politics, Introduction to American Government, The Legislative Process, Political Parties and Social

Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy: courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

TEACHING-RELATED AWARDS:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students." (The only faculty member ever to win this award more than once.)

OTHER PROFESSIONAL ACTIVITIES

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science

Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

SELECTED COMMUNITY SERVICE

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).
Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010 Project, 1996.

**EXHIBIT B**

**EXHIBIT B**

**WEAPONS AND "UNSOUND MIND" LAWS**

**ALABAMA**

Act of April 6, 1936, No. 82, § 8, Ala. Laws 51, 52 (delivery to minors and others forbidden). "Section 8. DELIVERY TO MINORS AND OTHERS FORBIDDEN. No person shall deliver a pistol to any person under the age of eighteen or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, and habitual drunkard, or of unsound mind."

**DISTRICT OF COLUMBIA**

Washington D.C. 47 Stat. 650, 651-652 (1932)
CARRYING CONCEALED WEAPONS
SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.
EXCEPTIONS
SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.
ISSUE OF LICENSES TO CARRY
SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business-within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the

duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.
SELLING TO MINORS AND OTHERS
SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

**FLORIDA**

1881 Fla. Laws 87, An Act to Prevent the Selling, Hiring, Bartering, Lending or Giving to Minors Under Sixteen Years of Age, or to any Person of Unsound Mind, Certain Fire-arms or other Dangerous Weapons, chap. 3285, § 1-2.
§ 1. it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any minor under sixteen years of age any pistol, dirk or other arm or weapon, other than an ordinary pocket-knife, or a gun or rifle used for hunting, without the permission of the parent of such minor, or the person having charge to such minor, and it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife. § 2. Any person or persons so offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty nor more than fifty dollars, or imprisoned in the county jail not more than three months.

**HAWAII**

1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8.
§ 8. In an exceptional case, when the applicant shows good reason to fear injury to his person or property, the chief of police of the city and county of Honolulu or the sheriff of a county, other than the city and county of Honolulu, may grant a license to a citizen of the United States or a duly accredited official representative of a foreign nation, of the age of twenty years or more, to carry concealed on his person within the city and county or the county in which such license is granted, a pistol or revolver and ammunition therefor. Unless renewed, such license shall automatically become void at the expiration of one year from date of issue. No such license shall issue unless it appears that the applicant is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony, or adjudged insane, in the Territory or elsewhere. All licenses to carry concealed weapons heretofore issued shall expire at midnight on the effective date of this Act. No person shall carry concealed on his person a pistol or revolver or ammunition therefor without being licensed so to do under the provisions of this section. For each such license there shall he charged a fee of ten dollars ($10.00), which shall be covered into the treasury of the city and county or the county in which such license is granted. Any person violating this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

**KANSAS**

1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, ch. 105, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars.

Sam Kimble Revised Ordinances of the City of Manhattan and Rules of the Council Page 49-50, Image 51-52 (1887) available at The Making of Modern Law: Primary Sources.
Ordinances of Manhattan, KS; Offenses Against the Public Peace, Health and Safety, Toy Pistols, §13. Any person who shall give, trade, loan or otherwise furnish any pistol, revolver, or toy pistol by which cartridges or caps may be exploded, or any dirk, bowie-knife sling shot or toy known as "rubber sling shot" or other dangerous weapon, to any minor or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before the Police Judge be fined not less than five nor more than one hundred dollars. § 14. Having Possession of the Same. Any minor who shall have in his possession any pistol, revolver, or toy pistol by which cartridges may be exploded or any dirk, bowie knife, brass knuckles, slung shot or toy known as "rubber sling shot" or other dangerous weapons shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than one nor more than ten dollars.

HOLTON, KAN. REV. ORDINANCES No. 169, §§ 18-21 at 130, 134-35 (1905) (effective Aug. 8, 1888).

"SEC. 18. It shall be unlawful for any person within this city to carry upon his person a pistol, dirk. bowie knife, or other deadly weapon concealed or otherwise, and any person so doing shall, upon conviction, be fined in any sum not exceeding one hundred dollars, or by imprisonment not to exceed three months, or by both such fine and imprisonment. Provided, however, that this shall not apply to an officer in the discharge of his official duty, nor to a person carrying an unloaded shot-gun or rifle; and provided further, that the mayor of this city may, for a good cause shown by any person engaged in any legitimate business, when he deems it necessary for the safety of such person, or his business, give to such person a written permit attested by his signature, and the seal of the city, to carry deadly weapons for his or her defense.

SEC. 19. Any person who shall, within this city, discharge any fire arms in any public place or in any street, alley or avenue, or any person who shall discharge any rockets, powder, fireworks or other dangerous combustible material in the streets, lots, grounds, alleys, or about or in the vicinity of any building shall, upon conviction thereof, be fined in any sum not exceeding one hundred dollars. Provided, however, that the provisions of this section shall not extend to persons making a display of fireworks by permission of the mayor and council of this city and under the direct supervision of a committee appointed by the same.

SEC. 20. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot or any other dangerous weapon to any minor or to any person of

notoriously unsound mind, shall, upon conviction, be fined not less than five or more than one hundred dollars.

SEC. 21. Any minor who shall have in his possession any pistol, revolver or toy pistol by which cartridges may be exploded, or any dirk, bowie knife, brass knuckles, slung shot or any other deadly weapons, shall, upon conviction thereof, be fined not less than one or more than ten dollars."

**MARYLAND**

1715 Md. Laws 90, An Act for the speedy trial of criminals, and ascertaining their punishment in the county courts when prosecuted there, and for payment of fees due from criminal persons, chap. 26, § 7
And, to prevent the abusing, hurting or worrying of any stock of hogs, cattle or horses, with dogs, or otherwise, Be It Enacted, That if any person or persons whatsoever, that have been convicted of any of the crimes aforesaid, or other crimes, or that shall be of evil fame, or a vagrant, or dissolute liver, that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned, shall forfeit and pay one thousand pounds of tobacco…

**NEW JERSEY**

1927 N.J. Laws 742

No retail dealer shall sell or expose for sale, or have in his possession with intent to use, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter provided. The Common Pleas judge of any court of this State, by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political-division, pistols or revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:
1. The business shall be carried on only in the building or buildings designated in the license.
2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read.
3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside.
4. No pistol or revolver shall be delivered (a) unless the purchaser shall have obtained a permit to purchase days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; provided, however, a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. 5. A true record of every pistol shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser.

Any person who shall knowingly sell any of the firearms or instruments enumerated in section one here- of to a minor under the age of eighteen years, or to a person not of sound mind, or to a

drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall he guilty of misdemeanor.

**NORTH CAROLINA**

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.
"Sec. 52. It shall be unlawful for any person to sell or give to any inmate of a state hospital any intoxicating drink, any narcotic, and poison or poisonous substances, or any deadly weapon, or any cartridge or ammunition for firearms of any kind, and every person violating this section shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined or imprisoned at the discretion of the court."

**PENNSYLVANIA**

Act of June 11, 1931, No. 158, § 8, PA. Laws 497, 499 (regulating and licensing the sale, transfer, and possession of certain firearms).
"Section 8. No person shall deliver a firearm to any person under the age of eighteen, or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind."

**SOUTH DAKOTA**

Uniform Firearms Act, ch. 208, § 8, 1935 S.D. Sess. Laws 355, 356.
"Section 8. DELIVERY TO MINORS AND OTHERS FORBIDDEN.
No person shall deliver a pistol to any person under the age of eighteen or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of un-sound mind."

**WASHINGTON STATE**

Act of March 23, 1935, ch. 172, § 8, Wash. Sess. Laws 599, 601.
"SEC. 8. Delivery to Minors and Others Forbid-den. No person shall deliver a pistol to any person under the age of twenty-one or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind."

**EXHIBIT C**

**INTOXICATION/WEAPONS LAWS**

| STATE | NO CARRY/ USE INTOX | ALCOHOL BUSINESS/ SALES | NO GUN SALE TO DRUNKS | MILITIA/ MILITARY/ POLICE | NAMED GROUPS |
|---|---|---|---|---|---|
| Alabama | | | | | |
| Alaska | | | | | |
| Arizona | 1907 | 1901 guns/saloons | | | 1901 Natives |
| Arkansas | | | | | |
| California | | | | | |
| Colorado | | | | | |
| Connecticut | | 1859 | | 1775 | |
| Delaware | | 1756 | 1911,1919 | | |
| District of Columbia | | | | | |
| Florida | | | | | |
| Georgia | | | | 1765,1903 | |
| Hawaii | | | | | |
| Idaho | 1909 | | | | |
| Illinois | | 1851 | | | |
| Indiana | 1921 | | | | |
| Iowa | | 1896 | | | |
| Kansas | 1868 | | | | |
| Kentucky | | | | | |
| Louisiana | | | | | |
| Maine | | 1856 | | | |
| Maryland | 1884,1927 | 1756 | | (1756) | |
| Massachusetts | 1663,1891 1891,1902 1903 | 1679 | | | |
| Michigan | 1931 | | | | |
| Minnesota | | 1858 | | | |
| Mississippi | | | 1878,1880, 1908 | | |
| Missouri | 20 laws* | 1923 | | | |
| Montana | | | | | |
| Nebraska | | | | | |
| Nevada | 1881,1885 (discharge) | | | | |
| New Hampshire | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| New Jersey | 1916 (hunting) | 1746 | | | |
| New Mexico | | | | | |
| New York | | | | | |
| North Carolina | | | | | |
| North Dakota | 1921 | | | | |
| Ohio | | 1886 | | | |
| Oklahoma | 1890,1891 | | | (1890), (1891) | |
| Oregon | | | | | |
| Pennsylvania | 1750 | 1875 | | 1777,1780 | |
| Rhode Island | 1636,1893, 1893 | 1853 | | | |
| South Carolina | 1899,1900 | | | 1782 | |
| South Dakota | | | | | |
| Tennessee | 1825 | | | | |
| Texas | | | | | |
| Utah | 1925 | | | | |
| Vermont | | 1852 | | | |
| Virginia | 1623,1631, 1632,1655 | | | | |
| Washington State | | | | | |
| West Virginia | 1925 | | | | |
| Wisconsin | 1883 | | | | |
| Wyoming | | | | | |
| TOTAL STATES | 20 | 15 | 2 | 6 | 1 |
| TOTAL LAWS | 52 | 15 | 5 | 9 | 1 |

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/. A total of 30 states in this table enacted some kind of law designed to sever the link between alcohol/inebriation and weapons.

*Of the 20 Missouri laws that criminalized the carrying or possession of weapons while intoxicated, two of them (1879 and 1883) were state laws. The rest (1873, 1881, 1890, 1894, 1898, 1900, 1902, 1903, 1903, 1903, 1903, 1907, 1907, 1908, 1908, 1910, 1910, and 1917) all applied to counties, cities, and towns.

**EXHIBIT D**

**INTOXICATION/WEAPONS LAWS**

**ARIZONA**

Laws regulating the sale of firearms to minors and Native Americans, Title 10, §§ 342 & 362 of AZ Penal Code in The Revised Statutes of Arizona Territory (1901).
"Sec. 342. Any person who shall sell or give to any minor under the age of fourteen years, or to any person for the use of such minor, any firearms, or toy pistols from which dangerous and explosive substances may be discharged, shall be deemed guilty of a misdemeanor."…
"Sec. 362. Any person who sells, gives, rents, barters or furnishes any rifles, carbines, pistols or revolvers, or any ammunition or cartridges for rifles, carbines, pistols or revolvers, or any shot larger in size than standard number six (6) shot, or any spirit, malt or vinous liquor, to Indians, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by imprisonment in the county jail not less than one or more than six months, or by a fine not less than fifty dollars or more than three hundred dollars, or by both such imprisonment and fine."
1901, AZ, Title 10, §§ 342 & 362 of the AZ Penal Code

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387 and 391.
§ 387 If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person. § 391: It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 of this act, and the sheriffs of the various counties shall notify the keeprs of hotels, boarding houses and drinking saloons, in their respoective counties, of their duties under this law, and if after such notificiation any keeper of a hotel, boarding house or drinking saloon shall fail to keep notices posted, as required by this act, he shall, on conviction thereof before a justice of the peace, be fined in the sum of five dollars, to go to the county treasury.

1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1.
It shall be unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm, or while so intoxicated to strike any person, or to strike at any person with a pistol, gun or other firearm . . .

**CONNECTICUT**

An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775).
"That whatsoever Commissioned Officer shall be found drunk on his Guard, Party, or other Duty under Arms, shall be cashiered for it: Any Non-Commissioned Officer or Soldier, so offending, shall suffer such Punishment as shall be ordered by the Sentence of a Regimental Court-Martial."
1775, CT, Act for Regulating and Ordering the Troops that are, or May be Raised, Art. 19
Connecticut, At a General Assembly of the Governor and Company of the English Colony of Connecticut, in New-England in America, Holden at Hartford, in Said Colony, on the Second Thursday of May, in the 15th Year of the Reign of His Majesty George the Third, King of Great-Britain, &C. A.D. 1775. An Act for Regulating and Ordering the Troops That Are, or May Be Raised, for the Defence of This Colony (New London, Conn.: Timothy Green printer to the governor and Company, 1775), 11. Article 19.

1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5 (1859).
"Sec. 5. If any booth shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling, the officer commanding said parade-ground, muster-field or encampment, the sheriff or deputy-sheriff of the county, or any justice of the peace, selectman, or constable of the town in which such booth, shed, tent, or other temporary erection is situated, upon having notice or knowledge that the same is so used or occupied, shall notify the owner or occupant thereof to vacate and close the same immediately; and, if said owner or occupant shall refuse or neglect so to do, said commanding officer, sheriff, deputy-sheriff, justice of the peace, selectman or constable, may forthwith abate such booth, shed, tent, or other such temporary erection, as a nuisance, and may pull down or otherwise destroy the same, with the assistance of any force, civil or military."
1859, CT, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances
Public Acts Passed by the General Assembly of the State of Connecticut, May Session, 1859 (Hartford, CT: Day & Clark State Printers, 1859), 62. Ch. 82 An Act in Addition to and in Alteration of "An Act for Forming and Conducting the Military Force," §5 Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. Approved 24 June, 1859.

**DELAWARE**

An Act for Establishing a Militia in this Government (Delaware, 1756)
"And be it further enacted by the authority Aforesaid that no Captain or other Officer shall Appoint any place of Meeting for his Company (town Companys only Excepted) within the Distance of half a mile of any Inn or Tavern under the Penalty of Forty Shillings for every such Offence and that no person or persons shall presume to keep a Booth or tent or expose to sale at or Bring on any Pretence whatsoever any strong Liquor to such place of Meeting under the Penalty or Forty shillings for every such offence."

1756, DE, An Act for Establishing a Militia in this Government
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 3 (Washington, D.C.: Government Printing Office, 1947), 13.

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 3. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.

Vol. 30 Del. Laws 55, 55-56 (1919)
Section 222. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person.
It shall be the duty of any person or persons, firm, company or corporation desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business, in which said book lie shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser, and the names and addresses of at least two freeholders resident in the County wherein the sale is made, who shall positively identify the purchaser before the sale can be made; Provided, that no clerk, employee or other person associated with the seller shall act as one of the identifying freeholders. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## GEORGIA

An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765).
"And be it further Enacted, by the authority aforesaid, That in case any person who shall be obliged to bear arms, whilst the regiment, troop, or company, to which he shall belong, shall be under arms, or in array, shall neglect or refuse to fire his gun not exceeding six times each muster day, or shall wilfully neglect or refuse to do his duty, or to obey the other lawful commands of his officer, or if any such militia-man be drunk at the time of his exercising, the majority of the officers of the troop or company to which such person belongs, if the offence shall be committed in a single troop or company, or any two field officers of the regiment to which such person shall belong, if the offence shall be committed in a regiment, shall have full power and authority to inflict on the person so offending any pecuniary mulct not exceeding ten shillings Sterling[.]"
1765, GA, An Act for the Better Ordering of the Militia of this Province, §19
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest

Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 4 (Washington, D.C.: Government Printing Office, 1947), 60.

1903 Ga. Laws 71, An Act for the Protection of the Officers and Employees of the Georgia Penitentiary at the Various Camps throughout the State, and for all other purposes, § 1.
Be it enacted by the General Assembly of the State of Georgia, and it is hereby enacted by authority of the same, That from and after the passage of this Act it shall be unlawful for any person in the State of Georgia to come inside of the guard-lines established, with gun, pistol or any other weapon, or any intoxicating liquors without the knowledge and consent of the deputy wardens in charge.

## IDAHO

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
If any person . . . or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor under the age of sixteen (16) years any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction, be punished by a fine of not less than twenty-five dollars ($25.00) nor more than two hundred dollars ($200.00), or by imprisonment in the county jail for a period of not less than twenty (20) nor more than sixty (60) days, or by both such fine and imprisonment: Provided, however, that it shall be a good defense to the charge of carrying such concealed weapons if the defendant shall show that he has been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, family home or property.

## ILLINOIS

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one

time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

## INDIANA

1921-23 Ind. Acts 108, Intoxicating Liquor—Transportation—Penalty, ch. 34, § 1. 1921 . . . That any person who shall transport intoxicating liquor in any wagon, buggy, automobile, water or air craft, or other vehicle or who shall transport intoxicating liquor in any such vehicle when such vehicle is not owned by said person, or without the consent of the owner of such vehicle, or when such vehicle is mortgaged property, or who shall transport intoxicating liquor in any such vehicle if there be in, or upon such vehicle or upon any person therein any firearms or guns, shall be guilty of a felony and upon conviction shall be imprisoned not less than one year nor more than two years and fined in a sum not exceeding one thousand dollars ($1,000).

## IOWA

Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

"Sec. 22. Any person who shall trespass on the encampment grounds, or the camp grounds of the guard in active service, or interrupt, molest, or interfere with any member of the guard in the discharge of his duties, or sell any malt, spirituous, or other intoxicating liquors within one mile of such encampment or camp, except under permit issued by the district or superior court, shall be guilty of a misdemeanor, and the commanding officer of such force may order the arrest of such person and cause him to be delivered to a peace officer or magistrate as soon as practicable."
1896, IA, An Act to Revise, Amend, and Codify the Statutes Relative to the Militia, § 22
Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa, Begun January 13 and Ended April 11, 1896 (Des Moines, IA: F.R. Conaway, 1896), 104. Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia, § 22. Approved April 10, 1896.

**KANSAS**

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

**MAINE**

Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856).
"Sect. 73. The mayor and aldermen of any city, or the selectmen of any town, upon complaint made to them under oath, that the complainant has reason to believe that any booth, shed, or other temporary erection, situated within one mile of any muster field, is used and occupied for the sale of spirituous or fermented liquors, or for the purpose of gaming for money, or other property, may, if they consider the complaint well founded, order the owner or occupant thereof to vacate and close the same immediately ; and if the owner or occupant shall refuse or neglect so to do, the said mayor and aldermen or selectmen may forthwith abate such booth, shed or other temporary erection, as a nuisance, and pull down or otherwise destroy the same in any manner they may choose, or through the agency of any force, civil or military, which they may see fit to employ."
1856, ME, Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed
Acts and Resolves Passed by the Thirty-Fifth Legislature of the State of Maine, A. D. 1856 (Augusta, ME: 1856), 97. Ch. 265 An Act to Organize and Discipline the Militia, §73 Temporary

Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed. Approved 9 April, 1856.

**MARYLAND**

An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756)
"And be it Enacted by the Authority aforesaid that any Person of the Militia who shall get drunk on any Muster-day before or at Muster shall forfeit the Sum of Ten Shillings Current Money and any Person who shall presume to vend Sell or Dispose of any Strong Liquor at any Place of training or at any other Place within Five Miles of any Place of training to any Person belonging to the Militia on any Muster day except between the Time of Discharge from such Training for that day and the Sun sitting thereof Such Person so vending selling or disposing of Such Strong Liquors Shall forfeit and pay the Sum of Five Pounds Current Money And no Person other than a licenced Ordinary Keeper shall vend Sell or dispose of any Strong Liquors to any Person whatever at such Time and Place aforesaid even between the Hours aforesaid under the Penalty of Five Pounds Current Money for every Such Offence and it Shall and may be lawfull for the Commanding Officer of the Party at such Muster and he is hereby directed and required to order the Strong Liquors of the Person so offending to be Siezed and Destroyed Provided always that nothing herein contained shall be construed to extend to any Merchant or licenced Ordinary-Keeper who shall vend Sell or Dispose of any Strong Liquors in his or her House the same not being to any Person of the Militia or any for the Use of Such Person[.]"
1756, MD, Proceedings and Acts of the General Assembly, 1755-1756, An Act for regulating the Militia of the Province of Maryland
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 5 (Washington, D.C.: Government Printing Office, 1947), 92-93.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884
City of Baltimore, § 742. Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1927 Md. Laws 156, § 388-B.
That no person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

**MASSACHUSETTS**

The Charters And General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663
Colony Laws. § 4. Be it also enacted by the authority of this court, that no masters of ships, or seamen, having their vessels riding within any of our harbors in this jurisdiction, shall presume to drink healths, or suffer any healths to be drunk within their vessels by day or night, or to shoot off any gun after the daylight is past, or on the sabbath day, on penalty for every health twenty shillings, and for every gun so shot twenty shillings.

Order p[ro]hibbiting retayling strong drinckes at traynings, Boston, May 28th, 1679
"… it is ordered by this Court and the authority thereof, that henceforth no person whatsoeuer shall presume to bring into the feild and sell by retayle vpon such occasions [i.e., militia training days] any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart, vnless he or they so doing haue license from the hands of two magistrates, or the cheife military officer or officers in the feild[.]"
1679, MA, Order p[ro]hibbiting retayling strong drinckes at traynings

Report of the Board of Park Commissioners of the City of Springfield, Mass., Park Ordinances (1891)
The Board of Park Commissioners of the City of Springfield, by virtue of its authority to make Rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with prior consent of the Board, it is forbidden: . . .
3. To throw stones, balls, or other missiles; to discharge or carry firearms, firecrackers, torpedoes, or fireworks; to make fires; to play musical instruments; to have any intoxicating beverages; to sell, offer, or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or to have possession of instruments of gambling; to make orations, harangues, or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Third Annual Report of the Park Commissioners of the City of Lynn for the year ending December 20, 1891, at 23, Ordinances
The Board of Park Commissioners of the City of Lynn , by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the Board, it is forbidden: . . .
3. To throw stones or other missiles; to discharge or carry firearms, except by members of the police force in the discharge of their duties; to discharge or carry fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating beverages; to sell, to offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Office of Park Commission, New Bedford, Mass., Park Ordinances (1902)
September 1, 1902. The Board of Park Commissioners of the City of New Bedford, by virtue of its authority to make rules for the use and government of the public parks of said city, and for breaches of such rules to affix penalties, hereby ordain that within the public parks and commons of the city, except with prior consent of the Commissioners, all persons are hereby forbidden: . . .
3. To throw stones, balls or other missiles; to discharge or carry firearms, firecrackers, torpedoes or fireworks; to make fires, to play musical instruments; to have for sale or otherwise any intoxicating liquors or beverages; to sell or offer for sale any goods or wares; to post or display signs, placards, flags or any advertising devices whatsoever; to play games of chance or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language; to make orations or loud outcries; to in any manner annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell,, at 58 (1903)
The Board of Park Commissioners of the City of Lowell, by virtue of its authority to make rules and regulations for the use and government of the Public Parks and Commons of said City, and to fix penalties for breaches of rules and regulations, hereby ordains that, within such Public Parks and Commons, except by and with the consent of the Board: . . .
3. It is forbidden to throw stones, balls or other missiles; to discharge or carry firearms, fire crackers, torpedoes or fire-works; to make fires; to have any intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions, to play games of chance, or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to commit any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any way annoy visitors to said Parks and Commons.

**<u>MICHIGAN</u>**

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 36, §237.
Possession or use of fire-arm by person under influence of liquor or drug–Any person under the influence of intoxicating liquor or any exhilarating or stupefying drug who shall carry, have in

possession or under control, or use in any manner or discharge any fire-arm within this state, shall be guilty of a misdemeanor.

**MINNESOTA**

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858
Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word "gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

**MISSISSIPPI**

1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3.
§ 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and

costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months. § 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described [pistols, knives, etc.], shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors or of the court.

Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources. 1880
Carrying Concealed Weapons, § 2986. It shall not be lawful for any person to sell to any minor or person intoxicated knowing him to a minor or in a state of intoxication, any weapons of the kind or description in the foregoing section described, or any pistol cartridge and on conviction he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any person of the kind or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding section. § 2988. Any student of any university, college, or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the foregoing section described, or any teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to hard labor as above provided.

Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).
“Deadly weapons; carrying of concealed.
Sec. 293. Any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, slungshot, sword, or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and, on conviction, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars, and all costs, or be imprisoned in the county jail not more than ninety days, or both, in the discretion of the court.
Weapon forfeited.
Sec. 294. Upon the conviction of any person under the preceding section, the weapon shown in such case to have been carried concealed, in whole or in part, shall be forfeited to the state, and shall be delivered to the sheriff of Yazoo county, who shall forthwith publicly destroy the same.
The same; not applicable to certain persons.
Sec. 295. Any person indicted or charged for a violation of the last section may show as a defense—

(a) That he was threatened, and had good and sufficient reason to apprehend a serious attack from an enemy, and that he did so apprehend; or

(b) That he was traveling and was not a tramp, or was setting out on a journey, and was not a tramp; or

(c) That he was a peace officer or deputy in the discharge of his duties; or

(d) That he was at the time in the discharge of his duties as a mail carrier; or

(e) That he was at the time engaged in transporting valuables for an express company or bank; or

(f) That he was in lawful pursuit of a felon.

And the burden of proving either of said defenses shall be on the accused.

Dealers to keep record of cartridges and weapons sold.

Sec. 296. Every merchant or dealer or pawnbroker that sells bowie knives, dirk knives, pistols, brass or metallic knuckles, or slungshots, or pistol or rifle cartridges, shall keep a record of all sales of such weapons and cartridges sold, showing the description of the weapon and kind and caliber of cartridges so sold, the name of the purchaser, and the description of weapons and the quantity of cartridges and date of sale. This record to be opened to public inspection at any time to persons desiring to see it. The dealer who violates this section shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than seven dollars and fifty cents nor more than twenty-five dollars.

The same; and cartridges not sold to infant or drunk person.

Sec. 297. It shall not be lawful for any person to sell, give, or lend to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any deadly weapon, or other weapon the carrying of which concealed is prohibited, or pistol cartridge; and, on conviction thereof, he shall be punished by a fine of not less than twenty-five dollars nor more than two hundred dollars, or imprisoned not exceeding ninety days, or both.

The same; father not to suffer infant son to have or carry.

Sec. 298. Any father who shall knowingly suffer or permit any son under the age of sixteen years to have or to own, or to carry concealed, in whole or in part, any weapon the carrying of which concealed is prohibited, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty dollars nor more than two hundred dollars, or may be imprisoned not more than sixty days in the county jail, or both.

The same; pupil in any public school not to have, etc.

Sec. 299. Any student or pupil in any public school of this city, who shall carry into such school any weapon of the kind mentioned or described in section 293, concealed, in whole or in part, or any professor, teacher, or instructor in such school who shall knowingly suffer or permit any such weapon to be carried into such school, concealed, as aforesaid, shall be guilty of a misdemeanor, and, on conviction thereof in the city court, shall be punished as provided in section 293.

The same; exhibiting in rude, angry, or threatening manner, etc.

Sec. 300. If any person, having or carrying any dirk, dirk knife, sword, sword-cane, or any deadly weapon, or other weapon the carrying of which concealed is prohibited, shall, in the presence of three or more persons, exhibit the same in a rude, angry, or threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person so offending, upon conviction thereof, shall be fined in any sum not less than seven dollars and fifty cents nor more than five hundred dollars, or be imprisoned not exceeding ninety days, or both. In prosecutions under this section, it shall not be necessary for the affidavit or

indictment to aver, nor for the city to prove on the trial, that any gun, pistol, or other firearm was charged, loaded, or in condition to be discharged."
Edwin Ruthven Holmes, ed., The Charter and Code of the Ordinances of Yazoo City, Mississippi (Yazoo City, MS: The Council of Yazoo City, 1908), 172-175. Chapter 20—Misdemeanors, §§ 293-300. Undated.

**MISSOURI**

1873 Mo. Laws 328, An Act to Incorporate The Town Of Moberly, art. III, § 1, pt. 15.
To . . . punish . . . any person who shall threaten, quarrel, challenge or fight within said city, or any person who shall be found intoxicated, who shall carry concealed deadly weapons in said city, or any person who shall be found guilty of a misdemeanor, and to define what acts shall constitute a misdemeanor.

MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879).
1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.
If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

J. H Johnston, The Revised Charter and Ordinances of the City of Boonville, Mo. Revised and Collated, A.D.1881 Page 91, Image 91 (1881) available at The Making of Modern Law: Primary Sources.
Offences Affecting the Public Peace § 6. If any person shall carry concealed upon or about his person any pistol, revolver, dirk, dagger, slungshot, knuckles of metal, or other deadly or dangerous weapon, within said city, or shall, in the presence of any one, exhibit such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person while intoxicated, he shall upon conviction thereof be fined not less than five nor more than ninety dollars: Provided, That nothing herein contained shall prevent any police officer, or any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests, from carrying such weapons in the necessary discharge of his duty.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.
If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., Ch. 17, §§ 160-164 in General Ordinances of the Town of Columbia. 1890

"Sec. 160. Any person who shall fire or discharge, or who shall cause the same to be done by any person under his authority or control, any gun, pistol, cannon, anvil, or any device or contrivance, charged with any explosive, shall be deemed guilty of a misdemeanor and on conviction be fined not less than ten dollars for each offense.

Sec. 161. Any person who shall ignite or explode any explosive compound, or suffer the same to be done by any person under his control, or who shall fire, or cause to be fired or exploded, or suffer the same to be done by any person under his control, any fire cracker, or crackers, Roman candles, rockets, torpedoes, squibs, or any other kind of fireworks whatever, shall be deemed guilty of a misdemeanor and on conviction be fined not less than five dollars for each offense.

Sec. 162. Any person who shall be guilty of carrying concealed upon or about his person any pistol, bowie knife, dirk, dagger, slung shot, or other deadly or danger-ous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than one hundred dollars for every such offense.

Sec. 163. Any person who shall go into any church, or place where people have assembled for religious wor-ship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill, or meetings, called under the militia laws of this state, carrying concealed or in sight upon or about his person, any fire arms or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one hundred nor more than one hun-dred and fifty dollars for ever such offense.

Sec. 164. Any person who shall be guilty of exhibit-ing any fire arms, or other deadly or dangerous weapon in a rude, angry, or threatening manner; or who shall carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, shall be deemed guilty of a misdemeanor, and shall upon conviction be fined not less than fifty dollars for every such offense.

Provided, that the three last preceding sections shall not apply to police officers, nor to any officer whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to any posse when lawfully summoned and on duty; nor shall sec-tion 162 apply to persons moving or traveling peaceably through the state."
1890, MO, Ch. 17—Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., §§ 160-164
General Ordinances of the Town of Columbia, in Boone County, Missouri, Revised, Published and Promulgated by Authority of the Board of Trustees of Said Town, in the Year 1890: To Which Are Appended the Provisions of the State Constitution Respecting Municipal Corporations; Also the General and Special Charters of Said Town (Columbia, MO: Statesman Book and Job Office, 1890), 34-35. Chapter 17—Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., §§ 160-164. Passed May 22, 1890.

The Revised Ordinances of the City of Huntsville, Missouri, of 1894. Collated, Revised, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Huntsville, Missouri, Under an Ordinance of the Said City, Entitled: "An Ordinance in Relation to Ordinances, and the Publication Thereof." Approved on the 11th Day of June, 189 Page 58-59, Image 58-59 (1894) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Huntsville, An Ordinance in Relation to Carrying Deadly Weapons, § 1. If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permission to any person to discharge gun, pistol or other firearms under the proper circumstances shown to him. § 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to exercise process or warrants, or to suppress breaches of the peace or to make arrests, nor to persons moving or travelling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

Carrying Deadly Weapons, Discharging Fire-Arms, etc., Ch. 12, Art. 3, §§ 50-52, in The Revised Ordinances of the City of Bloomfield (1898).
"Sec. 50. Carrying Deadly Weapons, etc.—If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place, within this city, where people are assembled for religious worship, or into any school room or place where people are assembled in this city, for educational, or social purposes, or to any election precinct, in this

city on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons, in this city, met for any lawful purpose other than for malitia [sic] drill, or meeting called under the militia laws of this State, having upon or about his person any kind of firearms, bowieknife [sic], dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than two hundred dollars, or by imprisment [sic] in the city calaboose, or city jail not less than five days nor more than six months, or by both such fine and imprisonment.
Sec. 51. Above Section Not to Apply to Certain Officers:—The next proceeding section shall not apply to any police officer in this city, or to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this State, and it shall be a good defense to the charge of carrying any such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.
Sec. 52. Discharging Fire-Arms Prohibited, When.—It shall be unlawful for any person in this city, except he be a police officer of this city or other officer in the discharge of his official duty, to discharge or fire off any gun, pistol or fire-arms of any description within the corporate limits of this city, and every person violating this section, shall, upon conviction, be deemed guilty of a misde-meanor and punished by a fine of not less than five nor more than twenty dollars, or by imprisonment in the city calaboose not exceed-ing twenty days."

A law forbidding weapons in certain places, sales of weapons to minors, etc., Ch. 45—Misdemeanors, § 32, in General Ordinances of the City of Brookfield Linn County, Missouri (1900).
"Sec. 32. Carrying Concealed Weapons.—If any person shall, with-in this city, carry concealed upon or about his person, any deadly or dan-gerous weapon, or shall go into any church or place where people have as-sembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room dur-ing the sitting of court, or into any other public assembly of persons met for any lawful purpose other than military drill, or meeting called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, sling shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon, in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxi-cated or under the influence of intoxicating drinks, or shall directly or indirectly, sell or deliver, loan or barter, to any minor any such weap-on, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than ten nor more than one hundred dollars, or be im-prisoned in the city jail not less than five nor more than thirty days."
Chas. K. Hart, ed., General Ordinances of the City of Brookfield Linn County, Missouri, to Which Are Prefixed a Copy of the Record in the Matter of Changing the City of Brookfield from a Fourth Class to a Third Class City, of the Ordinance Fixing the City Limits, a List of City Officers, and to Which is Added the Ordinance Ordering Publication Thereof (Brookfield, MO: The Gazzette, 1900), 116. Chapter 45—Misdemeanors, § 32. Undated.

Not to Carry Weapons Concealed; Where; nor Sell to Minors, etc., Ch. 43, An Ordinance in Relation to Dangerous and Deadly Weapons, §§ 1-3, in The Revised Ordinances of the City of Pattonsburg, Missouri (1902).
"An Ordinance in Relation to Dangerous and Deadly Weapons.
Be it ordained by the Board of Aldermen of the City of Pattonsburg, as follows:
Sec. 1. Not to Carry Weapons Concealed; Where; nor Sell to Minors.—Any person, who shall, within the corporate limits of the City of Pattonsburg, carry concealed upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the setting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of the state of Missouri, having upon or about his person any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the in-fluence of intoxicating drinks, or shall directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, shall, upon conviction, be fined in any sum not less than twenty-five nor more than one hundred dollars.
Sec. 2. Section One Not to Apply to Whom; Defense.—Section one of this chapter shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapons, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.
Sec. 3. Toy Pistols Not to Be Carried; Where; Penalty.—Any person, who shall, within the corporate limits of said city, be found upon any street or alley, or upon premises not his own, without license from the owners or occupants thereof, having upon or about his person any kind of toy pistol which may be used for the purpose of discharging any missile by force of gun powder, or explosive caps, or exploding percussion caps or powder, shall, upon conviction, be fined in any sum not less than one nor more than one hundred dollars.
Approved April 7th, 1902."
The Pattonsburg Board of Aldermen, eds., The Revised Ordinances of the City of Pattonsburg, Missouri, a City of the Fourth Class: Embracing All the Ordinances of General Application, Together With the Rules and Order of Business Adopted by the Board of Aldermen of Said City (Pattonsburg, MO: Pattonsburg Call Print, 1902), 108-109. Chapter 43—Concealed Weapons, An Ordinance in Relation to Dangerous and Deadly Weapons, §§ 1-3. Approved April 7, 1902.

Chapter 16—Misdemeanors, § 11—Carrying Concealed Weapons, in, Charter and Revised Ordinances of the City of Glasgow, Howard County, Missouri (1903).
"Sec. 11. Carrying concealed weapons.— If any person shall in this city carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school- room or place where the people are assembled for educational, literary or social purposes, or to any election precinct on any elec-tion day, or into any court-room during the sitting of court, or into any other public

assemblage of persons met for any lawful pur-pose other than for militia drill, or meeting called under militia law of this state, having upon or about his person any kind of fire- arms, bowie knife, dirk, dagger, slung-shot or other deadly weap-on, or shall, in the presence of one or more person, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxi-cated, or under the influence of intoxicating drinks, or shall, di-rectly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than one hundred dollars: Provided this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to sup-press breaches of the peace, or to make arrests."
Charter and Revised Ordinances of the City of Glasgow, Howard County, Missouri (Glasgow, MO: Glasgow Missourian Print, 1903), 64-65. Chapter 16—Misdemeanors, § 11—Carrying Concealed Weapons. Approved May 5, 1903.

Laws concerning carrying weapons in certain places, sales of weapons to minors, etc., Chapter 21—Misdemeanors, § 162, in Revised Ordinances of the City of Hamilton, Cauldwell County, Missouri (1903).
"Sec. 162. Any person who shall carry concealed upon or about his person any deadly or dangerous weap-on, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educa-tional, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for malitia [sic] drill, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, sling shot or oth-er deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, di-rectly or indirectly, sell or deliver, loan or barter, to any minor any such weapon without the consent of the par-ent or guardian of such minor, he shall be deemed guilty of a misdemeanor: Provided, however, that this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or to make arrests, nor to persons moving or traveling peaceably through the state. And it shall be a good defense to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property."
S. M. Young, ed., Revised Ordinances of the City of Hamilton, Cauldwell County, Missouri, 1903 (S. L., Hamiltonian Print, 1903), 57-58. Chapter 21—Misdemeanors, § 162. In Force March 9, 1903.

Laws that prohibit carrying concealed weapons, bringing weapons to certain places, and selling weapons to minors, Revised Ordinance No. 16, §§ 44-45, in The Revised Ordinances of the City of Maryville (1903).
"Sec. 44. Carrying Concealed Weapons.—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people are assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purpose, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for

any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not less than ten nor more than one hundred dollars.
Sec. 45. Above Section Not to Apply to Certain Officers.—The next preceding section shall not apply to police officers, or any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property."
The Revised Ordinances of the City of Maryville 1903 to Which Is Prefixed Charter of Cities of the Fourth Class under Revised Statues of Missouri of 1899 and Amendments Thereto (Maryville, MO: Maryville Tribune, 1903), 148-149. Revised Ordinance No. 16, Offenses against Good Order and Public Peace, §§ 44-45. Passed & Approved June 1, 1903.

Ordinances that prohibit carrying concealed weapons, bringing weapons to certain places, and firing weapons, Ch. 23, Art. 1, Ord. No. 2019, §§ 75-76 in Revised and Republished Ordinances of The City of Joplin, Missouri (1903).

"Sec.75. CARRYING CONCEALED WEAPONS.—If any person shall, in the City of Joplin, carry concealed upon or about his person, any deadly or dangerous weapon or shall go into any church or place where people have assembled for religious worship, or into a schocl room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings, called under the militia law of this State, having upon or about his person any kind of fire-arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons exhibit any such weapon, in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon without the consent of parent or guardian of said minor, any such person shall be deemed guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than fifty dollars, nor to exceed two hundred dollars, or by imprisonment in the city prison not less than five days, nor more than six months, or by both such fine and imprisonment; Provided, that this section shall not be so construed as to apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests; nor to persons moving or traveling peacefully through this State, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.

Sec. 76. DISCHARGE OF FIRE-ARMS IN THE CITY.—Any person who shall, in this city, without sufficient or reasonable cause, discharge any revolver, pistol, gun or other fire-arm

shall be deemed guilty of a misdemeanor, and be fined in a sum of not less than five dollars, nor more than fifty dollars for each shot discharged."
1903, Joplin, MO, Ch. 23, Art. 1, Ord. No. 2019, §§ 75-76
Revised and Republished Ordinances of The City of Joplin, Missouri: Revision of 1903 Together with the Provisions of the Constitution of the State of Missouri Affecting Municipal Corporations and their Charters, also Extracts of the Statutes of the State Affecting Cities, Towns and Villages of all Classes (Joplin, MO: Pratt Printing House, 1904), 201. Chapter 23, Misdemeanors and Police Regulations, Article I—Misdemeanors, Ordinance No. 2019—An Ordinance Defining Certain Offenses Against the Peace and Good Order of the City, and Prescribing the Punishment Therefor, §§ 75-76. Approved October 17, 1903.

Deadly Weapons Concealed, Etc., & Shooting Firearms, Ch. 30, §§ 184-185, in Revised Ordinances City of Sarcoxie, Jasper County, MO (1907).
"Sec. 184—Deadly Weapons Concealed, Etc. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meeting called under the militia law of this State, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapons, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction be punished by a fine of not less than fifty [$50.00] dollars nor more than two hundred [$200.00] dolars, or by imprisonment in the city jail not less than five days nor more than six months, or by both such fine and imprisonment. Provided, that this section shall not apply to persons moving or traveling peaceably through this state, nor to persons who have been threatened with great bodily harm or had good reason to carry the same in the necessary defense of themselves, home or property, nor to any police officer, or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests.
Sec. 185—Shooting Firearms. No person in this city shall discharge any gun, pistol or other fire-arms, or explode any detonating material, and any person so offending shall be deemed guilty of a mis-demeanor, but this section shall not apply to any officer in the discharge of his duty nor to the operator or workman in any mine, nor to persons properly using any lawful target gun in any licensed shooting gallery."
Revised Ordinances City of Sarcoxie, Jasper County, MO, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Sarcoxie, Jasper County, Missouri. Revision of 1907 (Sarcoxie, MO: Record Power Job Print, 1907), 46-47. Chapter 30—Misdemeanors, §§ 184-185. Undated.

An Ordinance Concerning Misdemeanors, §§ 14-15, in General Ordinances of the City of New Franklin (1907).

"Sec. 14. If any person shall carry concealed upon or about his person any deadly or dangerous weapon or shall go into any church or place where people are assembled for religious worship or into any school room or place where people are assembled for educational, literary or social purpose or to any election precinct on any election day or into any court room during the sitting of the court or into any other public assemblage of persons met for any lawful purpose, other than for militia drills or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks he shall upon conviction be punished by a fine not less than fifty nor more than two hundred dollars or by imprisonment in the City prison or work house not less than five days nor more than six months or by both such fine and imprisonment.
Sec. 15. The next preceding section shall not apply to police officers nor to any officer or person whose duty it is to execute process or warrants or to suppress breaches of the peace or make arrests nor to persons moving or traveling peaceably through this state and it shall be a good defence to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, home or property."

Carrying Concealed Weapons, No. 36, Art. 6, § 3, in The Charter and Revised Ordinances of the City of Palmyra, Missouri (1908).
"Sec. 3. If any person in this city shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under the militia law of this State, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating, drinks, or shall directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than one hundred and fifty dollars."
Full Text (Subscription Required): The Making of Modern Law
The Charter and Revised Ordinances of the City of Palmyra, Missouri: To Which are Prefixed the Provisions of the State Constitution Affecting Municipal Corporations and Statutory Laws Affecting Cities under Special Charter (Palmyra, MO: Sosey Bros., 1908), 216. No. 36—An Ordinance in Relation to Misdemeanors, Article 6—Offences Against Official Authority, § 3—Carrying Concealed Weapons. Approved July 2, 1908.

A law regulating the carrying of weapons in Slater, MO, Ch. 19, § 231, in Revised Ordinances of the City of Slater, Saline County, Missouri (1908).
"Sec. 231. If any person shall, within the City limits, carry concealed upon or about his person any dangerous or deadly weapon, or shall go into any church or place where people have

assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meeting called under the militia law of this state, having upon or about his person any fire arms, bowie-knife, dirk, dagger, slung shot or other deadly weapon or shall, in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than two hundred dollars. The foregoing provisions of this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, his home or property." Revised Ordinances of the City of Slater, Saline County, Missouri, of 1908: Revised, Printed and Published in Pursuance of an Ordinance Duly Passed by the Board of Aldermen of Said City and Approved by the Mayor of Said City on the 24th Day of August, 1908, Which Ordinance Is Numbered 575 and Entitled, An Ordinance Relating to the Revision of the Ordinances (Slater, MO: Rustler, 1908), 104-105. Chapter 19—Miscellaneous Offenses, § 231. Undated.

Ordinances that prohibit carrying concealed weapons, bringing weapons to certain places, and selling weapons to minors, Ch. 21, Art. 1, §§ 329-330, in, The Revised Ordinances of the City of Bevier, Missouri (1910).
"Sec. 329, Carrying Deadly Weapons, etc.—
If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than five days nor more than six months, or by both such fine and imprisonment. (§ 16, Ord. 109.)
Sec. 330. Above Section Not to Apply to Certain Officers.— The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through the state, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or

had good reason to carry the same in the necessary defense of his person, home or property. (17, Ord. 109.)"
E. Francis, ed., The Revised Ordinances of the City of Bevier, Missouri, of 1903 (No Publication Information), 104-105. Chapter 21—Misdemeanors, Article 1—Offenses Against Public Order and Peace, §§ 329-330. Undated.

A law regulating weapons: carrying concealed or in certain places, brandishing, and sales to minors, Ordinance No. 31, § 10, in Revised Ordinances of the City of Richmond, Missouri (1910).
"If any person shall carry, concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the setting of court, or into any other public assemblage of persons met for lawful purpose, other than for military drill or meetings called under the militia law of this state, having upon or about his person, any kind of fire-arms, bowie knife, dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit such weapon in a rude, angry and threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drink, or shall directly or indirectly loan or barter to any minor, any such weapon without the consent of the parent or guardian of such minor, he shall upon conviction be punished by a fine of not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the city prison not less than five days nor more than six months, or by both such fine and imprisonment."
Revised Ordinances of the City of Richmond, Missouri: 1910-1911 (Richmond, MO: The Conservator Print, 1911), 130-131. Ordinance No. 31—An Ordinance in Relation to Public Peace and Order, § 10. Approved December 21, 1910.

Joplin Code of 1917, Art. 67, § 1201. Weapons; Deadly. 1917
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

**NEVADA**

1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1.
Any person in this State, whether under the influence of liquor or otherwise, who shall, except in necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theater, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the County Jail for a term not less than two nor more than six months, or by a fine not less than one hundred nor more than five hundred dollars, or by both such fine and imprisonment; provided, that no Sheriff, Deputy Sheriff, Marshal, Constable, Deputy Constable or other peace officer shall be held to answer under the provisions of this Act for discharging firearms in the lawful pursuance of his or their duty.

David E. Aily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1076, Image 1084 (1885) available at The Making of Modern Law: Primary Sources.
[An Act to Prohibit the Use of Firearms in Public Places, § 1.Any person in this state, whether under the influence of liquor or otherwise, who shall, except I necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theatre, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the county jail for a term not less than two nor more than six months, or by a fine not less than one hundred nor more than five hundred dollars, or by both such fine and imprisonment: provided that no Sheriff, Deputy Sheriff, Marshal, Constable, Deputy Constable, or other peace officer shall be held to answer under the provisions of this Act for discharging firearms in the lawful pursuance of his or their duty.]

**NEW JERSEY**

An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place
"3. And be it further Enacted by the Authority aforesaid, That no Officer shall beat or abuse any of the Soldiers whilst under Arms on any such Days of Training as aforesaid : But if any Soldier shall, during that Time, use any reproachful or abusive Language towards any of his superior Officers, or shall quarrel himself, or promote any Quarrel amongst his Fellow-Soldiers, or appear in Arms disguised in Liquor, it shall and may be lawful for the Captain or Commanding Officer to disarm such Soldier at the Head of his Company, and to set a Centinel over him during the Time of the Company's being in Arms and no longer, or to fine him in Manner and Form aforesaid, as the said Captain or Commanding Officer in his Discretion shall think proper."
"23. And be it further Enacted by the Authority aforesaid, That no Innholder, or any other Person or Persons whatsoever, without Leave from the Captain or Commanding Officer for the Time being, shall presume to sell any strong Liquor to any of the Persons so listed, in such Days or Times that they are obliged to appear in Arms at the Place of Mustering or Training, or within a Mile thereof, until after they are dismissed for that Day ; and every Person or Persons so selling strong Liquor, contrary to the Directions of this Act shall forfeit the Sum of Three Pounds, to be recovered by any Person that will sue for the same, before any Justice of the Peace ; the one Half to such Person as will prosecute the same to Effect, the other Half to be applied for purchasing the Arms and Ammunitien aforesaid."
1746, NJ, An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 8 (Washington, D.C.: Government Printing Office, 1947), 25-26, 31.

1916 N.J. Laws 275-76, An Act to Prohibit Any Person from Going into the Woods or Fields with a Gun or Other Firearm when Intoxicated, or under the Influence of any Drug or Intoxicating Liquor, ch. 130, §§ 1-2.
1. It shall be unlawful for any person to go into the woods or fields at any time with a gun or firearm when intoxicated or under the influence of any drug or drugs or of intoxicating liquor. 2. Any person violating any of the provisions of this act shall be liable to a penalty of fifty dollars for each offense, to be sued for and recovered in the manner provided and by the persons authorized to sued for and recover penalties. . . . Upon the conviction of any person for violating the provisions of this act, the license to hunt and fish of such person issued to him . . . shall become void, and the justice of the peace, District Court judge, or police magistrate before whom such conviction is had, shall take from the person so convicted the license, mark the same "revoked" and send it to the Board of Fish and Game Commissioners. If such conviction is reversed on appeal the license shall be restored to the defendant. Any license to hunt or fish issued to any person convicted of a violation of this act during the calendar year in which such offense occurred shall be null and void.

**NORTH DAKOTA**

1921 N.D. Laws 173, An Act to Prohibit Intoxicating Liquors and Beverages and Property Intended for Manufacture of Same; Prohibiting the Transportation of Liquor . . . , ch. 97, § 13. Provided, however, that if the evidence in such case convinces the court that the person convicted of transporting intoxicating liquors in violation of this Act, was in charge of and used any wagon, buggy, automobile, water or aircraft, or other vehicle or conveyance not owned by him, or without permission of the owner, or when such vehicle or conveyance so sued was mortgaged property, or if there be in or upon such conveyance so used or upon any person therein any firearms, or guns, he shall be deemed guilty of a felony, and be punished by imprisonment in the penitentiary not less than six months and not more than five years.

**OHIO**

Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886).
"…Or, if any person shall temporarily erect any stand, booth, or other structure for the purpose of exposing for sale, giving, bartering, or otherwise dispose of any spirituous or other intoxicating liquors whatsoever, at or within a distance of one mile from any such parade or encampment, he may be put immediately under guard, and kept at the discretion of the commanding officer, and such commanding officer may turn over such person to any police officer or constable of the city, township or town wherein such duty, parade or drill, encampment or meeting is held, for examination or trial before any court of justice having jurisdiction of the place."
1886, OH, Amendments to Militia Regulations, Senate Bill No. 7, § 1
The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session Begun and Held in the City of Columbus January 4, 1886, vol. 83 (Columbus, OH: Myers Brothers, 1886), 100. Senate Bill no. 7, An Act to Amend Sections 3033, 3034, 3036, 3037, 3038, 3039, 3041, 3042, 3043, 3044, 3045, 3046, 3047, 3048, 3049, 3050, 3051, 3052, 3054, 3055, 3056, 3057, 3058, 3059, 3963, 3064, 3067, 3068, 3069, 3070, 3071, 3074, 3076, 3078, 3079, 3080, 3081, 3082, 3083, 3084, 3085, 3104 and 3105 of the Revised Statutes of Ohio, and to Repeal Sections 3035, 3060, 3061, 3062, 3065 and 3066, § 1, Amending § 3079 of Chapter 4—Uniforms, Drill, and Pay. Passed April 28, 1886.

**OKLAHOMA**

1890 Okla. Laws 495, art. 47
Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.
Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.
Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.
. . .
Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

Ch. 25—Crimes & Punishment, Art. 47—Concealed Weapons, §§ 1-10 in The Statutes of Oklahoma (1890).

"Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

Sec. 6. Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

Sec. 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

Sec. 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

Sec. 10. Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months."

1891, OK, Ch., 25—Crimes & Punishment, Art. 47—Concealed Weapons, §§ 1-10

Will T. Little, L G. Pitman, and R. J. Barker, The Statutes of Oklahoma 1890: Compiled under the Supervision and Direction of Robert Martin, Secretary of the Territory, by Will T. Little, L G. Pitman and R. J. Barker, from the Laws Passed by the That Legislative Assembly of the Territory (Guthrie, OK: The State Capital Printing Co., 1891), 495-496. Chapter 25—Crimes & Punishment, Article 47—Concealed Weapons, §§ 1-10. Undated.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.

Concealed Weapons, § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. §2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided. § 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person. § 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise. §6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less

than thirty days nor more than three months or both, at the discretion of the court. § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article. § 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. § 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise. § 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Leander G Pitman The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 496, Image 512 (Guthrie, 1891) available at The Making of Modern Law: Primary Sources.
Crimes and Punishment. § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

**PENNSYLVANIA**

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777).
"IX. Any officer or private man found drunk when under arms, shall be suspended from doing duty in the battalion, company or troop on that day, and be fined at the discretion of a General or Regimental Court-Martial.
X. Whatever centinel shall be found sleeping or drunk on his post, or shall leave it before he is regularly relieved, shall be fined at the discretion of a Court-Martial."

1777, PA, An Act to regulate the Militia of the Common-Wealth of Pennsylvania, § 9-10
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 11 (Washington, D.C.: Government Printing Office, 1947), 38.

An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.
§ 57 "…and if any non-commissioned officer or private shall, on any occasion of parading the company to which he belongs, appear with his arms and accoutrements in an unfit condition, or be found drunk or shall disobey orders or use any reproachful or abusive language to his officers or any of them ; or shall quarrel himself, or promote any quarrel among his fellow soldiers, he shall be disarmed and put under guard, by order of the commanding officer present, until the company is dismissed, and shall be fined in any sum not exceeding the price of ten day's [sic] labour, nor less than one day's labour.
§ 60 "12th. No company or battalion shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged ; and any person who shall bring any kind of spiritous liquor to such place of training shall forfeit such liquors so brought for the use of the poor belonging to the township where such offender lives."
1780, PA, An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 57 & § 60
Thomas McKean, The Acts of the General Assembly of the Commonwealth of Pennsylvania Carefully Compared with the Originals : And an Appendix Containing the Laws Now in Force, Passed between the 30th Day of September 1775, and the Revolution : Together with the Declaration of Independence, the Constitution of the State of Pennsylvania, and the Articles of Confederation of the United States of America (Philadelphia, PA: Francis Bailey, in Market-Street, 1782), 365-366; 368. An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania: § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule. Passed 20 March, 1780.
See also, The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 11 (Washington, D.C.: Government Printing Office, 1947), 97; 100.

1875 Pa. Laws, no. 52, § 1, AN ACT To prevent the sale of intoxicating liquors, and for the preservation of order at soldiers' encampments or re-unions
"Section. Be it enacted &c., That it shall not be lawful for any person or persons to erect, place or have any booth, stall, tent, carriage, boat, vessel, or any other place whatever, for the purpose of selling, giving, or otherwise disposing of any spirituous, vinous or malt liquors, or cider, or any fermented liquors whatsoever, or any admixtures thereof, or any liquid compounded or composed, in whole or part, of alcohol, or any other intoxicating drink whatever, (except as hereinafter excepted,) within three miles of the place of holding any soldiers' encampment or re-union in this state, during the time of holding such encampment or re-union."

1875, PA, AN ACT To prevent the sale of intoxicating liquors, and for the preservation of order at soldiers' encampments or re-unions
Laws of the General Assembly of the State of Pennsylvania Passed at the Session of 1875 (Harrisburg, PA: B.F. Meyers, State Printer, 1875), 48.

**RHODE ISLAND**

1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636
That if any person or persons shall presume to sport game or play at any manner of game or games or shooting out any gun or shall set tipling & drinking in any tavern alhouse ordinary or vitling house on the first day of the week more than neccesity requireth and upon examination of the fact it shall be judged by any Justice of the Peace and the Person or Persons so offending as aforesaid. Upon conviction before one Justice of Peace Shall by the said Justice of the Peace be sentenced for every the aforesaid offences to set in the stocks three hours or pay five shillings in money for the use of the poor of the town or place where the offence was committed.

An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853).
"It shall be the duty of any mayor, alderman, city marshal, city or town sergeant, constable or police officer, of any city or town, if he shall have information that any ale, wine, rum, or other strong or malt liquors, or any mixed liquors as aforesaid, are kept for sale or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any kind, to search such suspected place, and if such officer shall find upon the premises any ale, wine, rum, or other strong or malt liquors, or any mixed liquors as aforesaid, he shall seize them and apprehend the keeper or keepers of such place, and take them with the liquors and the vessels containing them, so found and seized, forthwith or as soon as may be convenient, before some justice of the peace, or court exercising the jurisdiction of at justice of the peace, of the town where found, and thereupon such officer shall make a written complaint under oath, and subscribed by him, to such justice or court, that ale, wine, rum, or other strong or malt liquors, or mixed liquors, a part of which is ale, wine, rum, or other strong or malt liquors, was found in the possession of such keeper or keepers, in a tent, shanty, hut, or place for selling refreshments, and upon proof that said liquors are either ale, wine, rum, or other strong or malt liquors, or mixed liquors as aforesaid, that they were found in the possession of the accused, in a tent, shanty or other place as aforesaid, for sale, he or they shall be sentenced to imprisonment in the county jail of the same county for twenty days, and the liquor and vessels so seized shall be dealt with, by order of such justice or court, as provided in the ninth section of this act. But from the sentence and order of said justice or court as aforesaid, the defendant may appeal to the Court of Common Pleas next to be holden in the same county after ten days; in the same manner, and upon the same terms and conditions and with the like effect, as prescribed in section 6th of this act. And in case of such appeal, if the final decision shall be against the appellant, sentence as aforesaid shall be passed upon him by the appellate court, and the liquor and vessels seized as aforesaid shall be dealt with as aforesaid."
Full Text: HeinOnline (subscription required)

Acts & Resolves of the General Assembly of the State of Rhode Island and Providence Plantations Passed January, A. D., 1853, Being the Adjournment of the October Session; with the Roll of Members, and the Reports Ordered to Be Published (Providence, RI: Sayles, Miller & Simons, 1853), 238-239. An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10. Passed at the January Session, 1853.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893
Offences Against Public Policy, § 25. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section twenty-three, such person, upon complaint and conviction, in addition to the penalties provided in section twenty-four, shall be subject to a fine of not less than five dollars nor more than twenty-five dollars, and the confiscation of the weapon so found.

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. § 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year. § 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

**SOUTH CAROLINA**

An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).
"Any officer or private who shall be found drunk on guard, or at any other time of duty, if an officer, be cashiered and turned into the ranks, or receive such other punishment as the court shall inflict ; if a non-commissioned officer or private, he shall be confined til sober, and serve ten days longer than he was otherwise liable to."
1782, SC, An Act for the Regulation of the Militia of this State
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 13 (Washington, D.C.: Government Printing Office, 1947),

96. An Act for the Regulation of the Militia of this State (SC, 1782), § 5 Regulations for the government of the militia, Rule 7.

1899 S.C. Acts 97, An Act To Prevent Drunkeness And Shooting Upon The Highway, No. 67, § 1
§ 1. Be it enacted by the General Assembly of the State of South Carolina, That any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors, or while feigning to be under the influence of such liquors, or without just cause or excuse, shall discharge any gun, pistol or other firearms while upon or within fifty yards of any public road, except upon his own premises, shall be guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not more than one hundred dollars or be imprisoned for not more than thirty days.

1900 S.C. Acts 449, An Act to amend an act entitled "An Act to Prevent Drunkenness and Shooting upon the Highway": § 1.
§ 1. . . That any person who shall, without just cause or excuse, or while under the influence, or feigning to be under the influence of intoxicating liquors, engage in any boisterous conduct, or who shall, without just cause or excuse, discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except upon his own premises, shall be guilty of a misdemeanor, and, upon conviction thereof, shall pay a fine of not more than one hundred dollars, or be imprisoned for not more than thirty days.

**TENNESSEE**

1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.
§ 3. Be it enacted, That said mayor and aldermen may, and shall, have power and authority to make any rules and laws regulating the police of said town and the inhabitants thereof, to restrain and punish drinking, gaming, fighting, breaking the sabbath, shooting and carrying guns, and enact penalties and enforce the same, so that they do not conflict or violate the constitution of this State, and are consistent with the laws of this state.

**UTAH**

Utah 1925, Chapter 21
Utah in 1925 passed an act punishing the use of firearms by persons in the pursuit of any "kind of birds or animals" while under the influence of liquor. Joseph P. Chamberlain, "Current Legislation," 11 A.B.A.J., 598 (Sept. 1925).

**VERMONT**

Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852).
"Sec. 15. It shall be the duty of any sheriff, sheriff's deputy, constable, selectman, or grand juror, if he shall have information that any intoxicating liquor is kept or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, except dwelling houses, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any

kind, to search such suspected place without warrant, and if such officer shall find upon the premises any intoxicating liquor, he shall seize and apprehend the keeper or keepers of such place, and take them, with the liquor so found and seized, forthwith, or as soon as conveniently may be, before some justice of the peace of the town in which the same was found ; and thereupon such officer shall make a written complaint under oath, and subscribed by him, to such justice ; and upon proof that such liquor is intoxicating, that the same was found in the possession of the accused, in a tent, shanty, or other place as aforesaid, he or they shall be sentenced to imprisonment, in the county jail of the county where such offence was committed, for thirty days, and the liquor so seized shall be destroyed by order of said justice, as provided in the twelfth section of this act ; and if any person, apprehended under this section and sentenced as aforesaid, shall claim an appeal, before his appeal is allowed, he shall recognize, with good and sufficient sureties, in the sum of one hundred dollars, that he will prosecute his said appeal to effect, and pay all fines and costs, and suffer such penalty as may be awarded against him. And if he is convicted upon such appeal, he shall, in addition to the penalty imposed by such justice, pay a fine of ten dollars to the town where said liquor was seized as aforesaid. And any person resisting an officer in the execution of his duties under this or any other section of this act, shall be liable to the same penalties as are provided by law for resisting a sheriff in the execution of legal process."
1852, VT, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15
The Acts and Resolves Passed by the General Assembly of the State of Vermont at the October Session, 1852 (Montpelier, VT: E. P. Walton & Son, 1852), 25. Acts & Resolves 25, no. 24 – An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15. Approved 23 Nov., 1852.

**VIRGINIA**

1623 Va. Acts 127 Acts of March 5th, 1623
29. That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c.
https://archive.org/details/statutesatlargeb01virg

1631 Va. Acts 173, Acts of February 24th, 1631, Act L
No commander of any plantation, shall either himselfe or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments. (edited for clarity).
https://archive.org/details/statutesatlargeb01virg

1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV
No commander of any plantation, shall either himselfe or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments. (edited for clarity).
https://archive.org/details/statutesatlargeb01virg

1655 Va. Acts 401, Acts of March 10, 1655, Act XII
What persons or persons soever shall, after publication hereof, shoot any guns at drinking (marriages and funerals only excepted) that such person or persons so offending shall forfeit 100 lb. of tobacco to be levied by distress in case of refusal and to be disposed of by the militia in ammunition towards a magazine for the county where the offence shall be committed.

https://archive.org/details/statutesatlargeb01virg/page/402/mode/2up?q=401

**WEST VIRGINIA**

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.
Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. . . .

**WISCONSIN**

Arthur Loomis Sanborn, Supplement to the Revised Statutes of the State of Wisconsin, 1878, Containing the General Laws from 1879 to 1883, with the Revisers' Notes to the Statutes of 1878 and Notes to Cases Construing and Applying These and Similar Statutes by the Supreme Court of Wisconsin and the Courts of Other States Page 848, Image 890 (1883) available at The Making of Modern Law: Primary Sources. 1883.
Offenses Against Lives and Persons of Individuals, § 3. It shall be unlawful for any person in a state of intoxication to go armed with any pistol or revolver. Any person violating the provisions

of this act shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars.

1883 Wis. Sess. Laws 290
Section 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession. Section 2. It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state. Section 3. It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver. Any person violating the provisions of this act, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars ($100).