UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
ISAAC RICHEY,

Plaintiff, 1:23-cv-00344-AJB-DJS

-against-

ANN MARIE T. SULLIVAN, M.D.,
in her Official Capacity,

Defendant.
---------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiff*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**

# TABLE OF CONTENTS

**Page(s)**


TABLE OF AUTHORITIES ............ i

PRELIMINARY STATEMENT ............ 1

STATEMENT OF UNDISPUTED FACTS ............ 3

STANDARD OF REVIEW ............ 5

ARGUMENT ............ 6

POINT I
AS APPLIED TO MHL § 9.39 EMERGENCY ADMISSIONS, MHL § 7.09(j) VIOLATES THE SECOND AMENDMENT ............ 7

A. The State Cannot Satisfy Its Burden of Identifying An Historical Analogue for Disarming a Person Based on a Brief Emergency Retention ............ 7

B. A § 9.39 Emergency Retention Is Not a "Commitment to a Mental Institution" ............ 8

POINT II
AS APPLIED TO PLAINTIFF, MHL § 7.09(j) VIOLATES THE SECOND AMENDMENT.. 12

POINT III
COMMISSIONER SULLIVAN CAN AND MUST EFFECT PLAINTIFF'S RELIEF ............ 15

CONCLUSION ............ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 5

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 5

*Doe I v. Evanchick*,
355 F. Supp. 3d 197 (E.D. Pa. 2019) .......... 8

*Field Day, LLC v. County of Suffolk*,
463 F.3d 167 (2d Cir. 2006) .......... 12

*Gazzola v. Hochul*,
88 F.4th 186 (2d Cir. 2023) .......... 6

*Higbie v. James*,
795 F. Supp. 3d 307 (N.D.N.Y. 2025) .......... 12

*Keyes v. Lynch*,
195 F. Supp. 3d 702 (M.D. Pa. 2016) .......... 14

*Mintz v. Chiumento*,
724 F. Supp. 3d 40 (N.D.N.Y. 2024) .......... 6

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) .......... 6, 7

*Phelps v. Bosco*,
711 F. App'x 63 (2d Cir. 2018) .......... 11

*Richey v. Sullivan*,
No. 1:23-CV-344, 2025 WL 1836492 (N.D.N.Y. July 3, 2025) .......... 6

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
837 F.3d 678 (6th Cir. 2016) .......... 10

*United States v. Bartley*,
9 F.4th 1128 (9th Cir. 2021) .......... 11

*United States v. Giardina*,
861 F.2d 1334 (5th Cir. 1988) .......... 10

*United States v. Hansel*,
474 F.2d 1120 (8th Cir. 1973) ........ 10

*United States v. Hemani*,
146 S. Ct. 1677 (2026)........ Passim

*United States v. Karper*,
847 F. Supp. 2d 350 (N.D.N.Y. 2011)........ 12

*United States v. McIlwain*,
772 F.3d 688 (11th Cir. 2014) ........ 10

*United States v. Midgett*,
198 F.3d 143 (4th Cir. 1999) ........ 11

*United States v. Rahimi*,
602 U.S. 680 (2024) ........ Passim

*United States v. Rehlander*,
666 F.3d 45 (1st Cir. 2012)........ 8, 10, 11

*United States v. Tucker*,
47 F.4th 258 (5th Cir. 2022)........ 10

**Statutes**

18 U.S.C. § 922(g)(3) ........ 12
18 U.S.C. § 922(g)(4) ........ 16
34 U.S.C. § 40912(c)(1)(B)(i)........ 15

**Rules**

Fed. R. Civ. P. 56(a) ........ 5

**Regulations**

14 N.Y.C.R.R. § 543.6........ 16
27 C.F.R. § 478.11 ........ 9

**Other**

*Open Letter to All State Attorneys General*,
2007 WL 9606857 (ATF May 9, 2007) ........ 11

**PRELIMINARY STATEMENT**

This is a narrow, as-applied Second Amendment challenge to Mental Hygiene Law ("MHL") § 7.09(j), brought on two independent grounds. **First**, § 7.09(j) is unconstitutional as applied to short-term MHL § 9.39 emergency admissions: a brief, *ex parte* § 9.39 hold is not a "commitment to a mental institution," and the State can identify no historical tradition of permanently disarming a person on the basis of such a temporary hold. **Second**, § 7.09(j) is unconstitutional as applied to Plaintiff himself: because his § 9.39 admission is not an adjudication that places him within any valid categorical prohibition, nor does the undisputed record justify his disarmament. *See United States v. Rahimi*, 602 U.S. 680 (2024); *United States v. Hemani*, 146 S. Ct. 1677 (2026).

Isaac Richey ("Plaintiff") is a United States Army infantry veteran and resident of Montana. In January 2019, while on active duty at Fort Drum, New York — grieving a dying grandmother, upset by a break-up, and worn down by relentless unit hazing — he agreed to go to Samaritan Medical Center for what he understood would be a few days to "reset." He was admitted under § 9.39 for emergency observation, held for a matter of days, and released without ever being converted to involuntary-commitment status under MHL § 9.27 or § 9.37. He then returned to his infantry unit, was re-armed with rifles, machine guns, and explosives, worked in the armory, lived among the very men who had hazed him — and never misused or threatened anyone with a weapon, including himself. He was honorably discharged in 2020. He has never been arrested, charged, or convicted of anything, and has never been hospitalized for a mental-health reason before or since.

Years later, when Plaintiff tried to buy a shotgun, he failed the background check. New York State treats a § 9.39 emergency admission as an "involuntary commitment" under Article 9

of the MHL, and — as it concedes — the New York State Office of Mental Health ("OMH") transmits records of § 9.39 admissions to the National Instant Criminal Background Check System ("NICS"). That transmittal, and the maintenance of Plaintiff's record in NICS, is the sole reason Plaintiff stands permanently disarmed today. The Office of NICS Appeals ("ONA") then denied his application for a certificate of relief — the only mechanism the State offers to undo the disqualification — without ever interviewing him, examining him, or conducting any evaluation of his present-day mental state, branding him "likely to act in a manner dangerous to public safety" on a closed paper record.

The material facts are undisputed and the State bears the constitutional burden to justify the challenged conduct. Plaintiff respectfully requests that the Court grant summary judgment and enter the prospective declaratory and injunctive relief that remains: an order declaring MHL § 7.09(j) unconstitutional as applied to MHL § 9.39 admissions, unconstitutional as applied to Plaintiff, and directing the Commissioner to cease transmitting, correct, and remove the record of Plaintiff's 2019 § 9.39 admission from NICS.

## STATEMENT OF UNDISPUTED FACTS

The facts material to this motion are set out in Plaintiff's Local Rule 56.1 Statement ("56.1") and the Declaration of Amy L. Bellantoni and its exhibits, and are summarized here.

### Plaintiff's Background

Plaintiff is a twenty-six-year-old married resident of Montana. (56.1 ¶ 1.) He has never been arrested or charged with — much less convicted of — any crime. (56.1 ¶ 2.) He was introduced to firearms as a boy through clay-pigeon shooting, and before enlisting he lawfully purchased and owned an AR-15 for recreational shooting. (56.1 ¶¶ 7, 9.) After graduating high

school in 2017, Plaintiff enlisted in the United States Army, was assigned to the Infantry, and was stationed at Fort Drum, New York, where he regularly used and trained on firearms and weapon systems. (56.1 ¶¶ 8, 10–15.)

**The January 2019 MHL § 9.39 Emergency Admission**

During his first year at Fort Drum, Plaintiff was heavily hazed and bullied. (56.1 ¶ 16.) In January 2019, a confluence of acute stressors converged: his grandmother — who had raised him and was, in every meaningful sense, his mother — was dying of kidney failure; his girlfriend had just ended their relationship; he was still grieving a childhood best friend who had died by suicide shortly before Plaintiff enlisted; and he was being subjected to relentless hazing and bullying by his unit. (56.1 ¶¶ 16–22.) On January 28, 2019, while Plaintiff was talking with his team leader about his sadness, military police performed a welfare check and asked whether he had "any interest in going to Samaritan Hospital." (56.1 ¶ 22.) Plaintiff, who had never experienced anything like this before, thought it "would be a good place to reset" and a chance to get away from the men hazing him. (56.1 ¶¶ 23–24.)

Plaintiff was admitted to Samaritan under MHL § 9.39. (56.1 ¶ 26.) The OMH-474 form was signed by an admitting physician who found "reasonable cause" to retain him for "immediate observation, care and treatment," and the Notice of Status and Rights advised that he had been admitted "as an emergency-status patient … because you are alleged to have mental illness." (56.1 ¶¶ 27–28; Ex. 3.) That same notice confirmed the statutory architecture: during the fifteen-day period a patient "may be released, **converted to involuntary status**, or asked to remain as a voluntary or informal patient." (56.1 ¶ 29; Ex. 3.) (emphasis added). Plaintiff was released without any conversion to involuntary-commitment status under MHL § 9.27 or § 9.37. (56.1 ¶¶ 32–33.)

**Plaintiff's Return to Armed Infantry Service**

Upon discharge from Samaritan, Plaintiff returned to his infantry assignment at Fort Drum with full access to firearms, munitions, and explosives. (56.1 ¶¶ 34–35.) He was, "twenty-four seven," in the company of the same individuals who had bullied him, and at no time — while armed and among them — did he use, threaten, or misuse any weapon. (56.1 ¶¶ 36–37.) He was assigned to the armory, where he helped clean M-4s, handguns, rocket and grenade launchers, SAWs, automatic machine guns, and explosives, and he was never disciplined for any misuse of firearms. (56.1 ¶¶ 38–40.) The Fort Drum Behavioral Health records concluded that Plaintiff "has no psychiatric disease or defect … is mentally sound and able to appreciate any wrongfulness in conduct and to conform conduct to the requirements of the law," and Fort Drum cleared him for deployment. (56.1 ¶¶ 43–44.) Plaintiff received an Honorable Discharge in 2020. (56.1 ¶ 49.) Other than the 2019 Samaritan admission, Plaintiff has never been hospitalized for any mental-health issue. (56.1 ¶ 51.)

**The NICS Denial, the Reporting, and the Certificate-of-Relief Denial**

After his discharge, Plaintiff attempted to purchase a shotgun for bird hunting and self-defense and failed the background check. (56.1 ¶¶ 59–60.) The State concedes that persons admitted under MHL § 9.39 are reported to NICS (56.1 ¶ 30; Answer ¶ 58 [DE 55]), and it treats a § 9.39 admission as an "involuntary commitment," characterizing Plaintiff's Samaritan admission that way in its own written determination. (56.1 ¶ 31; Ex. 5.) Plaintiff remains prohibited from possessing firearms because his § 9.39 admission was reported to, and is maintained in, NICS. (56.1 ¶ 75.)

Plaintiff completed and submitted the certificate-of-relief application the State required. (56.1 ¶¶ 62–63.) The ONA denied it. (56.1 ¶ 64; Answer ¶ 108 [DE 55].) The ONA never asked

that Plaintiff be evaluated by a state-selected psychiatrist, and no one from the ONA or acting on its behalf conducted any evaluation or assessment of Plaintiff's present-day mental state or character; its denial rested on stale, pre-application material and a records-only "investigation" with no present-dangerousness assessment. (56.1 ¶¶ 65–67.)

**Present Circumstances and the Absence of Dangerousness**

Plaintiff does not currently treat with any mental-health professional and takes no psychiatric medication. (56.1 ¶¶ 58, 70–71.) The circumstances that led to the 2019 episode were situational and no longer exist, and Plaintiff has no concern that any such episode would recur. (56.1 ¶¶ 69, 74.) In 2022, Dr. John Shackelford evaluated Plaintiff and found "no indication of excessive anger or tendencies to act out violence against himself or others," concluding that Plaintiff is "stable mentally and completely safe to buy and own firearms." (56.1 ¶¶ 77–79.) Plaintiff presently seeks to possess firearms again — for hunting and for self-defense, including against grizzly bears while hiking in Montana — and he can no longer possess the AR-15 he owned before enlisting. (56.1 ¶¶ 72–73, 76; Ex. 5.)

## STANDARD OF REVIEW

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the material facts are undisputed and the case turns on questions of law, summary judgment is particularly appropriate.

## ARGUMENT

The governing framework for Second Amendment challenges is settled. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022); accord *Rahimi*, 602 U.S. at 691 (the government "bears the burden to justify its regulation"). At the pleading stage, this Court held that Plaintiff is "an ordinary, law-abiding, adult citizen" who is "part of 'the people'" the Amendment protects, and that his "proposed course of conduct, purchasing a firearm through a federal firearm[s] licensee, falls squarely within the scope of the Second Amendment." *Richey v. Sullivan*, No. 1:23-CV-344, 2025 WL 1836492, at *20 (N.D.N.Y. July 3, 2025) (Dkt. 53) ("MTD Decision") (citing *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023)). The burden thus rests on the State to "provide historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation," *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 56 (N.D.N.Y. 2024) — a burden this Court held the State had not met on the pleadings. MTD Decision (Dkt. 53) at 41. Discovery is now closed, and the undisputed record entitles Plaintiff to judgment on two independent grounds.

## POINT I

## AS APPLIED TO MHL § 9.39 EMERGENCY ADMISSIONS, MHL § 7.09(j) VIOLATES THE SECOND AMENDMENT

### A. The State Cannot Satisfy Its Burden of Identifying An Historical Analogue for Disarming a Person Based on a Brief Emergency Retention

The burden immediately shifts, remaining on the State exclusively to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. The tradition the Supreme Court has identified is one of individualized, judicial dangerousness determinations.

Surety laws, "going armed" laws, and the disarmament sustained in *Rahimi* each operated through the judicial process, permitting disarmament only after a court found, following "notice and [a] hearing," that the person "represents a credible threat to the physical safety of another." *Rahimi*, 602 U.S. at 700; *see id.* at 698 (historical regulations "restrict[ed] gun use to mitigate demonstrated threats of physical violence"). The categorical disarmaments our tradition recognizes — of convicted felons and of those adjudicated mentally ill — likewise rest on a completed judicial adjudication.

By contrast, a § 9.39 emergency retention is different in kind: it is entered on a physician's emergency certificate, not a judicial adjudication after notice and hearing, and by statute it "shall not be deemed … an adjudication that the patient is mentally ill." MHL § 9.39(a). Section 7.09(j) nonetheless deems such a patient "committed" — and reports him to NICS as a person prohibited from possessing firearms — on his § 9.39 admission for observation, without any adjudication, hearing, or judicial finding.

That is the automatic, process-less disarmament the Supreme Court held outside our tradition this Term in *Hemani*, striking § 922(g)(3) because it "automatically divest[ed] an individual of his … right to bear arms … without any pre-deprivation process." *Hemani*, 146 S. Ct. at 1692. Just as the drug-user disability in *Hemani* attached the instant a person became an unlawful user, § 7.09(j) fixes a permanent, disqualifying "commitment" the instant a person *alleged* to be mentally ill is admitted for observation and evaluation — the antithesis of a tradition that required judicial process before the deprivation.

The courts to consider the question have recognized the resulting constitutional problem, as this Court observed. "[S]tatutes permitting permanent disarmament following a single temporary involuntary commitment may run afoul of the Second Amendment." MTD Decision (Dkt. 53) at 39 n.8 (citing *Rehlander*, 666 F.3d at 49 (Second Amendment concerns where the interpretation of "commitment" left plaintiffs "permanently deprived of a right to bear arms based solely on procedures suitable for temporary hospitalization under emergency conditions"), and *Doe I v. Evanchick*, 355 F. Supp. 3d 197, 218 (E.D. Pa. 2019) ("a temporary emergency commitment to a mental institution is not sufficient to consider the individual 'mentally ill' for the purposes of the *Heller* mental health exception")). The burden is the State's, and no such analogue exists. Should the State attempt to identify a historical analogue for permanently disarming a person on the basis of a brief emergency retention, Plaintiff will address any purported analogue, and the competing historical evidence, in reply.

**B. A § 9.39 Emergency Retention Is Not a "Commitment to a Mental Institution"**

A § 9.39 admission is not a "commitment to a mental institution" — the predicate that both § 922(g)(4) and MHL § 7.09(j)(1) require. The federal regulation defining the term excludes exactly this situation: "committed to a mental institution" does "not include a person in a mental

institution for observation or a voluntary admission to a mental institution." 27 C.F.R. § 478.11. A § 9.39 admission is, by its terms, an emergency admission "for immediate observation, care[,] and treatment" of a person "alleged to have a mental illness." MHL § 9.39(a); (56.1 ¶¶ 27–28; Ex. 3).

The Legislature's own text confirms that a § 9.39 admission is not a commitment. Even in the most formal case the statute contemplates — where the patient requests a court hearing and a court finds reasonable cause to retain him — the resulting order "shall not be deemed to be an adjudication that the patient is mentally ill, but only a determination that there is reasonable cause to retain the patient." MHL § 9.39(a). A status that even a judicial retention order "shall not be deemed" an adjudication cannot be the "adjudicat[ion]" or "commitment" that § 922(g)(4) requires.

New York's admission forms draw the same line. The Notice of Status and Rights that Plaintiff received states that, during the fifteen-day emergency period, a patient "may be released, converted to involuntary status, or asked to remain as a voluntary or informal patient." (56.1 ¶ 29; Ex. 3.) And the OMH-474 admission form provides that a patient may be "retained beyond 15 days only by completion of an application and two medical examinations as required for admission according to MHL Section 9.27 — Involuntary Admission on Medical Certification." (Ex. 3.)

A § 9.39 admission is thus an emergency *retention* that becomes an involuntary commitment only if it is converted to the separate certification procedures of MHL §§ 9.27 and 9.37 — with their medical certifications, notice, and right to a hearing. Plaintiff's admission was never converted; he was released without conditions. (56.1 ¶¶ 32–33.) That design is deliberate. Section 9.39 admits a person merely "alleged to have a mental illness" for a period of observation and evaluation — a window in which the hospital decides whether to release him, convert him to

involuntary commitment under §§ 9.27 or 9.37, or retain him voluntarily. If a § 9.39 observation admission were itself a "commitment," that evaluation period would cease to exist: the disqualifying "commitment" would attach on the initial allegation, before any evaluation ran its course. The State's reading does not construe New York's scheme; it erases the very safe harbor the Legislature placed between emergency observation and involuntary commitment.

The federal courts of appeals draw the same line, and consistently. The First Circuit has held that an emergency, *ex parte* hospitalization does not effect a "commitment," observing that the case would be "different … if section 922 addressed *ex parte* hospitalizations." *United States v. Rehlander*, 666 F.3d 45, 48–49 (1st Cir. 2012). The Fifth Circuit reversed a § 922(g)(4) conviction on the same ground, holding that a physician's emergency certificate is not an "adjudicat[ion]" because "the record lacks anything that resembles, let alone aspires to, judicial process," and that "the plain text of the statute relieves us of the need to precariously balance the Second Amendment on *ex parte*, often-unreviewable opinions of medical professionals." *United States v. Tucker*, 47 F.4th 258, 260–61 (5th Cir. 2022). The Fifth and Eighth Circuits had long since held that a person "hospitalized for observation" who was not adjudicated mentally ill and was not committed is not a prohibited person. *United States v. Giardina*, 861 F.2d 1334, 1337 (5th Cir. 1988); *United States v. Hansel*, 474 F.2d 1120, 1122–23 (8th Cir. 1973). And the Sixth Circuit, *en banc*, confirmed that § 922(g)(4) "does not use the phrase 'mentally ill,' nor does it attempt to prohibit all currently mentally ill persons from firearm possession," but uses "prior judicial adjudications … as a proxy" for dangerousness. *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 687 (6th Cir. 2016) (en banc).

The decisions on the other side of the line only sharpen it: each involved the full judicial process that a § 9.39 admission lacks. *See United States v. McIlwain*, 772 F.3d 688, 698 (11th Cir.

2014) (a "commitment," not "emergency hospitalization," where the defendant received "a full judicial hearing," "was represented by counsel," and was "found … mentally ill and … a real and present threat of substantial harm"); *United States v. Midgett*, 198 F.3d 143, 146 (4th Cir. 1999) (same); *United States v. Bartley*, 9 F.4th 1128, 1132 (9th Cir. 2021) (a "commitment" where — "unlike the emergency procedure … in *Rehlander*" — the defendant was examined by a psychologist, represented by counsel, and adjudged by a court "not fit to proceed").

The ATF instructs law enforcement to the same effect: a "'commitment' means a formal commitment, not a voluntary stay," and "[e]xcluded are stays for observation only." *Open Letter to All State Attorneys General*, 2007 WL 9606857, at *2 (ATF May 9, 2007).

This Court has already recognized that the question is open in this Circuit. As the Court explained, the Second Circuit in *Phelps v. Bosco* "explicitly left open the question of whether classification of MHL § 9.39 hospitalizations as 'commitments' for NICS reporting purposes is constitutional." MTD Decision (Dkt. 53) at 39 (discussing *Phelps*, 711 F. App'x 63, 65 (2d Cir. 2018) (summary order)). *Phelps* did "not consider whether the state violated any of [the plaintiff's] constitutional rights when it reported his hospitalizations to the FBI or whether concern for these constitutional rights might change [the] interpretation of the word 'commitment,'" and it cited *Rehlander* for the proposition that "recent developments in Second Amendment law should affect the treatment, under federal law, of a 'commitment.'" *Id.* Indeed, that characterization developed in decisions measuring the procedural adequacy of New York's civil-commitment scheme, not its consistency with the Second Amendment, and a label fashioned for that purpose cannot answer the constitutional question that *Bruen* and *Rahimi* now pose. On that open question, New York's own text and the uniform circuit authority establish that Plaintiff's brief § 9.39 emergency retention was never a reportable "commitment." The State concedes that OMH nonetheless transmits § 9.39

admissions to NICS (56.1 ¶ 30; Answer ¶ 58 [DE 55]) and that it treated Plaintiff's admission as an "involuntary commitment" (56.1 ¶ 31) — the misapplication that disarmed him and that the requested relief would redress.

**POINT II**

**AS APPLIED TO PLAINTIFF,
MHL § 7.09(j) VIOLATES THE SECOND AMENDMENT**

An as-applied challenge requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right. *Higbie v. James*, 795 F. Supp. 3d 307, 335 (N.D.N.Y. 2025) (cleaned up) (quoting *United States v. Karper*, 847 F. Supp. 2d 350, 356 (N.D.N.Y. 2011) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174-75 (2d Cir. 2006)) (collecting cases)).

Independently, § 7.09(j) is unconstitutional as applied to Plaintiff. On this record, disarming Plaintiff based on his § 9.39 admission cannot be reconciled with our Nation's tradition of disarming those who are "dangerous." *See Rahimi*, 602 U.S. at 698, 700. This Term, the Supreme Court confirmed how that inquiry runs, holding 18 U.S.C. § 922(g)(3) unconstitutional as applied to an individual where the Government offered no "individualized proof that [his] … use … renders him a danger to himself or others" and did not "claim [he] had done anything with his gun other than possess it in his home." *United States v. Hemani*, 146 S. Ct. 1677, 1685, 1693–94 (2026). On that question — present dangerousness, not diagnosis or a paper label — the undisputed record here is one-sided.

Nor does Plaintiff belong to the narrow class the historical tradition reached. As *Hemani* recounts, the founding-era and nineteenth-century laws invoked for the disarmament of the impaired targeted those whose condition left them "practically incapacitated and incapable of

managing their affairs" — the domain of the guardianship and civil-commitment laws — and otherwise reached only those shown to be dangerous. 146 S. Ct. at 1689–91. Plaintiff is neither. He was admitted for a brief emergency hold and released without conditions and without being "converted to involuntary status" (Ex. 3); he returned to armed infantry duty and, in 2020, to an honorable discharge; he has never been arrested or charged; and in the years since he has lived and worked as an ordinary member of his community. (56.1 ¶¶ 1–2, 4, 26, 32–40, 49.) A person who manages his own affairs, and whom the record affirmatively shows is not dangerous, falls outside every strand of the tradition the State must invoke.

There is no evidence — and there has never been any adjudication — that Plaintiff is dangerous. He has no other psychiatric hospitalization of any kind, before the 2019 episode or in the roughly seven years since. (56.1 ¶ 51.) He has no criminal history: no arrests, no charges, and no convictions. (56.1 ¶ 2.) The contemporaneous military record affirmatively found him sound: the Fort Drum Behavioral Health records concluded that he "has no psychiatric disease or defect … is mentally sound and able to appreciate any wrongfulness in conduct and to conform conduct to the requirements of the law," and Fort Drum cleared him for deployment. (56.1 ¶¶ 43–44.) And the only mental-health professional to evaluate Plaintiff for this purpose reached the same conclusion: Dr. John Shackelford, who evaluated Plaintiff in 2022, found "no indication of excessive anger or tendencies to act out violence against himself or others," and opined that Plaintiff is "stable mentally and completely safe to buy and own firearms." (56.1 ¶¶ 77–79; Ex. 6.) The sole determination of dangerousness anywhere in this record — the ONA's conclusion that Plaintiff is "likely to act in a manner dangerous to public safety" — was reached without ever interviewing or examining him and without any evaluation of his present-day mental state or character, on a stale, records-only review. (56.1 ¶¶ 65–67.)

The most telling evidence comes from the institution best positioned to judge Plaintiff's fitness to be armed. The United States Army returned Plaintiff to his infantry unit and to full access to firearms, munitions, and explosives — including duty in the armory handling every category of weapon — and it did so while placing him among the very men who had bullied him. (56.1 ¶¶ 34–39.) Plaintiff never used, threatened, or misused a weapon; he was never subject to any firearm-related discipline; and he was honorably discharged. (56.1 ¶¶ 37, 40, 49.)

That record forecloses disarmament under *Hemani*, where the Government's categorical bar failed as applied to a man who had done no more than "ke[ep] a firearm only in his home for self-defense, never misuse[d] it …, and never posed a danger to himself or others." 146 S. Ct. at 1693–94.

Plaintiff's record is stronger by a wide margin: he was entrusted with every category of military weapon, among the men who had hazed him, and — on the uncontradicted proof — is affirmatively not dangerous. This is the "illogical contradiction" that this Court referenced in denying dismissal: the incongruity "of being able to possess firearms in his professional capacities but not being able to possess a firearm for protection in his own home." MTD Decision (Dkt. 53) at 39 n.8 (quoting *Keyes v. Lynch*, 195 F. Supp. 3d 702, 722 (M.D. Pa. 2016)). A man the Army trusted with an M-4 and a live armory, among the men who had hazed him, is not a person our tradition has ever treated as too dangerous to keep a single shotgun for self-defense at home. A single, situational episode of acute grief and unit hazing — non-recurring for seven years, followed by armed military service without incident and clean clinical and behavioral-health evaluations (56.1 ¶¶ 43–44, 69, 74, 77–79) — is not the "demonstrated threat[] of physical violence" our tradition requires. *Rahimi*, 602 U.S. at 698.

As applied to Plaintiff, MHL § 7.09(j)'s reporting, maintenance, and failure to correct and remove his § 9.39 admission from NICS cannot be reconciled with the Second Amendment. Plaintiff is entitled to the prospective relief he seeks.

**POINT III**

**COMMISSIONER SULLIVAN CAN AND MUST EFFECT PLAINTIFF'S RELIEF**

The prospective relief Plaintiff seeks runs against the one official empowered to grant it. This Court has already held that "Commissioner Sullivan has a sufficient connection to the maintenance and transmission of OMH records to the NICS database," and rejected as "unavailing" the contention that she "lacks the authority to remedy the . . . ongoing violation." MTD Decision (Dkt. 53) at 12. That connection is statutory: the Mental Hygiene Law provides that "[t]he commissioner . . . shall collect, retain or modify data or records, and shall transmit such data or records . . . for determining whether a person is no longer permitted under federal or state law to possess a firearm." MHL § 7.09(j)(1); *accord* MTD Decision (Dkt. 53) at 12. Commissioner Sullivan is therefore the state official through whom Plaintiff's § 9.39 admission is maintained in and transmitted to NICS, and the only official who can correct and remove it.

Her authority is also a duty. Federal and New York law alike command removal once the disqualifying basis no longer applies. Federal law directs that the State, "on being made aware that the basis under which a record was made available . . . does not apply, or no longer applies, shall, as soon as practicable[,] . . . update, correct, modify, or remove the record from any database that the Federal or State government maintains and makes available to" NICS. 34 U.S.C. § 40912(c)(1)(B)(i). New York's implementing regulation is materially identical, providing that the Office of Mental Health, "on being made aware that the basis under which a record was made available by the Office . . . does not apply or no longer applies, shall, as soon as practicable[,] . . .

update, correct, modify or remove the record." 14 N.Y.C.R.R. § 543.6; *accord* MTD Decision (Dkt. 53) at 12 (quoting § 543.6).

The rulings sought in Points I and II supply precisely that predicate. Once the Court declares that, as applied to § 9.39 emergency admissions, MHL § 7.09(j) violates the Second Amendment, and/or that a § 9.39 emergency admission is not a "commitment" within 18 U.S.C. § 922(g)(4), and/or that, as applied to Plaintiff, MHL § 7.09(j) violates the Second Amendment, the "basis under which [his] record was made available . . . no longer applies," and the Commissioner's obligation to remove it attaches by operation of both statutes.

The injunctions Plaintiff seeks — directing the Commissioner to (i) remove the records of individuals reported to NICS based on § 9.39 admissions and (ii) remove Plaintiff's record from NICS — are thus squarely within her power to provide, and this prospective relief would redress his constitutional injury completely. See MTD Decision (Dkt. 53) at 12.

## CONCLUSION

Plaintiff's motion for summary judgment should be granted in its entirety; MHL § 7.09(j) should be declared to violate the Second Amendment as applied to § 9.39 admissions and as applied to Plaintiff; and an order should issue permanently enjoining Commissioner Sullivan, her officers, agents, employees, and all persons in active concert or participation with her that receive actual notice of same to remove from the NICS database and New York State database (i) the personal identifying records of individuals reported to NICS based on an admission pursuant to MHL § 9.39 and (ii) Plaintiff's personal identifying record, together with such other and further

relief as the Court deems just and equitable.

Dated: August 31, 2026
Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiff*

Amy L. Bellantoni

Amy L. Bellantoni
Bar No. 701018
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com